FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

OCT 20 2026

TAMMY H. DOWNS, CLERK
By: ______ DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

**JANIE MCMASTERS, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF STEPHEN KYLE MCMASTERS, DECEASED** **PLAINTIFF**

**VS.** **NO.** 3:26-cv-294-JM

This case assigned to District Judge Moody
and to Magistrate Judge Kearney

**KEITH MILAM, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS A CHIEF OF POLICE FOR THE CITY OF BAY, ARKANSAS;
TJ BURNS, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS AN ASSISTANT CHIEF OF POLICE FOR THE CITY OF BAY, ARKANSAS;
SARGEANT EDDIE WEEMS, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS A SARGEANT FOR THE CITY OF BAY, ARKANSAS; AND
THE POLICE DEPARTMENT OF THE CITY OF BAY, ARKANSAS** **DEFENDANTS**

## COMPLAINT

Plaintiff Janie McMasters, duly appointed Personal Representative of the Estate of Stephen Kyle McMasters, Deceased, ("Plaintiff") appears and for her complaint on behalf the Estate of Stephen Kyle McMasters, Deceased and all beneficiaries of said Estate against defendant Keith Milam, TJ Burns and Eddie Weems, in their individual and official capacities as ranking police officers for the City of Bay, Arkansas and the Police Department of the City of Bay, Arkansas:

## JURISDICTION AND VENUE

1. This federal action—based on the death of Stephen Kyle McMasters—arises under the United States Constitution, particularly under the Fourth and Fourteenth Amendments, and under law, the Civil Rights Act of 1871, 42 U.S.C. § 1983 and Arkansas state law.

2. This Honorable Court has jurisdiction by virtue of 28 U.S.C. §§ 1331 and 1367.

3. Venue is founded in this Court upon 28 U.S.C. § 1391 as the acts of which Plaintiff complains arose in this District.

## PARTIES

4. At all relevant times, Stephen Kyle McMasters (McMasters) was a United States citizen and was, therefore, entitled to all legal and constitutional rights afforded U.S. citizens. McMasters was 32 years old when he was killed in the City of Bay, Craighead County, Arkansas on October 21, 2023 during a police pursuit involving Christopher Shull (Shull), a Police Officer employed by the City of Bay Police Department (Bay PD).

5. McMasters was the husband of the plaintiff and was the father of three minor children, (KJM, KRM and JKM), the third of which was born after McMasters was killed. Plaintiff and her children, as well as Stephen Kyle McMasters's mother (Rebecca McMasters) and brother (Derek McMasters) are beneficiaries of the Estate.

6. On December 23, 2024, plaintiff was appointed as the personal representative of the Estate of Stephen Kyle McMasters ("the Estate") by the Probate

Court of Craighead County, Arkansas and Letters of Administration were issued. *In the Estate of Stephen Kyle McMasters, Deceased*, 16JPR-23-563. A copy of the Probate Court's Order is attached as Exhibit A.

**7.** On October 21, 2023, the City of Bay, Arkansas was the employer of Keith Milam ("Milam") as a Chief of the Bay PD. Milam was charged with developing and enforcing policies for officers, sergeants, lieutenants, and captains relating to their duties, including policies related to recruitment, hiring and training regarding the use of force, the operation of police vehicles and pursuits using police vehicles.

**8.** On October 21, 2023, the City of Bay, Arkansas was the employer of TJ Burns ("Burns") as an Assistant Chief of the Bay PD. Burns was charged with enforcing policies for officers, sergeants, lieutenants, and captains relating to their duties, including policies related to recruitment, hiring and training regarding the use of force, the operation of police vehicles and pursuits using police vehicles.

**9.** On October 21, 2023, the City of Bay, Arkansas was the employer of Eddie Weems ("Weems") as a Sargeant of the Bay PD. Weems was charged with enforcing policies for officers, sergeants, lieutenants, and captains relating to their duties, including policies related to recruitment, hiring and training regarding the use of force, the operation of police vehicles and pursuits using police vehicles.

**10.** On October 21, 2023, the City of Bay, Arkansas was the employer of Shull as a member of the Bay PD. The Bay PD was charged with developing and enforcing policies for its officers relating to their duties as police officers, including

policies related to use of force, the operation of police vehicles and pursuits using police vehicles.

**11.** At all relevant times, Milam was an individual residing in Craighead County, Arkansas.

**12.** As the Chief of the Bay PD, Milam had a duty to comply the United States Constitution. Specifically, when determining whether to hire a law enforcement officer, Milam had the duty to perform a sufficient investigation of the applicant's qualifications to perform all duties as a law enforcement officer, specially including the applicant's prior experience and performance as a law enforcement officer, and not deliberately disregard relevant information either learned, or which could have been reasonably learned, through such investigation which would indicate that the applicant was not qualified to perform all duties as a law enforcement officer and would likely take actions that would violate the constitutional rights of the individuals with whom the applicant would come into contact, all as evidenced by the applicant's performance and disciplinary history with a prior law enforcement agency.

**13.** Moreover, Milam had an obligation to contact the Arkansas Division of Law Enforcement Standards and Training to inquire as to the facts and reasons a law enforcement officer was terminated from a prior police department, pursuant to Ark. Code Ann. § 12-9-602.

**14.** Milam was the head/chair of the three-member committee/board assembled by Bay PD to assess the application of Shull to become employed as a police officer for Bay PD.

**15.** At all relevant times, Burns was an individual residing in Craighead County, Arkansas.

**16.** As the Assistant Chief of the Bay PD, Burns had a duty to comply the United States Constitution. Specifically, when determining whether to hire a law enforcement officer, Burns had the duty to perform a sufficient investigation of the applicant's qualifications to perform all duties as a law enforcement officer, specifically including the applicant's prior experience and performance as a law enforcement officer, and not deliberately disregard relevant information either learned, or which could have been reasonably learned, through such investigation which would indicate that the applicant was not qualified to perform all duties as a law enforcement officer and would likely take actions that would violate the constitutional rights of the individuals with whom the applicant would come into contact, all as evidenced by the applicant's performance and disciplinary history with a prior law enforcement agency.

**17.** Moreover, Burns had an obligation to contact the Arkansas Division of Law Enforcement Standards and Training to inquire as to the facts and reasons a law enforcement officer was terminated from a prior police department, pursuant to Ark. Code Ann. § 12-9-602.

**18.** Burns was a member of the three-member committee/board assembled by Bay PD to assess the application of Shull to become employed as a police officer for Bay PD.

**19.** At all relevant times, Weems was an individual residing in Craighead County, Arkansas.

**20.** As a Sargeant of the Bay PD, Burns had a duty to comply the United States Constitution. Specifically, when determining whether to hire a law enforcement officer, Weems had the duty to perform a sufficient investigation of the applicant's qualifications to perform all duties as a law enforcement officer, specifically including the applicant's prior experience and performance as a law enforcement officer, and not deliberately disregard relevant information either learned, or which could have been reasonably learned, through such investigation which would indicate that the applicant was not qualified to perform all duties as a law enforcement officer and would likely take actions that would violate the constitutional rights of the individuals with whom the applicant would come into contact, all as evidenced by the applicant's performance and disciplinary history with a prior law enforcement agency.

**21.** Moreover, Weems had an obligation to contact the Arkansas Division of Law Enforcement Standards and Training to inquire as to the facts and reasons a law enforcement officer was terminated from a prior police department, pursuant to Ark. Code Ann. § 12-9-602.

**22.** Weems was a member of the three-member committee/board assembled by Bay PD to assess the application of Shull to become employed as a police officer for Bay PD.

**23.** Bay PD is an agency of the City of Bay, Arkansas, a municipality located in Craighead County, Arkansas.

**24.** Bay PD had the duty to perform adequate background checks on persons applying to work as certified police officers for the Bay PD to prevent the violation of individuals' constitutional rights.

**25.** Bay PD also had the duty to train persons employed as certified police officers with regard to safe and effective pursuit tactics and the proper use of a police vehicle during a pursuit.

## FACTUAL ALLEGATIONS

### A. Shull's employment at Jonesboro Police Department

**26.** Upon information and belief, Shull was hired as a law enforcement officer for the Jonesboro Police Department ("Jonesboro PD") on January 18, 2018.

**27.** Upon information and belief, Shull accumulated thirteen (13) separate reprimands and disciplinaries while employed at the Jonesboro Police Department.

**28.** Many of these reprimands were for disobeying orders and insubordination with the intent to deceive his supervisors.

**29.** Shull also received numerous reprimands for careless and reckless driving, and violations of Jonesboro PD's emergency vehicle operations policy.

**30.** On October 3, 2020, Shull received a reprimand in relation to attempted pursuit in which he "self-dispatched" to an incident well away from his assigned

patrol sector, during which he obtained a top speed of ninety-three miles per hour and driving over 80 miles an hour through the Arkansas State University campus. A copy of the reprimand is attached as Exhibit B.

**31.** On March 15, 2021, Shull received a reprimand arising from an incident that occurred on October 3, 2020. A copy of the reprimand is attached as Exhibit C.

**32.** During the October 3, 2020, incident, Shull engaged in an emergency pursuit of an alleged robbery suspect, even though Jonesboro PD policy did not permit pursuits for robbery calls.

**33.** Per the investigation of the Jonesboro PD, the amount of items allegedly involved in the alleged robbery totaled $30.00.

**34.** During the October 3, 2020 pursuit, Shull committed and was disciplined for multiple violations of the Jonesboro PD pursuit and use of emergency vehicle policies including:

- **a.** Driving over 90 miles per hour in town;
- **b.** Driving over 120 miles per hour through a one lane construction zone;
- **c.** Driving 60 miles an hour into head-on traffic;
- **d.** Driving 66 miles per hour through a red light;
- **e.** Overtaking forward vehicles by passing on the right, including driving on the sidewalk in a populated area with retail establishments and restaurants; and
- **f.** Making high-speed "U-turns" without consideration for the safety of nearby motorists.

**35.** In addition to the above, during the October 3, 2020 pursuit, Shull asked to perform a "precision immobilization technique" or, more commonly, PIT maneuver.

**36.** Upon information and belief, a PIT maneuver is to be performed only by officers that are certified to do so.

**37.** Upon information and belief, Shull was not trained to perform PIT maneuvers.

**38.** Shull knew or should have known that he did not possess the adequate training and certification to perform PIT maneuvers.

**39.** A PIT maneuver was subsequently performed by a member of the Arkansas State Police during the October 3, 2020 pursuit. The robbery suspect was killed as a result of the maneuver.

**40.** In his reprimand, Shull was found to have been operating his police vehicle with a "total disregard for public safety" and was disciplined for violating Jonesboro PD's emergency vehicle policy.

**41.** On January 27, 2022 , Shull received a reprimand arising from a pursuit on January 16, 2022 during which he repeatedly disobeyed the orders of his superior to terminate a pursuit and even – unsuccessfully - tried to enlist the assistance of a fellow officer to continue the pursuit and attempt a "rolling roadblock." *See* Exhibit D;

**42.** Shull's other relevant reprimands include:

a An incident on May 24, 2019 when Shull was disciplined for threatening physical violence and using vulgarity to a minor in the Jonesboro Public Schools. *See* Exhibit E;

b An incident on August 12, 2019 when Shull was disciplined for insubordination and violation of the Jonesboro PD Code of Conduct for failing to obey the orders of a supervisor about the preservation of body cam recordings and engaging in a conspiracy with two other officers to deceive the supervisor about their actions. *See* Exhibit F;

c An incident on January 17, 2020 when Shull was disciplined for being involved in an accident while he was eating in his patrol car while responding to a call when he ran off the road and struck a retaining wall with sufficient force to damage the vehicle's frame, right side wheels and body panels. *See* Exhibit G;

d An incident that occurred on July 14, 2020 when Shull damaged his patrol car when he was backing up while typing on his in-car computer. *See* Exhibit H.

**43.** Shull was finally terminated from Jonesboro PD on May 20, 2022, after being disciplined for violating a social media policy and for lying to supervisors about a video Shull had posted on Instagram of a suspect which Shull had tasered and onto which Shull had dubbed the Metallica song *Ride the Lighting* and on which he had placed the caption "Can't Stop the Flop." *See* Exhibit I.

**44.** Jonesboro PD, as confirmed by the deposition testimony of its Fed. R. Civ. P. 30(b)(6) designee, concluded that Shull made poor decisions while a police officer for Jonesboro PD, that Shull did not meet the minimum standards of a

Jonesboro PD law enforcement officer, and that Shull is not eligible for re-hire with Jonesboro PD.

**45.** Significantly, Jonesboro PD, as confirmed by the deposition testimony of its Fed. R. Civ. P. 30(b)(6) designee, confirmed that all of Shull's supervisors would have known of the termination as well as most, if not all, of Shull's individual disciplinaries.

**46.** Further, Jonesboro PD confirmed that no contact was made by Bay PD, including contact by Milam, Burns and Weems, inquiring as to Shull's performance and disciplinary history at Jonesboro PD.

**47.** Finally, Jonesboro PD confirmed that the majority of Shull's disciplinary history and reprimands were forwarded to the State of Arkansas Office of Professional Standards.

**B. Shull's application to City of Bay Police Department**

**48.** On December 19, 2022, Shull applied to be a patrolman with the Bay PD.

**49.** In his application, Shull noted that the reason why he was no longer employed by Jonesboro PD was that he was "[t]erminated for policy violations" including the social media policy and the Jonesboro PD Code of Conduct. *See* Exhibit J.

**50.** Accordingly, Milam, Burns and Weems had direct knowledge that Shull had violated Jonesboro PD policies.

**51.** Further, as noted above, Jonesboro PD confirmed that the majority of Shull's disciplinary history and reprimands were forwarded to the State of Arkansas Office of Professional Standards.

**52.** In the report to the Commission on Law Enforcement Standards and Training Initial Employment Report, Milam, Burns and Weems affirmed that Shull had been "investigated as to background" and had been interviewed and "found to be suitable for appointment as a law enforcement officer." *See* Exhibit K.

**53.** Ark. Code Ann. § 12-9-602(c)(1) mandates that a subsequent employing police department – such as Bay PD in the case of Shull's application - "contact the [Division of Law Enforcement Standards and Training] to inquire as to the facts and reasons a law enforcement officer became separated from any previous employing agency."

**54.** There is no indication in Shull's personnel file from Bay PD that Milam, Burns or Weems made any contact with the Division of Law Enforcement Standards and Training to learn of Shull's disciplinary history with Jonesboro PD.

**55.** There is, however, an internal memorandum ("the memo" or "memo") in Shull's personnel file signed by Milam in which he wrote: "I completed a background check and found nothing in [Shull's] personal history, family life, and previous employers that would reflect any negativity toward him being hired as a full-time patrolman with this department. [Shull] has previously worked for the Jonesboro Police Department, to which his supervisors spoke highly of Christophers knowledge

and abilities in law enforcement" and concluded the memo with the statement that Shull would be a "great asset to this department." *See* Exhibit L.

**56.** Contrary to Milam's memo, Jonesboro PD confirmed through the deposition testimony of its Fed. R. Civ. P. 30(b)(6) designee that no contact was made by Bay PD, including Milam, inquiring as to Shull's performance and disciplinary history at Jonesboro PD.

**57.** Jonesboro PD also confirmed that there was no communication found in which one of Shull's supervisors had "spoken highly" of Shull's knowledge and abilities in law enforcement, and no communication describing Shull as a "good officer," all in direct contradiction to Milam's memo.

**58.** Jonesboro PD confirmed that had Milam, Burns or Weems inquired regarding Shull's performance at Jonesboro PD, they would have been provided accurate and truthful information.

**59.** Further, Jonesboro PD confirmed that had Milam, Burns or Weems asked for Shull's disciplinary records, these would have been provided upon presentation of a release executed by Shull.

**60.** Milam, Burns and Weems had such a release from Shull expressly authorizing contact with former employers and the release of all records possessed by the former employer. *See* Exhibit M.

**61.** Other than Milam's suspect memo, there is no evidence in Shull's personnel file that Milam, Burns or Weems obtained Shull's disciplinary records from Jonesboro PD or, in fact, conducted any legitimate investigation of Shull's

performance as a police officer; particularly his history of disobeying the orders of his superiors, lying to his superiors and multiple violations of Jonesboro PD's pursuit and use of emergency vehicle policies.

**62.** Despite his history, Shull was hired by the Bay PD on January 11, 2023, provided the authorities of a sworn law enforcement officer and, wholly without any training or supervision, permitted the use of a full-size Dodge Ram pick-up which he used to kill Kyle McMasters while attempting an unauthorized and uncertified PIT maneuver.

**C. Shull's October 21, 2023 PIT maneuver**

**63.** On October 21, 2023, at approximately 11:30 p.m., McMasters was driving a Utility Task Vehicle ("UTV"), commonly referred to as a "side-by-side," on a city street in Bay, Craighead County, Arkansas. The UTV belonged to his mother-in-law and was being used with her permission. He had left his home in Jonesboro and, travelling on farm roads, is believed to have been headed to his brother's house in Bay.

**64.** At the time, driving a UTV on a public roadway subjected the operator to a misdemeanor with penalties limited to a fine of not less than ten dollars nor more than fifty dollars or imprisoned of not more than thirty days. Ark. Code Ann. § 27-21-104.

**65.** As McMasters was operating the UTV, he was observed by Shull who was parked in an unmarked full-size Dodge Ram pick-up truck belonging to the Bay PD.

**66.** On October 21, 2023, at approximately 11:30 p.m., the streets of Bay were practically deserted.

**67.** McMasters was at most subject to a limited misdemeanor citation for traveling on the streets of Bay in the UTV.

**68.** Shull left his parked spot and pursued McMasters at a high rate of speed, driving through residential yards, and rammed the rear of the UTV with the full-size Dodge Ram pick-up four (4) separate times.

**69.** Three of Shull's ramming incidents occurred in the span of thirty-nine (39) seconds.

**70.** On the fourth ramming incident, Shull was operating the full-size Dodge Ram pick-up at sixty-seven (67) mph, as confirmed by the pick-up's dash mounted camera.

**71.** As shown in the dash camera video, Shull was overtaking McMasters's UTV when he intentionally steered the full-size Dodge Ram pick-up truck into the left rear of the UTV. Shull performed a PIT maneuver.

**72.** Upon the impact of the PIT maneuver by Shull's full-size Dodge Ram pick-up truck, the UTV was forced to the right where it exited the roadway and impacted a telephone/utility pole that was sheared off at the ground by the force of the impact.

**73.** McMasters was ejected and, per the Arkansas State Crime Lab, sustained fatal Craniocerebral Injuries, which included:

a. Multiple comminuted skull fractures;

b. "Deep, pulverizing type lacerations" involving the base of the brain and "extensive lacerations" of the inferior right frontal lobe and the left temporal lobe;

c. White matter hemorrhage in both frontal lobes, as well as hemorrhage in both basal ganglia and the thalamic nuclei, as well as multiple punctate hemorrhages in the pons and widespread soft tissue hemorrhage involving the right frontal, temporal, parietal, and occipital scalp and diffuse subarachnoid hemorrhage involving the cerebral hemispheres and the cerebellum; and

d. The basilar skull fracture was associated with widespread terminal blood aspiration, with heavy deposition of blood in the upper airways and both lungs.

**74.** During the pursuit, which culminated in the death of McMasters, Shull's communications over the Bay PD radio band were erratic and revealed that he was unable to report his location and, objectively, was out of control

**75.** After performing the PIT maneuver which killed McMasters, Shull stood over McMasters's body, gun drawn, and was recorded making inconsistent and untrue statements.

**76.** When asked how he felt shortly after McMasters's death, Shull responded that he "felt great."

**77.** On November 1, 2023, Bay PD purportedly cleared Shull of any wrongdoing related to the death of McMasters.

**78.** On November 3, 2023, just two days later, Bay PD terminated Shull's employment.

**<u>COUNT I</u>**

## MILAM'S "DELIBERATE INDIFFERENCE" IN HIRING SHULL

**79.** Plaintiff hereby restates and realleges all preceding paragraphs as if fully set forth again in this paragraph.

**80.** Milam, an agent of the State, was acting under the color of state law between December 19, 2022 and January 11, 2023—the time period between Shull's application to work at Bay PD and date of hiring.

**81.** Shull, an agent of the State, was acting under the color of state law when he pursued McMasters on October 21, 2023.

**82.** Milam's failure to thoroughly review Shull's disciplinary history with Jonesboro PD was done with deliberate indifference to the potential that Shull would act consistently as a Bay PD patrolman, particularly with regard to the reckless operation of police vehicle during a pursuit.

**83.** Per the testimony of Jonesboro PD, there is no record of Milam contacting anyone at Jonesboro PD to discuss Shull's prior employment or the multitude of disciplinaries that Shull received, despite Shull acknowledging that policy violations were why he was terminated from Jonesboro PD.

**84.** Per the testimony of Jonesboro PD, Shull did not meet the minimum standards of a law enforcement officer at Jonesboro PD and is not eligible for re-hiring. This is a direct contradiction to the comments in Milam's memo.

**85.** Nonetheless, Milam stated in his memo that the supervisors at Jonesboro PD spoke highly of Shull.

**86.** There is no indication in Shull's personnel file that Milam requested or obtained any records regarding Shull's disciplinary history from either the Division of Law Enforcement Standards and Training or Jonesboro PD.

**87.** Had Milam reviewed the lengthy catalog of disciplinaries that Shull received while at Jonesboro PD, he would have discovered the numerous policy violations that directly involve Shull's operation of a vehicle.

**88.** Had Milam reviewed the lengthy catalog of disciplinaries that Shull received while at Jonesboro PD, he would have discovered the many comments that Shull engages in careless and reckless driving, with no consideration of the safety of others.

**89.** Had Milam reviewed the lengthy catalog of disciplinaries that Shull received while at Jonesboro PD, he would have discovered the October 3, 2020 incident in which he committed multiple policy and code violations which occurred in a single pursuit, which involved Shull's request to perform a PIT maneuver despite his lack of training or certification and ended with the death of the person Shull was pursuing.

**90.** The Commission on Law Enforcement Standards and Training also warned that "[f]alse swearing is a Class A misdemeanor."

**91.** While Milam's memo is not sworn, it is false.

**92.** In hiring Shull as a patrolman, despite his multiple disciplinaries, Milam disregarded "a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 1360, 179 L. Ed. 2d 417 (2011) (quoting

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 117 S. Ct. 1382 (1997)).

**93.** In hiring Shull as a patrolman, Milam made the decision to put the motorists, including Kyle McMasters at risk of Shull's careless and reckless behavior and use of excessive force, in violation of the Fourth Amendment.

**94.** The Eighth Circuit has characterized a 42 U.S.C. §1983 claim as for deliberate indifference to require the showing that "the hiring decision and the plaintiff's alleged constitutional injury are closely connected—an applicant's background is that causal link." *Morris v. Crawford Cnty.*, 299 F.3d 919, 923 (8th Cir. 2002).

**95.** Here, the "causal link" is the exhaustive list of Shull's reckless driving and insubordination disciplinaries.

**96.** In particular, the October 3, 2020 incident in which Shull committed multiple pursuit policy violations and requested to perform an unsanctioned PIT maneuver that killed the driver, is identical to what happened to McMasters on October 21, 2023— three years later.

**97.** Shull's conduct during the pursuit of McMasters, specifically the repeated ramming of the UTV with a full-size Dodge Ram pick-up, and the performance of a PIT maneuver on the UTV at sixty-seven (67) mph, which directly and proximately resulted in the death of McMasters, constituted unnecessary and objectively unreasonable and excessive force all in violation of McMaster's Fourth Amendment rights.

**98.** Shull's conduct likewise violated McMasters' right to due process as guaranteed by the Fourteenth Amendment.

**99.** Shull's long history of police misconduct demonstrated a substantial risk of future misconduct and a tendency to use excessive force against citizens.

**100.** Milam participated in the decision to hire Shull despite Shull's history and did not require any training to ensure Shull would not be a threat to citizens.

**101.** Milam knew or should have known that hiring Shull would have naturally and probably resulted in harm, but nonetheless, intentionally disregarded and was deliberately indifferent to such risks.

**102.** Those risks were actualized when Shull's actions resulted in the death of Kyle McMasters.

**103.** Through his action of hiring Shull, which led Shull to the violation of Kyle McMasters' constitutional rights as described herein, Milam is liable to Plaintiff in damages pursuant to 42 U.S.C. § 1983, including compensatory damages, costs, attorneys' fees and punitive damages.

## COUNT II

## BURN'S "DELIBERATE INDIFFERENCE" IN HIRING SHULL

**104.** Plaintiff hereby restates and realleges all preceding paragraphs as if fully set forth again in this paragraph.

**105.** Burns, an agent of the State, was acting under the color of state law between December 19, 2022 and January 11, 2023—the time period between Shull's application to work at Bay PD and date of hiring.

**106.** Shull, an agent of the State, was acting under the color of state law when he pursued McMasters on October 21, 2023.

**107.** Burns failure to thoroughly review Shull's disciplinary history with Jonesboro PD was done with deliberate indifference to the potential that Shull would act consistently as a Bay PD patrolman, particularly with regard to the reckless operation of police vehicle during a pursuit.

**108.** Per the testimony of Jonesboro PD, there is no record of Burns contacting anyone at Jonesboro PD to discuss Shull's prior employment or the multitude of disciplinaries that Shull received, despite Shull acknowledging that policy violations were why he was terminated from Jonesboro PD.

**109.** Per the testimony of Jonesboro PD, Shull did not meet the minimum standards of a law enforcement officer at Jonesboro PD and is not eligible for re-hiring.

**110.** There is no indication in Shull's personnel file that Burns requested or obtained any records regarding Shull's disciplinary history from either the Division of Law Enforcement Standards and Training or Jonesboro PD.

**111.** Had Burns reviewed the lengthy catalog of disciplinaries that Shull received while at Jonesboro PD, he would have discovered the numerous policy violations that directly involve Shull's operation of a vehicle.

**112.** Had Burns reviewed the lengthy catalog of disciplinaries that Shull received while at Jonesboro PD, he would have discovered the many comments that

Shull engages in careless and reckless driving, with no consideration of the safety of others.

**113.** Had Burns reviewed the lengthy catalog of disciplinaries that Shull received while at Jonesboro PD, he would have discovered the October 3, 2020 incident in which he committed multiple policy and code violations which occurred in a single pursuit. which involved Shull's request to perform a PIT maneuver despite his lack of training or certification and ended with the death of the person Shull was pursuing.

**114.** In participating in the hiring of Shull as a patrolman, despite his multiple disciplinaries, Burns disregarded "a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 1360, 179 L. Ed. 2d 417 (2011) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 117 S. Ct. 1382 (1997)).

**115.** In participating in the hiring of Shull as a patrolman, Burns made the decision to put the motorists, including Kyle McMasters at risk of Shull's careless and reckless behavior and use of excessive force, in violation of the Fourth Amendment.

**116.** The Eighth Circuit has characterized a 42 U.S.C. §1983 claim as for deliberate indifference to require the showing that "the hiring decision and the plaintiff's alleged constitutional injury are closely connected—an applicant's background is that causal link." *Morris v. Crawford Cnty.*, 299 F.3d 919, 923 (8th Cir. 2002).

**117.** Here, the "causal link" is the exhaustive list of Shull's reckless driving and insubordination disciplinaries.

**118.** In particular, the October 3, 2020 incident in which Shull committed multiple pursuit policy violations and requested to perform an unsanctioned PIT maneuver that killed the driver, is identical to what happened to McMasters on October 21, 2023—three years later.

**119.** Shull's conduct during the pursuit of McMasters, specifically the repeated ramming of the UTV with a full-size Dodge Ram pick-up, and the performance of a PIT maneuver on the UTV at sixty-seven (67) mph, which directly and proximately resulted in the death of McMasters, constituted unnecessary and objectively unreasonable and excessive force all in violation of McMaster's Fourth Amendment rights.

**120.** Shull's conduct likewise violated McMasters' right to due process as guaranteed by the Fourteenth Amendment.

**121.** Shull's long history of police misconduct demonstrated a substantial risk of future misconduct and a tendency to use excessive force against citizens.

**122.** In participating in the hiring of Shull as a patrolman despite Shull's history and not requiring any training, Burns failed to take steps to ensure that Shull would not be a threat to citizens.

**123.** Burns knew or should have known that hiring Shull would have naturally and probably resulted in harm, but nonetheless, intentionally disregarded and was deliberately indifferent to such risks.

**124.** Those risks were actualized when Shull's actions resulted in the death of Kyle McMasters.

**125.** Through his action in participating in the hiring of Shull, which led Shull to the violation of Kyle McMasters' constitutional rights as described herein, Burns is liable to Plaintiff in damages pursuant to 42 U.S.C. § 1983, including compensatory damages, costs, attorneys' fees and punitive damages.

**COUNT III**

**WEEMS' "DELIBERATE INDIFFERENCE" IN HIRING SHULL**

**126.** Plaintiff hereby restates and realleges all preceding paragraphs as if fully set forth again in this paragraph.

**127.** Weems, an agent of the State, was acting under the color of state law between December 19, 2022 and January 11, 2023—the time period between Shull's application to work at Bay PD and date of hiring.

**128.** Shull, an agent of the State, was acting under the color of state law when he pursued McMasters on October 21, 2023.

**129.** Weems failure to thoroughly review Shull's disciplinary history with Jonesboro PD was done with deliberate indifference to the potential that Shull would act consistently as a Bay PD patrolman, particularly with regard to the reckless operation of police vehicle during a pursuit.

**130.** Per the testimony of Jonesboro PD, there is no record of Weems contacting anyone at Jonesboro PD to discuss Shull's prior employment or the

multitude of disciplinaries that Shull received, despite Shull acknowledging that policy violations were why he was terminated from Jonesboro PD.

**131.** Per the testimony of Jonesboro PD, Shull did not meet the minimum standards of a law enforcement officer at Jonesboro PD and is not eligible for re-hiring.

**132.** There is no indication in Shull's personnel file that Weems requested or obtained any records regarding Shull's disciplinary history from either the Division of Law Enforcement Standards and Training or Jonesboro PD.

**133.** Had Weems reviewed the lengthy catalog of disciplinaries that Shull received while at Jonesboro PD, he would have discovered the numerous policy violations that directly involve Shull's operation of a vehicle.

**134.** Had Weems reviewed the lengthy catalog of disciplinaries that Shull received while at Jonesboro PD, he would have discovered the many comments that Shull engages in careless and reckless driving, with no consideration of the safety of others.

**135.** Had Weems reviewed the lengthy catalog of disciplinaries that Shull received while at Jonesboro PD, he would have discovered the October 3, 2020 incident in which he committed multiple policy and code violations which occurred in a single pursuit. which involved Shull's request to perform a PIT maneuver despite his lack of training or certification and ended with the death of the person Shull was pursuing.

**136.** In participating in the hiring of Shull as a patrolman, despite his multiple disciplinaries, Weems disregarded "a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 1360, 179 L. Ed. 2d 417 (2011) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 117 S. Ct. 1382 (1997)).

**137.** In participating in the hiring of Shull as a patrolman, Weems made the decision to put the motorists, including Kyle McMasters at risk of Shull's careless and reckless behavior and use of excessive force, in violation of the Fourth Amendment.

**138.** The Eighth Circuit has characterized a 42 U.S.C. §1983 claim as for deliberate indifference to require the showing that "the hiring decision and the plaintiff's alleged constitutional injury are closely connected—an applicant's background is that causal link." *Morris v. Crawford Cnty.*, 299 F.3d 919, 923 (8th Cir. 2002).

**139.** Here, the "causal link" is the exhaustive list of Shull's reckless driving and insubordination disciplinaries.

**140.** In particular, the October 3, 2020 incident in which Shull committed multiple pursuit policy violations and requested to perform an unsanctioned PIT maneuver that killed the driver, is identical to what happened to McMasters on October 21, 2023—three years later.

**141.** Shull's conduct during the pursuit of McMasters, specifically the repeated ramming of the UTV with a full-size Dodge Ram pick-up, and the performance of a PIT maneuver on the UTV at sixty-seven (67) mph, which directly

and proximately resulted in the death of McMasters, constituted unnecessary and objectively unreasonable and excessive force all in violation of McMaster's Fourth Amendment rights.

**142.** Shull's conduct likewise violated McMasters' right to due process as guaranteed by the Fourteenth Amendment.

**143.** Shull's long history of police misconduct demonstrated a substantial risk of future misconduct and a tendency to use excessive force against citizens.

**144.** In participating in the hiring of Shull as a patrolman despite Shull's history and not requiring any training, Weems failed to take steps to ensure that Shull would not be a threat to citizens.

**145.** Weems knew or should have known that hiring Shull would have naturally and probably resulted in harm, but nonetheless, intentionally disregarded and was deliberately indifferent to such risks.

**146.** Those risks were actualized when Shull's actions resulted in the death of Kyle McMasters.

**147.** Through his action in participating in the hiring of Shull, which led Shull to the violation of Kyle McMasters' constitutional rights as described herein, Weems is liable to Plaintiff in damages pursuant to 42 U.S.C. § 1983, including compensatory damages, costs, attorneys' fees and punitive damages.

**148.** Plaintiff demands a trial by jury.

**149.** Plaintiff also seeks all other just and equitable relief which this Court finds that she is entitled.

## COUNT IV

## CITY OF BAY PD'S FAILURE TO PERFORM ADEQUATE BACKGROUND CHECKS OF APPLICANTS AND FAILURE TO TRAIN ITS OFFICERS

**150.** Plaintiff hereby restates and realleges all preceding paragraphs as if fully set forth again in this paragraph.

**151.** Upon information and belief, and consistent with its failures to perform an adequate background check of Shull as demonstrated in the preceding paragraphs, Bay PD established a custom or practice, which was exhibited over time, to not perform adequate background checks on persons applying to work as certified police officers for the Bay PD to prevent the violation of individuals' constitutional rights, such that the actions of Bay PD amounts to deliberate indifference.

**152.** Upon information and belief, and consistent with its failures to train Shull regarding when to engage in pursuits and the proper use of a police vehicle during a pursuit, Bay PD established a custom or practice, which was exhibited over time, to not perform adequate training to police officers for the Bay PD to prevent the violation of individuals' constitutional rights such that the actions of Bay PD amounts to deliberate indifference.

**153.** Bay PD's failure as alleged above ultimately violated McMasters' right as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

**154.** Bay PD is liable to plaintiff in damages pursuant to 42 U.S.C. § 1983, including compensatory damages, costs, attorneys' fees and punitive damages.

**155.** Plaintiff demands a trial by jury.

**156.** Plaintiff also seeks all other just and equitable relief which this Court finds that she is entitled.

WHEREFORE, PREMISES CONSIDERED, plaintiff Janie McMaster, duly appointed Personal Representative of the Estate of Stephen Kyle McMaster, Deceased, prays for judgment in an amount to fairly and fully compensate for the damages alleged herein; and further prays for any and all other relief to which she may be entitled including an award of punitive damages, attorneys' fees and costs.

WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Ave.
Suite 2300
Little Rock, Arkansas 72201
Phone: (501) 371-0808
Email: jhenry@wlj.com
jsallings@wlj.com
kwilson@wlj.com

By: ______________________________
Judy Simmons Henry (84069)
Jerry J. Sallings (84134)
Kyle R. Wilson (89118)

*Attorneys for Plaintiff Janie McMasters, Individually and as Personal Representative of the Estate of Stephen Kyle McMasters*

AND

Jeannette A. Robertson (84131)
ROBERTSON LAW FIRM
408 W. Jefferson, Suite A
Jonesboro, Arkansas 72401
Phone: (870) 932-6606
Email: rlf@robertsonlawfirm.biz

*Attorneys for Plaintiff Janie McMasters, Individually and as Personal Representative of the Estate of Stephen Kyle McMasters*

ELECTRONICALLY FILED
Craighead County Circuit Court in Jonesboro - Probate Division
Mary Dawn Marshall, Craighead County Clerk
2024-Dec-23 16:36:31
16JPR-23-563
C02D04 : 1 Page

**IN THE CIRCUIT COURT OF CRAIGHEAD COUNTY, ARKANSAS**
**PROBATE DIVISION**

**IN THE ESTATE OF STEPHEN KYLE MCMASTERS CASE NO. 16JPR-23-563**
**deceased**

**ORDER FOR APPOINTMENT OF SPECIAL REPRESENTATIVE**

On the 23rd day of December, 2024, came on for consideration the Petition for Appointment of Special Representative, filed by Janie McMasters, surviving spouse and personal representative of the estate of the deceased, and after consideration of the facts, the law and representations by counsel for the estate, Jeannette A. Robertson, with Janie McMasters on her own behalf and that of her three minor children of the marriage, having signed a waiver on the petition and hearing the Court finds and orders:

1. That the verified petition filed with this Court confirms that the Estate of Stephen Kyle McMasters requires the appointment of a Special Representative to pursue the deceased's claims and that of the statutory beneficiaries in a wrongful death action and other claims related to the passing of Stephen Kyle McMasters.
2. That the petitioner is an appropriate person to be appointed as the Special Representative to investigate, file and pursue any litigation on behalf of the estate of the deceased, Stephen Kyle McMasters, as it relates to her position as the surviving spouse and mother of the three minor children of the deceased, in a wrongful death action relating to her husband Stephen Kyle McMasters and on behalf of the Estate of Stephen Kyle McMasters and any statutory beneficiaries.
3. That this Court hereby appoints Janie McMasters as Special Representative to investigate, file and pursue litigation on behalf of the Estate and heirs of Stephen Kyle McMasters and all other associated legal duties with regards to any related litigation.
4. That this Court hereby authorizes the Special Representative to contract with any professional for services necessary to pursue any legal actions deemed appropriate by her investigation. Further, this Court hereby authorizes the Special Representative to assess any costs or fees incurred in pursuit of any such legal action to the cost of the action, with reimbursement from the estate and/or any settlement or award issued in any legal actions taken by her on behalf of the Estate of Stephen Kyle McMasters and the statutory heirs pursuant to state law.

IT IS SO ORDERED.

Keith L. Chrestman, Circuit Judge
Date: 23 December 2024

EXHIBIT
tabbies
A

COPY

# JONESBORO POLICE DEPARTMENT

## Performance Notice

To: Ptl. Christipher Shull  Badge Number 1354

You are hereby: ☐ Counseled ☐ Admonished ☒ Reprimanded

The narrative below explains the reason and/or reasons for this action.

On 9-21-2020 at approximately 2140 you self dispatched to a shots fired call at 318 Gordon (area 6) when you were assigned to area 4. Two units had already been dispatched to handle the call at 2137. You responded code 3 from near the intersection of Phillips and Redwolf and drove north down Redwold Blvd. in excess of 90 miles per hour. Your incar camera showed your speed at 93 MPH. When you drove down Johnson through the ASU campus you were in excess of 80 MPH. Your incar camera showed your top speed at 93MPH near Johnson and Howard. At 2145 officers advised to redirect the net and you would not be on scene until 2147.

The reckless manor in which you opperated your police car inroute to a call your were not dispatched to placed unnecessary danger on citizens of Jonesboro and yourself. This is in violation of policy 502.01 Emergency Vehicle Operations section IV. Emergency Driving Procedures - General (Non-Pursuit Situations) [7.17]
A. The Jonesboro Police Department's primary concern in emergency driving situations is the protection of the lives and safety of all citizens and officers. During emergency driving situations, officers will operate their vehicles with extreme caution and in compliance with A.C.A. § 27-37-202, which requires that the emergency light bar and siren be activated on authorized emergency vehicles when exceeding the posted speed limit. Driving under emergency conditions does not relieve the officer from the duty to drive with due regard for the safety of all persons, nor will these provisions protect the driver from the consequences of his disregard for the safety of others.
Y

You will receive retraining on policy 502.01 Emergency Vehicle Operations and you will review the above video with a supervisor.

A copy of this reprimand will be fowarded to the Office of Profesional Standards.

From: [signature] 291  Received by: [signature] 1354  Date: 10-6-2020
Signature of Supervisor  Signature of receiving Officer

IA Performance Notice_JPD213  F:\Police\Police Microsoft Doc Templates\Administration Forms

EXHIBIT
B

The City of JONESBORO POLICE DEPARTMENT

## 502.01 Emergency Vehicle Operations

Effective: 7/17/2018 | Reviewed: 7/17/2018 | Authority: RE
ALEAP: 7.17, 7.22

I. **Policy**

In order to apprehend violators of the law and to offer adequate assistance and protection to the citizens of Jonesboro, the Department recognizes the necessity to respond under emergencies as rapidly as possible. It is further recognized that discretion is necessary when making an emergency response and that the importance of the officer arriving safely at the scene is of primary concern. Indiscriminate driving habits can only serve to jeopardize life and property.

II. **Legal Implications**

A.C.A. § 27-51-202 authorizes emergency vehicles responding to emergency calls, with activated emergency lights and audible siren, to exceed the posted speed limit, but it shall be the officer's duty not to create through his or her conduct any greater risk to public safety.
Officers should carefully review the laws and Departmental directives, which apply to the operation of authorized emergency vehicles, to ensure that they operate within the established boundaries.

III. **Definitions**

Code Three – This designation is used to describe the operation of a vehicle while the emergency lights and siren are activated.
Code Two – This designation is used to describe the normal operation a vehicle without the use of emergency lights or siren, when responding to a call for service immediately.
Code One – This designation is used to describe the normal operation of a vehicle without the use of emergency lights or siren when responding to a call for service that would allow for temporary delays if necessary.

IV. **Emergency Driving Procedures - General (Non-Pursuit Situations) [7.17]**

A. The Jonesboro Police Department's primary concern in emergency driving situations is the protection of the lives and safety of all citizens and officers. During emergency driving situations, officers will operate their vehicles with extreme caution and in compliance with A.C.A. § 27-37-202, which requires that the emergency light bar and siren be activated on authorized emergency vehicles when exceeding the posted speed limit. Driving under emergency conditions does not relieve the officer from the duty to drive with due regard for the safety of all persons, nor will these provisions protect the driver from the consequences of his disregard for the safety of others.

B. The decision to drive under emergency conditions will be discretionary with each individual officer, based on the following considerations:

1. When deciding to initiate or continue driving under emergency conditions, officers shall consider such factors as traffic volume, time of day, and potential hazard or liability to themselves and the public.
2. Calls will be designated through the CAD system as priority levels "Low", "Medium", and "High".
3. Officers shall have sufficient information to justify the decision to drive under emergency conditions.
4. Officers responding to an "officer needs assistance" type call must bear in mind that even though a rapid response is important, they must arrive at the scene safely in order to be of assistance.
5. Officers who are operating in emergency status should not operate the emergency flashers, as operation of emergency flashers will make the turn signals inoperative.
6. Officers shall not implement an emergency response to those calls believed to be "routine" or non-emergency in nature.

C. Jonesboro Police Department unmarked vehicles shall not be routinely used for traffic enforcement. This does not prohibit unmarked vehicles from stopping violators when encountered.

V. Code Three [7.17]

A. Code three emergency responses shall be made only when the call involves a life-threatening situation or a violent crime in progress. These calls will be designated through the CAD system as priority level "High". These calls will include, but will not be limited to the following:

1. Accidental shooting;
2. Physical assault in progress;
3. Disturbance involving weapons;
4. Robbery in progress;
5. Aggravated residential burglary in progress (residence occupied);
6. Kidnapping in progress;
7. Officer's emergency;
8. Other calls types as designated by the shift supervisor.

B. Officers, upon deciding to make an emergency response to any situation, will immediately notify the dispatcher of their decision.

1. All officers, when making an emergency response, will notify the dispatcher of such by using the term "Code Three". This will indicate that the officer will be employing emergency equipment (emergency blue lights and siren).
2. Patrol Supervisors shall override the officer's decision to make an emergency (Code Three) response if, in their judgment, it is not warranted or cannot be done safely. The supervisor of the officer making an emergency response will normally be responsible for making this determination.

C. No officer shall operate a police vehicle in emergency (Code Three) status if any passengers other than another police officer or a person who has signed a release or waiver of liability occupy the police vehicle.

D. Police vehicles without emergency lights and sirens will not make emergency (Code Three) responses.

VI. Code Two [7.17]

A. This mode of operation may be used when responding to urgent calls. These include situations in which there is reason to believe the immediate response of a police officer will prevent a situation from worsening, or there is the reasonable possibility that the suspect can be apprehended. Examples of Code II calls include, but are not limited to:

1. Non-violent felonies in progress
2. Disorderly conduct involving violence
3. Assault in Progress
4. Fleeing Shoplifter

B. When operating Code II, officers SHALL obey all traffic laws and regulations.

1. If it becomes necessary, officers may temporarily activate their lights or the air horn to pass through a congested traffic area.
2. Officers will at all times use due regard for the safety of motorists, pedestrians, and property.

VII. Code One (Non-Emergency) Operation of Departmental Vehicles [7.17]

A. Department employees will comply with all city ordinances and state laws when operating vehicles owned, rented, leased or seized by the City, when not engaged in an emergency response in a properly equipped vehicle.

B. Officers will use seat belts at all times when operating any city vehicle. [7.22]

C. Inspection prior to Commencement of Duties

1. All pool vehicles will be inspected for damage or missing equipment prior to the commencement of patrol duties. (After the vehicle is in service, the operating officer shall be responsible for any damage or missing equipment.)
2. Officers will also inspect the rear seat area for contraband or evidence. (Officers shall inspect the rear seat area after transporting every prisoner.)
3. Officers should also ensure that they have a sufficient amount of fuel and ensure that the spare tire is in its proper location and secured to avoid damage to radio or other equipment. When a police vehicle has a flat tire at any time, the assigned officer will have the tire repaired/replaced, after approval of a supervisor and notification of the repair is made to the service division.

D. Careless, abusive, negligent or reckless handling of any vehicle by any employee shall result in disciplinary action.

Last Reviewed: 07/17/18

PS-21-016

# JONESBORO POLICE DEPARTMENT

COPY

## Performance Notice

To: Ptl. Christopher Shull Badge Number 1354

You are hereby: ☐ Counseled ☐ Admonished ☒ Reprimanded

The narrative below explains the reason and/or reasons for this action.

On 10.03.2020, you were involed in a persuit that did not conform to department policy. During the pursuit you drove recklessly putting the public in danger as well as yourself.

You have been reprimanded on three pervious occasions during 2020. First, on January 15th you violated policy 502.01 Emergency Vehicle Operations by Wrecking your police care causing major damage by running off the road while reaching for food. Second, on July 14th you violated policy 322.04 Vehicle Use by backing over a pole in the Police Station parking lot while typing on your computer causing damage to the pole and trunk of the car. Third, on September 21st you were found in violation of policy 502.01 Emergency Vehicle Operations. While conducting video reviews you were found to be driving recklessly while responded to a call for service where other officers were on scene. Your in-car camera showed you driving 93 miles per hour in a residential area.

Capt. McDaniel conducted a thorough investigation and found that during the persuit on 10.03.20 you violated policy 502.01 Emergency Vehicle Operations by passing on the right side at Parker and Culberhouse, Drove 66MPH through a red light, you then drove 60MPH into head on traffic while driving down parker road. You also asked on the radio for permission to P.I.T. the fleeing vehcile do to the reckless manor of their driving while you followed their everymove in an attmept to keep up. While North on Caraway road you attempted to over take the vehicle in some type of one vehicle road block while in excess of 40 miles per hour. Then at the Caraway and Phillips intersection you performed a highspeed U-turn without due reguard for other motorest. At the intersection of Phillips and Redwolf you once again passed on the right this time driving on the sidewalk to avoid other vehicles. Once on the interstate you were driving 95MPH in a one lane construction zone passing cars who were forced to pull off on a steap sholder. When State Police Joined the persuit you drove 85MPH on the sholder of the interstate in a construction zone to allow him to pass.

These facts show that you operated you Police vehicle with a total disreguard for public safety as well as a disreguard for you personal well being. By your own comments asking to P.I.T. the fleeing vehicle you acknowledged that the persuit had become extreamly dangerous.

Policy 502.01 Emergency Vehicle Operatons clearly states that The following policy and procedures shall be in effect for members of the Jonesboro Police Department and their handling of vehicle pursuits. The decision to pursue a motor vehicle is among the most critical made by law enforcement officers. A police vehicle can potentially be a deadly weapon during a high speed pursuit and such pursuit is justified only when the necessity of apprehension outweighs the degree of danger created by the pursuit.



EXHIBIT

C

15-21-016

The Jonesboro Police Department desires the apprehension of suspects and officers are not automatically prohibited from pursuing all suspects. However, officers shall carefully weigh the seriousness of the offense with the hazards of the pursuit.

Below are specific sections of the policy you violated as described above.

COPY

II.Policy [7.15A]

A.The safety of officers and citizens is the paramount concern of the Jonesboro Police Department with regard to vehicle pursuits. The operation of emergency vehicles is governed by A.C.A. § 27-51-202, which authorizes emergency vehicles responding to emergency calls, with activated emergency lights and audible siren, to exceed the posted speed limit, but it shall be the officer's duty not to create through his or her conduct any greater risk to public safety than that involved in every pursuit.

B.The initial decision to pursue rests with the individual officer in accordance with this directive. Officers will continually question whether the seriousness of the violation reasonably warrants the initiation or continuation of the pursuit. Apprehension is secondary to the importance of safety. The pursuing officer or ANY supervisor shall terminate a pursuit at any point when the risk associated with continuing the pursuit is greater than the risk associated with terminating it.

IV.PROCEDURES

3. All units should exercise extreme caution at intersections. Secondary units should also remain mindful that motorists may not be aware of additional emergency vehicles after initial vehicles have passed by.

G. Termination Decision [7.15D]

1.A pursuit must be terminated when in the opinion of the pursuing officer, or in the opinion of a supervisor, there exists a clear and unreasonable danger to other motorists, pedestrians or others created by the pursuit that outweighs the necessity for immediate apprehension of the suspect(s).

2. The pursuing officer will have to use their own judgment, training and overall experience, and bearing in mind the procedures, and guidelines outlined in this policy, apply them collectively to the existing circumstances. If the officer feels certain that the pursuit is justified according to the established criteria and it can be performed safely, he or she may continue with the intent to apprehend the suspect, but only while exercising the maximum of safety to all concerned.

VI. Forcible Stop / Roadblock Procedures

2. Rolling / Moving Roadblocks

c. Blocking: In a pursuit of moderate speed (less than 40 mph), blocking can be accomplished by positioning a Jonesboro Police Department vehicle in front of the violator and another Jonesboro Police Department vehicle beside the violator. Speed should be reduced gradually until the violator is stopped. Every effort should be made to avoid actual contact with the violator vehicle.

5-21-06

**COPY**

As stated in this policy of the Departments the decision to persue a motor vehicle is one of the most critical decisions to be made by an officer. You have to weigh many factors in determining which is in the publics best interest the immeadate apprehension of the suspect of the safety of the public which you serve. Officers have to continually question the decision and look at the totality of circumstances. its clear in watching your in-car video that the suspect was driving with a total disreguard for human life, and while in persuit you follow there every move driving at excessive speeds, driving into on coming traffic and even driving driving on a sidewalk in a commercial area with hotel and resturants.

Based on your actions in this persuit you are reprimanded and will lose the priviledge of the take home vehicle porgram for 90 days beginning on 3-15-2021 and ending on 6-15-2021.

Any further policy violations of this nature will be met with a more severe form of discipiline up to and including termination.

A copy of this reprimand will be fowarded to the office of professional standards for review.

From: Lt. T. D[signature] 394 Received by: Ptl. [signature] /354 Date: 3/15/2021
Signature of Supervisor — Signature of receiving Officer

# Jonesboro Police Department
## Supervisor Review of Pursuit

Date: 10.3.2020 Case Number: 20-9897

Officers Involved: Ptl. Chris Shull

Suspect (Name/DOB): Lakita Davis [redacted] ☐ Arrested ☐ Wanted

Suspect Vehicle(LPN/Description): 2018 Honda Civic Silver TN 9W61G5

Wrecker(s): Terry's Towing Hold Vehicle: ☐ Yes ☐ No

What was the Reason for the pursuit (original Charges)? Robbery

Final Charges? Robbery and Fleeing

What were the Conditions during the pursuit (time of day, traffic, speeds, weather or other factors)?
Pursuit began at approximatley 1900 hrs, it was dusk turning into darkness near the end of the pursuit, speeds were in excess of 90 mph in town and over 120 mph on the interstate, traffic was light to moderate with congestion at intersections, weather was clear. Pursuit lasted approximately 5 minutes and 30 seconds

Was any action taken against the suspect vehicle(spike strip deployment, etc.)? ASP trooper performed a P.I.T maneuver against the suspect vehicel and JPD officers attempted spike strip deployment.

What role, if any, did personnel or vehicles from other agencies take during the pursuit?
Arkansas State Police performed a P.I.T. Maneuver against the suspect vehicle

What action ended the pursuit (suspect stopped, fled on foot, terminated, etc)?
Suspect vehicle wrecked due to P.I.T maneuver by ASP

During the pursuit, did the actions of the officers conform to established policy? ☐ Yes ☒ No
If no, EXPLAIN: Robbery is not listed as one of the violent felony offenses we are allowed to pursue for. After reviewing Ptl. Shulls video he is seen passing vehicle on the right side and at one point attmepts to pass the susepect vehicle. Also unsafe U-turns, excessive speed on city streets and in a construction zone on I555

Video reviewed from the following units: Ptl. C. Shull, Ptl. B. Wright, Sgt. J. Beasley Sgt. B. Davis (no video)

Based on the information obtained for this report, was the pursuit handled properly? ☐ Yes ☒ No
EXPLAIN: Per policy the officers in the pursuit will continully question if the seriousness of the violation reasonably warrants the initation or continuation of the pursuit. There was a lack of communication from officers, dispatchers, and supervisors in reguards to the orginal offense. Due to the suspects manor of driving, officers should have recognized that the risk of the pursuit had become too dangerous and terminated it.

Supervisor completing report [signature] 394 Date: 10.23 2020

Command Staff Review [signature] Within Policy? ☐ Yes ☒ No Date 10.23.20

JONESBORO POLICE DEPARTMENT

PERSONNEL INVESTIGATION

Date: 10/19/2020

Officer's Name: Christopher Shull Rank: Patrolman

Complaint: Pursuit Review

The following statement/interview is being conducted in reference to the above complaint that has been made against you.

You will be asked questions specifically directed and narrowly related to the allegation(s) made against you.

You are entitled to all the rights and privileges guaranteed by the laws of the state of Arkansas and the Constitution of the United States, including the right not to incriminate yourself.

As this is a personnel investigation you are compelled to answer fully and truthfully all questions asked concerning the complaint or allegation(s) made against you. Refusal to answer any questions relevant to this personnel investigation will be deemed insubordination and you will be immediately placed on suspension pending a hearing before the chief of police.

If you do answer, neither your statements or any information or evidence which is gained by reason of such statements can be used against you in any subsequent criminal proceedings. However, these statements can be used against you in relation to subsequent departmental charges.

I understand that I have the right to have a witness of my choice present during this interview. This individual will be present as a witness only and will not be allowed to become actively involved in this interview process.

Officer's Name: Ptl. Chris Shull /1354 Date: 10/19/2020

Investigating Officer: Capt. S McDaniel

Witness: ______________________

10/09/2020

**Pursuit Review Summary**
JPD Dispatch Call Number C1744176
Case Number 20-09897

On October 03, 2020 at 1851 hours, the Jonesboro Dispatch Center received a recorded telephone call from a female caller, later identified as Rachel Franke. Ms. Franke was greeted by a 911 call taker and asked the location of her emergency. Ms. Franke informed dispatch that the emergency was at 5431 Southwest Drive. The caller said that they "were just robbed" and she tried to tell the suspects to stop, but they got in the car, and then they hit her with the car." The call taker confirms the address and Ms. Franke advised that the suspect vehicle was headed north on Southwest Drive. She described the vehicle as a silver Honda with a sweater hanging over the license plate. The call taker then asked if the incident happened at a house or business, to which the caller replied that it was business, Dollar General. The call taker then asked what type of vehicle was involved and is again given a description of a "light silver" Honda car and that one of the three reported suspects in the vehicle covered up the license plate so Ms. Franke could not get a video of the plate.

The call was then dispatched to J169 (Joseph Harris) and J160 (Kara Austin). Almost immediately, J147 (Christopher Shull) volunteered for the call and says that he is on his way. Shull asked for a description and license plate number and said he was coming in from the north as his siren could be heard in the background.

Shortly after, Shull advised Dispatch that he had spotted a Honda with "no lights" on Southwest Drive headed northbound toward Parker Road. Shull made a U-turn on Southwest Drive and began his pursuit of the suspect vehicle.

Officer Shull asked Dispatch if the suspects were armed and he was told by Dispatch that they were trying to obtain that information. As Shull approaches Parker Road, he advised dispatch that he believed the vehicle to be the suspect vehicle and said that they were at "a high rate of speed, Parker Road, headed east. Dispatch responded to Shull and asked if the Officer in Charge was aware of the radio traffic. At the time, the OIC (Sergeant Brian Davis) said that he was aware and that he was at Parker and Harrisburg Road attempting to deploy some spike strips.

As Officer Shull pursued the vehicle on Parker Road, he radioed that the vehicle was running the red light at Parker and Culberhouse and advised that the vehicle was a silver passenger car with damage on the right rear bumper. Seconds later, Dispatch could be heard saying the caller did not believe the suspects had any weapons. Officer Shull did not acknowledge the dispatcher, and a couple seconds later, advised that the vehicle had a Tennessee license plate. Shull then advised that the suspect vehicle was passing illegal head-on into traffic and that they were coming up on the other officers who were east of his location.

A few seconds later, an officer could be heard on the radio saying the suspect vehicle had missed the spikes, which had been deployed by Sergeant Davis on Parker Road east of Home Depot. Officer Shull then gave the license plate number of the suspect vehicle as 9W61G5 and then said the vehicle "blew another red light, Harrisburg and Parker," as both the suspect vehicle and Shull continued east on Parker Road at a high rate of speed.

As Officer Shull continued to pursue the vehicle on Parker Road, he asked the OIC for permission to perform a PIT (Pursuit Intervention Technique) on the vehicle and tells the OIC that the vehicle "just about lost it." Just after being denied the request by Sergeant Josh Beasley, he said that traffic was light and that the suspect vehicle almost struck two vehicles head-on near J.T. White lumber store. At that time, Sgt. Davis radioed Shull and informed him that an Arkansas State Police officer was right behind Shull. When that happened, Shull acknowledged and said that when they got up with him, he would turn it over to the State Police.

After a few seconds, Sgt. Beasley asked for an officer to go to Dollar General to find out more about what had happened. Again, Officer Shull said that the suspect vehicle was driving head-on into traffic on Parker Road. At that time, J169 (Harris) said he would head to Dollar General.

As J150 (Bruce Wright) radios his positon as Parker Road and Stadium Boulevard a few seconds later, Officer Shull advised that the suspect vehicle was on northbound on Caraway Road headed to I555. Seconds later, he advised that the suspect vehicle turned eastbound onto Phillips Drive, drove over a sidewalk, and then southbound on Red Wolf Boulevard toward Parker Road, then southbound I555. At this time, Officer Wright joins the pursuit directly behind Officer Shull. Shull then tells Dispatch to let the State Police know they are southbound on I555 so they might intercept them.

At that time, ASP Trooper C12 (Tanner Middlecoff) advised that he was the third car back and that he was going to try to move into position to perform a PIT maneuver. A few seconds later, Shull informed Dispatch that the suspect vehicle was running vehicles off the road and tells the JPD units to let ASP through. Shortly after, he said the suspect ran off the road and then back on the roadway. After a few seconds, Shull advised that ASP had the lead of the pursuit and that he would be relaying radio traffic. He said that traffic was light and that ASP was moving into position for a PIT maneuver. He calls out the speed of the pursuit at 120 MPH and again said that traffic was light. After a couple seconds, Officer Shull advised that ASP had performed a PIT maneuver, the suspect vehicle crashed, and requested emergency medical services. The dispatch center announced the location of the crash as being on I555 almost at Nestle Road, just past Commerce Drive.

As a result of the crash, The driver of the suspect vehicle, Lakita A. Davis, a 35 year-old female, was fatally injured. Her passengers, 18 year-old Tavia Jackson, 20 year-old Tecorrion Golden, and 16 year-old Octavious Moore, were transported to the hospital with non-life threatening injuries. No other injuries were reported.

**Inquiry**

Upon receiving the request to review this pursuit to determine if it complied with JPD Policy 501.05 (Pursuit Driving), I gathered all known call recordings, radio recordings, dash cam, body camera, video from the robbery victim, and police reports and statements related to the case. In addition, I interviewed Officer Christopher Shull concerning his actions before, during, and following the pursuit.

The decision to pursue must be based upon what information the pursuing officer has at his disposal at the time of the pursuit and he or she must constantly reassess and weigh whether the seriousness of the violation reasonably warrants the continuation of the pursuit. With apprehension being secondary to the importance of safety, the pursuit should be terminated when the risks associated with it are greater than the risk associated with terminating the pursuit.

In this case, based upon the initial information given by dispatchers, it is my opinion that the officers who received the dispatch would have reasonably believed that the suspects were being sought for Aggravated Robbery because of the fact that a business had been robbed and there has been a history of Aggravated Robberies in this area of smaller retail stores, including Dollar General stores. Upon spotting the suspect vehicle, Officer Shull made a U-turn and began to pursue in an attempt to apprehend what he believed were robbery suspects.

As the vehicle made its way east on Parker Road, Officer Shull began to radio the details of the pursuit. After only a few seconds, he asked if the suspects are armed but did not receive an answer to this question until over fifty seconds later. When Dispatch did say the caller did not believe there to be any weapons, Officer Shull did not respond, most likely due to his being very occupied with following the vehicle at a high rate of speed as it drove recklessly. Shortly after, Officer Shull was able to relay the license plate information of the suspect vehicle to Dispatch.

Almost from the onset of the pursuit, the suspect vehicle, as well as Officer Shull, began driving in a manner which greatly increased the likelihood of personal injury or property damage. When Officer Shull volunteered to respond to the robbery call, he was on Main Street near College Street. He activated his blue lights and siren and proceeded southbound toward 5431 Southwest Drive. He traveled in the mid-40 mph range to the first intersection he encounters, Highland Drive. The traffic light was red for his direction and vehicles were turning south onto Southwest from westbound on Highland as well as crossing the intersection westbound. Officer Shull slowed to about 22 mph and cleared the intersection without any apparent issues on the five lane roadway. He quickly accelerated to as high as 91 mph in the business south of Highland and sustained his speed in the 80-85 mph range as he caught a yellow light at South Culberhouse Street.

Shull continued south toward the I555 overpass and used the turn lane to pass a same direction vehicle traveling in the left hand lane near the Team Clean Car Wash. At this point, his speed was still in the mid 80 mph range. He had a green light at Alexander Drive and continued south. He then slowed to the low 50 mph range as he approached Parker Road, continued southbound, and then accelerated to as high as 68 mph before spotting the suspect vehicle south of Wood Street, with no headlights, northbound and making a wide U-turn to give chase.

After spotting the suspect vehicle and turning around, Officer Shull drove northbound on Southwest Drive, reaching speeds in the mid 70 mph range as he passed a vehicle on the left near Wood Street. He slowed to 22 mph as turned right onto Parker Road, following the suspect vehicle. Shortly after, he advised that he believed it to be the suspect vehicle he was chasing due to their high rate of speed.

Shull passed a vehicle on the left as he approached a curve on Parker road and accelerated to 97 mph just before reaching Culberhouse Road and advised that the suspect vehicle ran the red light at that intersection. Shull briefly slowed to approximately 37 mph before proceeding through a red light by passing the heavily populated intersection in the right turn lane and then continued eastbound while relaying more information about the suspect vehicle, then continued accelerating until reaching 103 mph as he passed Home Depot and Sonic Drive In, both well attended businesses.

As he approached heavy traffic, Shull told Dispatch that the suspect vehicle was passing "illegal head-on into traffic." Officer Shull mimics this action at 55 to 65 mph, passed several vehicles, and said that there was "no traffic at the moment." In fact, there was heavy traffic at that time and a long column of vehicles were passed by both Shull and the suspect vehicle. Within seconds, Sgt. Davis and Sgt. Beasley can be seen on dash cam video pulled to the north side of Parker Road and stopped as Sgt. Davis attempted to deploy spike strips, which were ultimately avoided by the suspect vehicle. Shull continued to pursue the vehicle through a red light at Harrisburg Road, slowing to about 45 mph, and relayed to Dispatch that the vehicle "blew another red light." At about the same time, Officer Shull was able to call out the license plate number of the vehicle as 9W61G5. At this point, ASP had joined in behind Shull and Sgt. Beasley followed at a distance behind ASP.

Approximately ten seconds later, at speeds of about 70 mph, Shull radioed the OIC and asked for permission to "PIT" the vehicle, adding that the suspect vehicle "just about lost it." During that time, there were westbound vehicles present on Parker Road. After being denied permission to perform the PIT maneuver, he relayed that traffic was light and the suspect "took the curve wide in front of J.T. White Lumber and almost hit two cars head on." He then said that he was going to relay the pursuit over to ASP when "they get up here." Between Harrisburg Road and Perkins Drive, both the suspect vehicle and Officer Shull were traveling as high as 98 mph, and passed several vehicles which were driving in both directions.

The suspect vehicle drove a large portion of the time on the wrong side of the road and nearly struck an oncoming vehicle at approximately 95 mph. As they approached the intersection at Caraway Road, Officer Shull radioed that the suspect vehicle was driving head-on into traffic on Parker as the suspect narrowly missed striking vehicles, swerved in and out of traffic, ran a red light, and turned north on Caraway. Officer Shull followed and mimicked these actions. During my interview with Shull, he told me that he thought the driver of the suspect vehicle was going to kill somebody.

Once on Caraway Road at the I555 overpass, at speeds in the low 70 mph range, Officer Shull overtook the suspect vehicle on the left and it then turned right onto Phillips Drive and drove east. When this happened, Shull did a wide U-turn in the intersection, drove around a couple vehicles, and followed. Speeds reached as high as 87 mph on Phillips Drive as both the suspect and officer drove past vehicles and crossed an intersection in the area heavily populated with businesses, hotels, and restaurants.

When the pursuit approached Red Wolf Boulevard, the suspect vehicle drove to the right of traffic stopped at the red light and across a sidewalk while turning southbound. Officer Shull relayed this information before following the same path across the sidewalk. Within seconds, Officer Shull drove left of center on the I555 overpass to avoid a truck. While performing this action, he narrowly missed a Jonesboro Police Department police vehicle head-on. The JPD vehicle was being driven by Officer Bruce Wright.

Traffic was heavy as the suspect vehicle turned left onto the I555 Southbound on-ramp. Within a short time, speeds reached in the mid-90 mph range through a walled, one lane construction area southbound on I555. At this time, Officer Wright had joined the pursuit and, after pulling in front of ASP, was directly behind Shull. ASP Trooper Middlecoff followed behind the JPD officers. As speed increased to around 100 mph, the suspect vehicle left the roadway on the narrow shoulder and passed a vehicle on the right. Shortly after, Shull and Wright yielded to the right near the Highway 463 Overpass to let the ASP Trooper pass them and take the lead of the pursuit. Officer Shull told dispatch that ASP had taken the lead and that he would stay with them to relay radio traffic. ASP took the lead of the pursuit and continued southbound on I555 as the JPD officers followed. The vehicles passed the Highway 18 overpass, and approximately 25 seconds later, Trooper Middlecoff positioned himself to the right side of the suspect vehicle and performed a PIT maneuver at approximately 130 mph. When this happened, the suspect left the right side of the roadway at a high rate of speed and crashed into a stand of trees.

Officers Shull announced that a PIT maneuver had been performed, the vehicle had crashed, and asked Dispatch to send emergency medical services. The involved officers pulled to the side of the highway and began a search for victims of the crash.

The time of the initial call and subsequent pursuit was approximately 6:50 P.M., the sun was setting and weather conditions were clear. By the time the pursuit ended about 8 minutes later, the sky was nearly dark. Vehicle traffic was heavy in some areas, moderate in some, and light in others. The driving method of the suspect was reckless and high speed with little or no regard for the safety of life and property.

**Findings**

Based upon the initial information given to officers, the decision to begin pursuing the suspect vehicle was permitted by policy of Jonesboro Police Department. I believe that a reasonable officer could have easily concluded from the dispatch that a violent felony had occurred and several suspects had fled the scene of the crime.

I could not conclude, after listening to the audio available to Shull and observing his actions on video at the time, that Officer Shull heard or comprehended the follow up information from Dispatch that the suspects were not believed to have been armed. I do not think that the Officer in Charge, Brian Davis, heard or comprehended this information, based upon the fact that he was in the process of deploying spike strips. Sgt. Beasley was assisting in that effort.

However, I do conclude that the pursuit quickly became too dangerous to continue as such high speeds were reached shortly after it began on Parker Road. The suspect clearly drove with a disregard for the safety of others, almost from the onset. Considering this, I think the proper decision would have been to discontinue the pursuit somewhere close to Parker and Culberhouse after the suspect showed no concern for other motorists.

A few seconds later and after a failed attempt to deploy spike strips, Officer Shull was able to relay the license plate number of the vehicle to dispatch and other officers, making the likelihood of identification and apprehension at a later time even greater. In this case, the fact that the suspect continued her reckless disregard and showed no attempt to stop or slow for the pursuing officers while running red lights, driving on the wrong side of the road, narrowly missing other vehicles, driving at extremely high speeds, and creating other hazards which were a very real and present risk to innocent lives, was more than enough reason for any officer or supervisor to conclude that the pursuit should have been terminated within the first minute or two.

Further, I found that Officer Shull was in violation of JPD Policy by failing to exercise extreme caution at numerous intersections, driving at an unacceptably high rate of speed during both the pursuit and prior to the pursuit, attempting a blocking maneuver at speeds much greater than 40 mph, and creating, through his own conduct, a greater risk for public safety.

Officer Shull should have easily concluded, given the information he had available at the time of the pursuit, that the hazards exposed to himself, other officers, and the public were unnecessarily high, the dangers to innocent lives existed and were clearly unreasonable, and those things clearly outweighed the necessity for immediate apprehension of the suspects.

Concerning the supervisors working at that time, Sgt. Brian Davis and Sgt. Josh Beasley, based upon their observations and the radio traffic, I believe that they had enough information available to make the decision to terminate this pursuit.

Capt. S. McDaniel

Capt. Stephen McDaniel

COPY

# Jonesboro Police Department

General Orders

Policy and Procedure Remedial Training

## Acknowledgement

Officer / Employee Ptl. Chris Shull Date 3.25.2021

I have received additional training on the following Jonesboro Police Department Policies:

Review of in car video C1744776

Review of policy 502.01 Emergency Vehicle Operations

I have a complete understanding of the above listed policies and have received thorough instructions for the implementation of those policies. The procedures described in these policies have been demonstrated to me and I will adhere to the training provided.

Signed Ptl. Chris Shull /354

Lt. T. Durg 391 3.25.2021

Incident # 20-09897

Page 1 of 15

# Jonesboro Police Dept

Incident Report

Report Date 10/03/20

Report Time 7:15 PM

| Status | Exception Clearance | Date 10/23/2020 | Reporting Officer | ORI/Agency |
|---|---|---|---|---|
| Closed | Death Of Offender | | 1399 Harris, Joseph | AR0160100 |
| | Assigned Officer: Mccanless, Michael | | Entered By: LMorgan | Approving Officer: Holmes, Lane |
| | Assisting Officers | | | |

## Complainant

| SSN/ID/TIN | Title | Name | DOB | Age | Sex | Resident Status |
|---|---|---|---|---|---|---|
| ** MASKED ** | | Franke, Rachel | ** MASKED ** | 29 | F | Resident |

| Race | Ethnicity | Home Phone | Work Phone | Other Phone | DL (#, ST) |
|---|---|---|---|---|---|
| White | Not Hispanic/Latino | ** MASKED ** | ** MASKED ** | ** MASKED ** | ** MASKED ** |

| US Citizen | Legal Alien | Doc Type | Immig Doc # | Nationality |
|---|---|---|---|---|
| Yes | | | | |

Home Address: 2900 Turtle Creek RD,Jonesboro, AR 72404

Employer: Dollar General

Work Address: 5431 Southwest DR,Jonesboro, AR 72401

Occupation: Employee

## Offenses

Incident Location: 5431 Southwest DR Jonesboro, AR 72401

Zone:

| Earliest Possible Date | Time | Latest Possible Date | Time |
|---|---|---|---|
| 10/03/2020 | 19:15 | 10/03/2020 | 19:15 |

| # | Statute/Code | Description | Fel/Misd | Att/Comp | Loc | Bias | Wpn | CATypes |
|---|---|---|---|---|---|---|---|---|
| 1 | 5-12-102 | Robbery | Felony | Completed | 12 | 88 | 99 | P |
| 2 | 5-54-125 | FLEEING | Felony | Completed | 13 | 88 | 99 | O |

MO: Suspect stole items, used force when fleeing scene

Method Of Entry: No Force Used

# Prems: 1

**Location Types**

01 Air/Bus/Train Terminal
02 Bank/S&L
03 Bar/Night Club
04 Church/Synag/Temple
05 Commercial/Off Bldg
06 Construction Site
07 Convenience Store
08 Dept/Discount Store
09 Drug Str/Dr Off/Hosp
10 Field/Woods
11 Govt/Public Bldg
12 Grocery/Supermarket
13 Hway/Road/Alley
14 Hotel/Motel
15 Jail/Prison
16 Lake/Waterway
17 Liquor Store
18 Parking Lot/Garage
19 Rental Storage Facility
20 Residence/Home
21 Restaurant
23 Service/Gas Station
24 Specialty Store
25 Unknown/Other
37 Abandoned/Condemned Structure
38 Amusement Park
39 Arena/Stadium/Fair grounds/Coliseum
40 ATM Separate from Bank
41 Auto Dealership New/Used
42 Camp/Campground
44 Daycare Facility
45 Dock/Wharf/Freight/ Modal Terminal
46 Farm Facility
47 Gambling Facility/Casino/Race Track
48 Industrial Site
49 Military Installation
50 Park/Playground
51 Rest Area
52 School - College/University
53 School - Elementary/Secondary
54 Shelter - Mission/Homeless
55 Shopping Mall
56 Tribal Lands
57 Community Center
58 Cyberspace

**Bias Motivation Codes**

ANTI-
11 White
12 Black or African American
13 American Indian or Alaska Native
14 Asian
15 Multi-races, Group
16 Native Hawaiian or Other Pacific Islander
21 Jewish
22 Catholic
23 Protestant
24 Islamic (Muslim)
25 Other Religion
26 Multi-religious group
27 Atheist/Agnostic
31 Arab
32 Hispanic or Latino
33 Not Hispanic or Latino
41 Gay (male)
42 Lesbian
43 Lesbian, Gay, Bisexual, or Transgender, Mixed Group (LGBT)
44 Heterosexual
45 Bisexual
51 Phys Disability
52 Mental Disability
61 Male
62 Female
71 Transgender
72 Gender Non-Conforming
88 None
99 Unknown

**Suspected Of Using**: None

**Criminal Activity Types**

B Buying/Receiving
P Possessing/Concealing
D Distributing/Selling
E Exploiting Children
C Cultivating/Manuf/Publishing
O Operating/Promoting/Assisting
T Transport/Import/Transmit
U Using/Consuming
A Simple/Gross Neglect
F Organized Abuse
I Intentional Abuse & Torment
S Sexual Animal Abuse

**Weapon Type(s)**

11 Firearm (Auto)
12 Handgun (Auto)
13 Rifle (Auto)
14 Shotgun (Auto)
15 Other Firearm
20 Knife/Cutting Instr
30 Blunt Object
35 Motor Vehicle
40 Personal Weapons
50 Poison
60 Explosives
65 Fire/Incendiary Device
70 Drugs/Narc./Sleeping Pills
85 Asphyxiation
90 Other
95 Unknown
99 None

## Victim #1 — Event #'s Related 1,2

Name: Dollar General

Contact Name: Rachel Franke

Business Address: 5431 Southwest DR,Jonesboro, AR 72401

Business Phone: 5012540435

| Victim Type | Injury Type | Aggravated Assault/Homicide Circumstances | Relationship To Suspect |
|---|---|---|---|
| Business | None | None | #1 N/A<br>#3 N/A |

Justifiable Homicide Circumstances: None

Taken to: (Hospital Name)

Injury Description

*Copyright Relativity Inc.© - RPS(Relativity Public Safety)*

Printed : 10/27/2020 3:33:08 PM

Incident # 20-09897

Page 2 of 15

# Jonesboro Police Dept

Incident Report

Report Date 10/03/20

Report Time 7:15 PM

**Victim #3** Event #s Related 1,2

| | | |
|---|---|---|
| Name: Hobby Lobby | | Contact Name: Luke |
| Business Address: 1843 E Highland DR,Jonesboro, AR 72401 | | Business Phone: 8709310636 |
| Victim Type: Business | Injury Type: None, | Aggravated Assault/Homicide Circumstances: None |
| Relationship To Suspect: #1 N/A #3 N/A | | |
| Justifiable Homicide Circumstances: None | | Taken to: (Hospital Name) |
| Injury Description: | | |

**Victim #2** ☑ Is Complainant Event #s Related 1,2

| | | | | | |
|---|---|---|---|---|---|
| SSN/ID/TIN: ** MASKED ** | Title: | Name: Franke, Rachel | DOB: ** MASKED ** | Age: 29 | Sex: F |
| Resident Status: Resident | | | | | |
| Race: White | Ethnicity: Not Hispanic/Latino | Home Phone: ** MASKED ** | Work Phone: ** MASKED ** | Other Phone: ** MASKED ** | DL (#, ST): ** MASKED ** |
| US Citizen: Yes | Legal Alien: | Doc Type: | Immig Doc #: | Nationality: | |
| Home Address: 2900 Turtle Creek RD,Jonesboro, AR 72404 | | | | Employer: Dollar General | |
| Work Address: 5431 Southwest DR,Jonesboro, AR 72401 | | | | Occupation: Employee | |
| Victim Type: Individual | Injury Type: None, | Aggravated Assault/Homicide Circumstances: None | | Relationship To Suspect: #1 N/A #3 N/A | |
| Justifiable Homicide Circumstances: None | | | Taken to: (Hospital Name) | | |
| Injury Description: | | | | | |

**Suspect #1**

| | | | | | |
|---|---|---|---|---|---|
| SSN/ID/TIN: ** MASKED ** | Title: | Name: Davis, Lakita A | DOB: ** MASKED ** | Age: 35 | Sex: F |
| Resident Status: Nonresident | | | | | |
| Race: Black / African American | Ethnicity: Not Hispanic/Latino | Home Phone: ** MASKED ** | Work Phone: ** MASKED ** | Other Phone: ** MASKED ** | DL (#, ST): ** MASKED ** |
| US Citizen: Yes | Legal Alien: | Doc Type: | Immig Doc #: | Nationality: | |
| Home Address: 5252 Shelborne CIR,Memphis, TN 38134 | | | | Employer: | |
| Work Address: | | | | Occupation: | |
| Height: - | Weight: - | Eyes: | Build: | AKA: | |

**Suspect #3**

| | | | | | |
|---|---|---|---|---|---|
| SSN/ID/TIN: ** MASKED ** | Title: | Name: Golden, Tacorrion | DOB: ** MASKED ** | Age: 20 | Sex: M |
| Resident Status: Unknown | | | | | |
| Race: Black / African American | Ethnicity: Not Hispanic/Latino | Home Phone: ** MASKED ** | Work Phone: ** MASKED ** | Other Phone: ** MASKED ** | DL (#, ST): ** MASKED ** |
| US Citizen: Yes | Legal Alien: | Doc Type: | Immig Doc #: | Nationality: | |
| Home Address: 3216 Velmagi ST,Memphis, TN 38128 | | | | Employer: Unknown | |
| Work Address: | | | | Occupation: | |
| Height: - | Weight: - | Eyes: | Build: | AKA: | |

*Copyright Relativity Inc.© - RPS(Relativity Public Safety)*

Incident # 20-09897

Page 3 of 15

# Jonesboro Police Dept

Incident Report

Report Date 10/03/20

Report Time 7:15 PM

## Witness #1

| SSN/ID/TIN | Title | Name | DOB | Age | Sex | Resident Status |
|---|---|---|---|---|---|---|
| ** MASKED ** | | Denny, Jerri | ** MASKED ** | 50 | F | Nonresident |

| Race | Ethnicity | Home Phone | Work Phone | Other Phone | DL (#, ST) |
|---|---|---|---|---|---|
| White | Not Hispanic/Latino | ** MASKED ** | ** MASKED ** | ** MASKED ** | ** MASKED ** |

| US Citizen | Legal Alien | Doc Type | Immig Doc # | Nationality |
|---|---|---|---|---|
| Yes | | | | |

| Home Address | Employer |
|---|---|
| 200 S 11Th AVE,Paragould, AR 72450 | Dollar General |

| Work Address | Occupation |
|---|---|
| 5431 Southwest DR,Jonesboro, AR 72401 | Employee |

## Witness #2

| SSN/ID/TIN | Title | Name | DOB | Age | Sex | Resident Status |
|---|---|---|---|---|---|---|
| ** MASKED ** | | Jackson, Octavia | ** MASKED ** | 18 | F | Nonresident |

| Race | Ethnicity | Home Phone | Work Phone | Other Phone | DL (#, ST) |
|---|---|---|---|---|---|
| Black / African American | Not Hispanic/Latino | ** MASKED ** | ** MASKED ** | ** MASKED ** | ** MASKED ** |

| US Citizen | Legal Alien | Doc Type | Immig Doc # | Nationality |
|---|---|---|---|---|
| Yes | | | | |

| Home Address | Employer |
|---|---|
| 5252 Shell Born ,Memphis, TN 38108 | Unknown |

| Work Address | Occupation |
|---|---|
| | |

## Witness #3

| SSN/ID/TIN | Title | Name | DOB | Age | Sex | Resident Status |
|---|---|---|---|---|---|---|
| | | ****** INDIVIDUAL INFORMATION MASKED ****** | | 16 | M | Nonresident |

| Race | Ethnicity | Home Phone | Work Phone | Other Phone | DL (#, ST) |
|---|---|---|---|---|---|
| Black / African American | Not Hispanic/Latino | | | | |

| US Citizen | Legal Alien | Doc Type | Immig Doc # | Nationality |
|---|---|---|---|---|
| Yes | | | | |

| Home Address | Employer |
|---|---|
| | |

| Work Address | Occupation |
|---|---|
| | |

## Property

**Involvement**
1 None
2 Burned
3 Counterfeit/Forge
4 Destroyed/Damaged
5 Recovered
6 Seized
7 Stolen
8 Unknown

**Category**
02 Alcohol
4 Bicycles
05 Clothes/Fur
07 Computer Hdwr/Sftwr.
03 Consumable Goods
09 Credit/Debit Cards
10 Drugs/Narcotics
11 Drug/Narc Equipment
12 Farm Equipment
13 Firearms
14 Gambling Equipment
15 Hvy Construct/Industrial
16 Household Goods
17 Jewelry/Precious Metals
18 Livestock
19 Merchandise
20 Money
21 Negotiable Instruments
22 Non-neg. Instrument
23 Office-Type Equip
25 Purses/Handbags/Wallets
26 Radio/TV/VCR
27 Recordings-Audio/Visual
29 Structure-Single Occ
30 Structure-OtherDwelling
31 Structure-Commercial
32 Structure-Industrial
33 Structure-Public
34 Structure-Storage
35 Structure-Other
36 Tools-Power/Hand
38 Vehicle Parts
39 Watercraft
41 Aircraft Parts/Access
42 Artistic Supplies
43 Building Materials
44 Camping/Hunting/Fishing
45 Chemicals
46 Collections/Collectibles
47 Crops
48 Documents / Pers or Bus.
49 Explosives
59 Firearm Accessories
64 Fuel
65 Identity Documents
66 Identity - Intangible
67 Law Enforcement Equip.
68 Lawn/Yard/Garden Equip
69 Logging Equipment
47 Crops
48 Documents / Pers or Bus.
49 Explosives
59 Firearm Accessories
64 Fuel
65 Identity Documents
66 Identity - Intangible
67 Law Enforcement Equip.
68 Lawn/Yard/Garden Equip
69 Logging Equip.
70 Medical / Lab Equipment
71 Metals, Non-Precious
72 Musical Instruments
73 Pets
74 Photographic/Optical
75 Portable Electronic Comm
76 Recreational/Sports Equip
77 Other
78 Trailers
79 Watercraft Parts/Access
80 Weapons - Other
88 Pending Inventory

| Involvement | Category | Qty/Wt | Brand/Make | Model | Style | CAL/GA |
|---|---|---|---|---|---|---|
| 7 | 19 | 1 | | | | |

Description

Lighter, 5 hour energy pack, paper towels, laundry products

| Owner | Serial# / Owner Applied# | NCIC Ref # | Evidence # | Value |
|---|---|---|---|---|
| V1: Dollar General | N/A | | | $30.00 |

| Recovered Date | Recovery Location | Recovery Condition | Recovered Value |
|---|---|---|---|
| 10/5/2020 | Scotts Towing | Damaged | $0.00 |

| Involvement | Category | Qty/Wt | Brand/Make | Model | Style | CAL/GA |
|---|---|---|---|---|---|---|
| 6 | 13 | 1 | Glock | 30 | | 45 Caliber |

Description

1 black Glock 30 .45ACP with factory night sights and "LE/Gov restricted" marked 13 round magazine.

| Owner | Serial# / Owner Applied# | NCIC Ref # | Evidence # | Value |
|---|---|---|---|---|
| S1: Davis, Lakita A | SUT200 | | | $0.00 |

*Copyright Relativity Inc.© - RPS(Relativity Public Safety)*

Incident # 20-09897

Page 4 of 15

# Jonesboro Police Dept

Incident Report

Report Date 10/03/20

Report Time 7:15 PM

## Property

**Involvement**
1 None
2 Burned
3 Counterfeit/Forge
4 Destroyed/Damaged
5 Recovered
6 Seized
7 Stolen
8 Unknown

**Category**
02 Alcohol
4 Bicycles
06 Clothes/Fur
07 Computer Hdwr/Sftwr
08 Consumable Goods
09 Crdt/Debit Cards
10 Drugs/Narcotics
11 Drug/Narc Equipment
12 Farm Equipment
13 Firearms
14 Gambling Equipment
15 Hvy Construct/Industrial
16 Household Goods
17 Jewelry/Precious Metals
18 Livestock
18 Merchandise
20 Money
21 Negotiable Instruments
22 Non-neg. Instrument
23 Office-Type Equip
25 Purses/Handbags/Wallets
26 Radio/TV/VCR
27 Recordings-Audio/Visual
29 Structure-Single Occ
30 Structure-OtherDwelling
31 Structure-Commercial
32 Structure-Industrial
33 Structure-Public
34 Structure-Storage
35 Structure-Other
36 Tools-Power/Hand
38 Vehicle Parts
39 Watercraft
41 Aircraft Parts/Access
42 Artistic Supplies
43 Building Materials
44 Camping/Hunting/Fishing
45 Chemicals
46 Collections/Collectibles
47 Crops
48 Documents / Pers or Bus.
49 Explosives
59 Firearm Accessories
64 Fuel
65 Idenity Documents
66 Identity - Intangible
67 Law Enforcement Equip.
68 Lawn/Yard/Garden Equip
69 Logging Equipment
47 Crops
48 Documents / Pers or Bus.
49 Explosives
59 Firearm Accessories
64 Fuel
65 Identity Documents
66 Identity - Intangible
67 Law Enforcement Equip.
68 Lawn/Yard/Garden Equip
69 Logging Equip
70 Medical / Lab Equipment
71 Metals, Non-Precious
72 Musical Instruments
73 Pets
74 Photographic/Optical
75 Portable Electronic Comm
76 Recreational/Sports Equip
77 Other
78 Trailers
79 Watercraft Parts/Access
80 Weapons - Other
88 Pending Inventory

| Involvement | Category | Qty/Wt | Brand/Make | Model | Style | CAL/GA |
|---|---|---|---|---|---|---|
| 6 | 59 | 1 | Winchester | .45ACP | brass | |

Description

1 .45ACP spent shell casing removed from chamber of firearm.

| Owner | Serial# / Owner Applied# | NCIC Ref # | Evidence # | Value |
|---|---|---|---|---|
| S1: Davis, Lakita A | | | | $0.00 |

| Involvement | Category | Qty/Wt | Brand/Make | Model | Style | CAL/GA |
|---|---|---|---|---|---|---|
| 6 | 59 | 5 | Winchester | .45ACP | cartridges | |

Description

3 Winchester brass .45ACP FMJ loaded cartridges and 2 Federal.

| Owner | Serial# / Owner Applied# | NCIC Ref # | Evidence # | Value |
|---|---|---|---|---|
| S1: Davis, Lakita A | | | | $0.00 |

## Vehicles

**Involvement**
1 None
2 Burned
3 Counterfeited/Forged
5 Recovered
6 Seized
7 Stolen
8 Unknown
9 Crime Location
10 Suspect Vehicle

**Category**
01 Aircraft
03 Auto
05 Buses
24 Other
37 Trucks
39 Watercraft

| Involvement | Category | Tag # | Tag Yr | State | Tag Type | VIN | NCIC Ref # |
|---|---|---|---|---|---|---|---|
| Suspect Vehicle | 03 | 9W61G5 | 0 | TN | Passenger Automobile | 19XFC2F78JE023214 | |

| Year | Make | Model | Style | Primary Color | Secondary Color |
|---|---|---|---|---|---|
| 2018 | HONDA | Civic / CRX | Auto - Hardtop, 4-door | Silver | |

| Owner | Description | Est. Value | Evidence # | Impounded | Towed By |
|---|---|---|---|---|---|
| | Silver 4D Honda Civic | $0.00 | | No | |

| Insurance Company | Policy Number |
|---|---|
| | |

## Narrative & Statements

**Narrative - Harris, Joseph - 10/3/2020 (Initial)**

On 10/3/2020 at 1853 hours, I was dispatched to 5431 Southwest DRJonesboro, AR 72401 in reference to a Robbery of a Business in Progress.

**Narrative - Harris, Joseph - 10/3/2020 (Investigative)**

On 10/3/2020 at 1853 hours, I was dispatched to 5431 Southwest DRJonesboro, AR 72401 in reference to a Robbery of a Business in Progress.

While enroute to 5431 Southwest DRJonesboro, AR 72401, PTL Christopher Shull advised over the radio that he was behind the suspect vehicle heading East on Parker Rd at Southwest Dr. I then headed East on Highland at Main attempting to help with apprehending the vehicle. I then heard other units check enroute to PTL Shull. I then re-directed to 5431 Southwest DRJonesboro, AR 72401 to take the initial report.

Upon arrival to 5431 Southwest DRJonesboro, AR 72401, I made contact with Complainant (Franke, Rachel) outside in her car. Complainant (Franke, Rachel) advised that she had been hit by the suspect vehicle while it was leaving the parking lot of 5431 Southwest DRJonesboro, AR 72401. Emerson checked Complainant (Franke, Rachel) out and Complainant (Franke, Rachel) refused to go with them.

Complainant (Franke, Rachel), who is a clerk at 5431 Southwest DRJonesboro, AR 72401, stated that she noticed Suspect #1 (Davis, Lakita A) grab a pack of 5 hour energies and walk out of the store without paying for

*Copyright Relativity Inc.© - RPS(Relativity Public Safety)*

Narrative & Statements

**Narrative - Harris, Joseph - 10/3/2020 (Investigative)**

them. Complainant (Franke, Rachel) then followed Suspect #1 (Davis, Lakita A) out to the listed suspect vehicle, where Suspect #1 (Davis, Lakita A) got into the driver's seat. A black male wearing a black hat, black jacket, and grey pants, got out of the back driver's side door and walked around to the trunk. Complainant (Franke, Rachel) then attempted to stop the suspect vehicle from leaving the parking lot. The black male then got back into the back driver's side seat. Suspect #1 (Davis, Lakita A) turned the wheels away from Complainant (Franke, Rachel) and drove off. While passing Complainant (Franke, Rachel), the male in the back driver's side seat opened the door and struck Complainant (Franke, Rachel) with the door to the vehicle. The suspect vehicle then drove off. I collected a statement from Complainant (Franke, Rachel) which is attached to this report. Complainant (Franke, Rachel) also took video of the incident, which I have attached to evidence.com with this call number and case number.

I then watched the video of the store camera where Suspect #1 (Davis, Lakita A) walked into the store and then walked back out. You can see Complainant (Franke, Rachel) walk back outside and follow the suspect vehicle. Both Complainant (Franke, Rachel) and the suspect vehicle then get out of view of the camera. The manager of 5431 Southwest DRJonesboro, AR 72401 was advised that they needed to get the video footage from 5431 Southwest DRJonesboro, AR 72401 as soon as possible.

I then talked to Witness #1 (Denny, Jerri), who is the other clerk at 5431 Southwest DRJonesboro, AR 72401. She stated that she did not see Suspect #1 (Davis, Lakita A) steal the items, but saw Complainant (Franke, Rachel) follow Suspect #1 (Davis, Lakita A) out of the store. Witness #1 (Denny, Jerri) saw Complainant (Franke, Rachel) get near the suspect vehicle. She also stated that the back driver's side passenger opened up the door and struck Complainant (Franke, Rachel) with the door as the car was driving by. I was then advised to leave 5431 Southwest DRJonesboro, AR 72401.

All pictures and videos from 5431 Southwest DRJonesboro, AR 72401 were taken with my Axon Capture and attached to evidence.com.

See other officer's narratives for further.

**Narrative - Davis, Bryan - 10/3/2020 (Investigative)**

On 10/3/2020, while acting as OIC, I heard dispatch tone out a high priority call that a Robbery in Progress was occurring at the Dollar General on Southwest Drive. I began to drive in the direction of 5431 Southwest DRJonesboro, AR 72401. Dispatch put out the vehicle description and advised that it was northbound on Southwest Drive, and had the license plate obscured with something from the trunk of the vehicle. Officer Shull advised that he had located the vehicle in the area of Parker and Southwest. He attempted to stop the vehicle, and it failed to pull over. The vehicle began driving a a high rate of speed east bound on Parker.

I was in the area of Parker and Harrisburg when Shull advised the vehicle was coming in my direction. I positioned my vehicle on Parker Drive west of Harrisburg and attempted to deploy spike strips to stop the vehicle. The vehicle was able to drive on the shoulder of the road to avoid the spike strips. I observed an Arkansas State Police vehicle behind me on Parker, and did a U-Turn to join in the pursuit as it passed our vehicles. I withdrew the spike strips, and loaded them back into the trunk of my vehicle. At this time, the pursuit continued east bound on Parker Drive, but I was too far behind to keep up but I continued to drive in the direction that the pursuit went.

Officer Shull continued to pursue the vehicle, and give updates on the radio. Officer Shull requested permission to conduct a PIT on the vehicle, but this was rejected. I did advise him that ASP should be behind him, however as they are trained in the PIT. The pursuit went northbound on Carway, east bound on Phillips, north on Red Wolf, and then continued southbound on I555.

I was advised that ASP had taken over the pursuit, and was moving into position to conduct a PIT. I was then advised that ASP had completed a PIT on the vehicle, and that it had wrecked out off of I555.

I continued in the direction of where the PIT occurred. and when I arrived on scene, began to establish a perimeter. At the time, we had not located the vehicle or the occupants due to the thick vegetation. The vehicle was found shortly later crashed into a tree and was at rest on it's roof. We began to break out the windows on the vehicle

*Copyright Relativity Inc.© - RPS(Relativity Public Safety)*

**Narrative - Davis, Bryan - 10/3/2020 (Investigative)**

in order to get to the occupants inside.

I was able to hail out the rear passenger side passenger, and they were able to crawl out to me unassisted. The driver side rear passenger was able to crawl to the window, and I pulled them the rest of the way from the vehicle. The front seat passenger was buckled in, and was hanging upside down. She was unable to free herself from the vehicle. I then crawled inside the vehicle, and was able to unlatch the buckle which allowed me to pull her from the vehicle with the assistance of Officer Johnson.

I then went to the driver side with Officer Johnson. Officer Johnson pulled back the air bag, and I observed a glock handgun beside the driver. I secured this firearm, and then continued to attempt to extricate the driver. We were unable to extract the driver without the assistance of rescue, but EMT units were able to assess that she was deceased.

The three passengers were transported to St. Bernard for treatment.

The Firearm I located was turned over to Officer Shull.

The scene of the PIT was turned over to ASP so that they could conduct their investigation.

Sgt. B. Davis

**Narrative - Shull, Christopher - 10/3/2020 (Investigative)**

On 10/03/20 at approximately 1853 hours, Dispatch advised of a robbery of a business in progress at 5431 Southwest DRJonesboro, AR 72401. At the time they dispatched the call I was headed southbound on S. Main St. passing through the intersection of College Ave. Due to the nature of the call, I checked en route and activated my emergency lights and sirens and began running code 3 to 5431 Southwest DRJonesboro, AR 72401. While en route, Dispatch advised that the suspects had just left the scene headed northbound back into town. Knowing this information and that I was traveling southbound, I knew there was a high probability of intercepting them. After passing Southwest Dr. and Parker Rd. intersection, I spotted a silver Honda passenger car traveling northbound in the outside lane with no tail lights on and traveling at a high rate of speed. I turned around on the vehicle thinking it was most likely the suspects involved with the robbery.

After turning around on the listed vehicle, as I caught up to them I observed them to turn right at the intersection of Southwest Dr. and E. Parker Rd. without stopping for the red light. I then cleared the intersection and continued trying to catch up the vehicle. I observed it traveling at a now higher rate of speed than I had previously. I then observed the suspect vehicle to overtake vehicles on the right side of the road coming up on the intersection of S. Culberhouse and E. Parker Rd. I then observed the vehicle to run the red light at the intersection of S. Culberhouse and E. Parker Rd. passing vehicles illegally on the right side of the road. I then observed the suspect vehicle to pass other vehicles on the left side of the road into oncoming head on traffic. I then observed us coming up on several patrol units parked in front of Waffle House restaurant with their lights on. I observed the vehicle to abruptly swerve to the right as if trying to avoid something in the roadway. As we passed the patrol units, I observed that one officer had deployed a spike strip ineffectively. I continued pursuing the suspect vehicle and observed them to blow the intersection of Harrisburg Rd. and E. Parker Rd. I then observed the vehicle to take the curve on E. Parker Rd. in front of JT White Lumber wide and almost strike two vehicles head on in the opposite lane of traffic. I believe the lead vehicle that the suspect vehicle almost struck head on in front of JT White lumber was a pickup truck or SUV. The suspect vehicle abruptly swerved to the right almost losing control of the vehicle but was able to regain control of the vehicle and continued eastbound on E. Parker Rd.

The suspect vehicle then once again began attempting to pass cars on the left side of the road even in no passing zones clearly marked with double yellow lines. The suspect vehicle then maneuvered to avoid striking a vehicle head on just west of the intersection of S. Caraway Rd. and E. Parker Rd. The vehicle then maneuvered around a vehicle it passed on the left between it and the vehicle it met head on. The suspect vehicle then proceeded to run the red light at the intersection of S. Caraway Rd. and E. Parker Rd. and turned back northbound (left) onto S.

*Copyright Relativity Inc.© - RPS(Relativity Public Safety)*

**Narrative & Statements**

**Narrative - Shull, Christopher - 10/3/2020 (Investigative)**

Caraway Rd. It was at this point I attempted to perform a "rolling road block" on the suspect vehicle and use my patrol car positioned in front of the suspect vehicle and slightly to the left to force the vehicle to exit the roadway to the right. While doing this it appeared as if the the suspect vehicle swerved over towards me as if attempting to strike my patrol vehicle with the suspect vehicle. I swerved over to the left to avoid a collision which allowed the suspect vehicle to exit onto Phillips St. traveling eastbound. I had passed the intersection of Phillips St. and S. Caraway Rd. due to performing evasive maneuvers to avoid being struck by the suspect vehicle. I performed a U-turn and proceed to get back in pursuit of the suspect vehicle which was now traveling eastbound on Phillips St. I then observed the suspect vehicle to run over the curb and drive up on the sidewalk at the intersection of Phillips St. and Red Wolf Blvd. to avoid the red light. When doing this, the vehicle almost struck a natural gas main upright that was surrounded by steel tubing as a protective barrier and painted in bright yellow safety paint. The suspect vehicle once again ran a red light and made a right hand turn southbound on Red Wolf Blvd.

The suspect vehicle was now traveling southbound in the outside lane on Red Wolf Blvd. going over the overpass of I555. I observed a Jonesboro Police Department patrol unit to come over the overpass from the south with it's emergency lights and siren activated in the inside northbound lane. The suspect vehicle again evaded being stopped and I maneuvered between the JPD patrol unit and a white pickup truck overtaking the pickup on it's driver side and continued giving chase. I then advised Dispatch that the suspect vehicle was taking the on ramp for I555 southbound and had illegally overtaken a silver SUV on the passenger side on the shoulder. I continued advising Dispatch of my speed, direction of travel, and traffic conditions once on the interstate. Up to this point the worst traffic had been was moderate but mostly light. I advised all JPD units involved in the pursuit to allow ASP Troopers to maneuver around them if they were to get behind them so that ASP could take lead on the pursuit due to their ability to "PIT" to end the pursuit the safest way possible for all motorists on the interstate. At approximately the Commerce Dr./Martin Luther King Jr. Blvd. and I555 overpass, I heard Officer Wright advise me that an ASP Trooper was on my rear bumper. I advised Dispatch that I was pulling off of the pursuit and allowing ASP to take the lead in the pursuit at approximately the Nettleton/I555 overpass but was unable to safely pull over enough to allow the Trooper by due to ongoing construction on the interstate and the concrete barriers that were in place and the guard rail on the interstate. Once over te Nettleton/I555 overpass I was able to finally safely pull over enough to allow the ASP Trooper around me and advised Dispatch that ASP had the lead in the pursuit and that I would be staying with him to relay radio traffic for him.

ASP Trooper was then able to effectively PIT the suspect vehicle at approximately mile marker 38. I observed the vehicle to turn perpendicular to the roadway and go off of the south side of the interstate and down an embankment and then back up the other side. I then observed the vehicle to go airborne and into a small patch of woods on the south side of the interstate as I passed it. I then requested EMS via radio for the occupants due to the severity of the crash and possible injuries to the occupants. I then turned around and drove to the edge of the interstate closest the patch of woods and exited my patrol car and went with multiple other Officers and Troopers to try and attempt to locate the vehicle. After approximately 5 minutes or so of searching for the vehicle in the dense wood lot Officer Wright and myself located the vehicle overturned on it's roof. We began calling out to the occupants inside with no verbal response. I observed all side door windows to still be intact. I then began breaking all 4 side door windows out of the vehicle with my baton to try and contact the occupants.

Upon breaking the side door windows, I was able to see that all of the side curtain air bags had deployed and were further blocking out view of the cabin of the vehicle and the occupants. Officer Wright and myself held cover on the vehicle until more Officers and Troopers were with us. We then located a black male in the passenger side rear seat that finally began making verbal contact with us and we ordered him to crawl out towards the sound of our voice. Sgt. B. Davis held cover on him while I contacted him and placed him into handcuffs. We then learned he was 15 years old and from Memphis, TN. Another passenger in the rear seat on the driver side then began calling out to us that he was hurt and we ordered him to crawl out to us. Once he got his upper torso out of the window he advised he could not crawl anymore and that his legs were hurt. Myself and another Officer then drug him the remaining way out of the vehicle and he was placed into handcuffs and he advised that he was 20 and also from Memphis, TN. We then began trying to remove the front seat passenger from the vehicle but was unable to due to her still being buckled in with her seat belt and hanging upside down in the seat. Due to the position of the vehicle, we were unable to safely cut the seat belt strap without potentially injuring the passenger so Sgt. Davis was able to partially crawl into the vehicle and physically unbuckle the seat belt releasing the occupant. she then attempted to crawl out but was unable to due to her injuries so Inv. E. Johnson and Sgt. Davis assisited her by pulling her free of the car. This occupant was then placed on a spine board and pulled away from the crash scene and handed over to EMS.

*Copyright Relativity Inc.© - RPS(Relativity Public Safety)*

**Narrative - Shull, Christopher - 10/3/2020 (Investigative)**

Inv. Johnson and Sgt. davis then began attempting to gain access to the driver and render aid to her if needed. It was determined that she was entrapped and they could not gain access to her. I called for Fire Department for entrapment as well as another ambulance. Once Fire Department arrived on scene, the second EMS unit arrived right after. I began assisting Fire Department in getting their equipment across the fence that runs down the side of the interstate while EMS began assisting Inv. Johnson and Sgt. Davis with the driver. It was at this point that EMS advised that we could slow down on trying to get the extrication equipment to the vehicle that the driver was deceased and that it would be a recovery not a rescue. I advised Fire Department of this. At some point during the extrication of the driver, Sgt. Davis had recovered a firearm from the inside of the vehicle and secured it inside his vehicle. He then a short while later transferred custody of the firearm to me to secure in my vehicle. The firearm was a Glock model 30 handgun black in color chambered in .45ACP. The firearm had a full size magazine protruding from the grip of the mid size pistol. I asked Sgt. Davis if he had cleared the firearm and he advised he had not. I then slightly pulled the slight back out of battery and observed a brass case in the ejection port and advised him there was a round in the chamber. I then fully racked the slide to eject the cartridge and observed a spent casing to be ejected from the ejection port and breech of the firearm. I collected the spent case and removed the magazine from the firearm and observed 5 more live rounds in the magazine. I then secured the evidence in the trunk of my patrol car. It was during this time that the coroner had arrived whom EMS had called. I ran the firearm through Dispatch who advised that the firearm was NOT reported stolen through NCIC/ACIC.

Once the coroner was on scene, he advised that he needed to take photos of the skid pattern left from the suspect vehicle as it exited the roadway after the PIT maneuver. Due to the interstate still having one lane of traffic open being the inside lane, I advised Sgt. Davis that they were needing us to stoop traffic briefly so they could safely take photos for the investigation. Sgt. Davis told me to advise ASP which I did and they advised for me to shut it down. I advised Sgt. Davis of this. I then shut down all southbound traffic on I555 so that the coroner could safely take the required photos needed. The inside lane was then re-opened. I was advised by Sgt. Davis to stop recording and begin uploading all of my in car and body worn camera footage of the incident and begin working on the report. Shortly after, I fully re-opened I555 southbound and cleared the scene turning it over to ASP for them to finish their investigation. I then transported the evidence to the Jonesboro Police Department where it was logged into evidence. The three passengers in the vehicle were all transported to SBRMC ER via EMS.

The firearm was logged into evidence with the magazine according to evidence procedures. The live cartridges were logged separate from the spent casing and the firearm. The spent casing was logged by itself in it's own packaging. There were 3 Winchester brand and 2 Federal Cartridge Company brand loaded cartidges. All were full metal jacket and brass cased ammunition. This concludes my involvement in this incident. See other Officer's narratives for further.

**Narrative - Chism, Levi - 10/3/2020 (Investigative)**

On 10/3/2020 at 1852 hours, I was dispatched to 5431 Southwest Drive in reference to a robbery in progress. While traveling to the store, I heard Officer Shull advise that he saw the listed vehicle and was attempting to make a traffic stop on the vehicle. After several minutes of pursuing the vehicle, Officer Shull advised over the radio that an Arkansas State Trooper had pitted the vehicle on 555 near the Nestle Road exit. I then heard multiple officers advise that they required a K9. I deployed my K9 partner Frost to assist in apprehending the suspects. A K9 announcement was given and all suspects were advised if they did not exit the vehicle I would send K9 Frost into the vehicle. The suspects that we could see began showing their hands and complying. Three suspects crawled out of the vehicle and were placed into custody. After the suspects were taken into custody K9 Frost was put back into my unit. Other officers and departments arrived to secure the scene. See other narratives for further.

**Narrative - Beasley, Joshua - 10/3/2020 (Investigative)**

On 10-3-20 at approximately 1851 hours, I heard a dispatch come out via radio of a robbery of a business in progress. Dispatch gave the address and stated it was the Dollar General on Southwest Drive. Myself and Sgt Bryan Davis were on break at Caraway Road and Parker Road. Myself and Sgt Davis ran out and got into our separate patrol cars. Dispatch stated the business had been robbed and gave a vehicle description that was fleeing the scene. I heard Officer Shull state he located the car north bound on Southwest Drive, coming toward Parker Road. Shull

Copyright Relativity Inc.© - RPS(Relativity Public Safety)

Narrative - Beasley, Joshua - 10/3/2020 (Investigative)

then stated the vehicle was east bound on Parker. Myself and Sgt Davis were west bound on Parker. I was able to see the vehicle in the curve just west of Harrisburg Road coming at me. Sgt Davis was advising he had spike strips in the road. The vehicle passed me and continued onto Parker Road, now east of Harrisburg Road. I noticed a State Police car near Harrisburg Road, joining the pursuit. I called over the radio for an Officer to get down to Dollar General and see what actually occurred. The suspect vehicle continued on Parker Road until it turned north bound onto Caraway Road. Officer Shull had stated the car was running red lights and running cars off the road. The suspect vehicle turned east bound on Phillips Drive. The vehicle continued down Phillips Drive and turned right (south) onto Red Wolf Blvd. The vehicle went south on Red Wolf and then turned left (east) onto I555. I continued east onto I555 and noticed the State Police take the lead of the pursuit around the Commerce Drive exit. I believe I was the fourth police car behind the suspect vehicle. Before we made it to the Nestle Drive exit. the State Police car performed a "pit" maneuver on the suspect vehicle and the vehicle went off road and into the woods on the south side of I555. By now many police cars were on scene and we went to make contact locate the suspects in the woods. We located the vehicle in the woods and noticed the car had over turned. Officers were able to get two males from the back seat out of the vehicle. Once they were out, officers were able to get a female from the front passenger seat. Officer Eric Johnson was on scene and began medical treatment. I ask if we had all suspects out of the vehicle and was told that there should be four people in the car. We were finally able to locate a female in the drivers seat. however we were not able to get her out without extrication. The fire department arrived on scene and began extricating the female from the car. I stepped away and notified the Chief of Police of the incident.

Narrative - Austin, Kara N - 10/3/2020 (Investigative)

On 10-3-20 at approximately 18:52, I was dispatched to 5431 Southwest DRJonesboro, AR 72401 in reference to a robbery in progress. While en route, Ofc. Shull advised that he was behind a silver passenger car that was driving without headlights that fit the vehicle description. Ofc. Shull then advised that the vehicle began driving at a high rate of speed and driving into on-coming traffic. When the vehicle began running red lights and heading towards the interstate, State Police was contacted for assistance. I then heard over the radio that the vehicle had been stopped by State Police using a PIT maneuver. We were told that the vehicle left the roadway, ran into a ditch and then went airborne over the trees and landed on the roof in the woods.

When I arrived on scene, three of the suspects were out of the vehicle. Two were black males, sitting on the ground in handcuffs and the female was on a spine board being loaded into an ambulance. I went over to the vehicle to see if I could assist when we were told the other female suspect was deceased and trapped inside the vehicle. While emergency crews extracted the deceased female, I followed Emerson ambulance to St. Bernards. The female suspect, Octavia, had to be restrained in the ambulance due to fighting at her restrains and not complying with EMS personnel. When we arrived at St. Bernards, the suspects were placed in separate rooms and allowed no contact with each other. Myself and Ofc.Wright were advised not to disclose of the death of the second female suspect due to her being the parent of two of the suspects inside the vehicle. It was a concern that their reactions may put their wellbeing at jeopardy.

I was notified by hospital personnel that Octavia needed to be transported to the Med in Memphis due to an orbital fracture to her left eye socket. This was cleared by Sgt. Beasley. Shortly after 22:00, Ofc. Wright and I were told to release the suspects and that warrants would be filed at a later date.

With that, we cleared from the hospital.

See other officers narratives for further.

Narrative - Mccanless, Michael - 10/3/2020 (Investigative)

Today, I received a call out in reference to a robbery call that then led to a pursuit, which led to ASP assisting and in which a Trooper apparently used a "PIT" maneuver on the suspect vehicle. I was also told that the vehicle then "wrecked out" and the driver had died as result of the wreck. There were four persons in the vehicle and three of them survived. Those individuals were all transported to St. Bernards for treatment.

I spoke to several supervisors who stated that Arkansas State Police were conducting an investigation of

**Narrative - Mccanless, Michael - 10/3/2020 (Investigative)**

their involvement. and that I am responsible for the alleged robbery which was the reason for contacting and pursuing that vehicle. The robbery was said to have taken place at the Dollar General on Southwest Dr, in Valley View.

Upon arrival at Dollar General, I met with Ptl. Harris and an employee of the store. That employee, Witness #1 (Denny, Jerri), was working on getting the video of this incident saved and expanded on to show all the movements of Suspect #1 (Davis, Lakita A) while she was inside the store. I was advised that the employee who noticed the theft, and later hit by the car the suspect was driving in, had left to go home already. I then had Ptl Harris work on contacting her to meet with me at the police station for a formal interview. There was nothing else to do at this location, in that the only evidence was the video, which Witness #1 (Denny, Jerri) stated that she may have to have a supervisor come up there to gather it.

While at Dollar General, I also spoke further to several patrol officers and supervisors, to get a clearer picture of the series of events. I spoke to Sgt. Bryan Davis at length, who was the Officer In Charge tonight. He stated that dispatch sent out officers to this Dollar General in reference to a "Robbery in Progress" and gave patrol officers a description and direction of travel of the vehicle. It was said that one of the occupants possibly covered the rear license plate of the vehicle and therefore none was available. I was also advised that Ptl. Shull was traveling south on Southwest Dr, at which time he encountered the believed suspect vehicle traveling the opposite direction at a high rate of speed. I was told that he then turned his patrol vehicle around and caught up to the suspect vehicle, initiating a stop when the suspect vehicle fled. Sgt. Davis stated that with the suspect vehicle being involved in a robbery, that they continued the pursuit and that he (Sgt. Davis) attempted to "spike" the car as it fled at a high rate of speed on Parker Rd. The pursuit lasted several minutes, making different changes in direction of travel, at which time I was told that the vehicle got onto I-555 heading south towards Bay and Trumann. By that time, officers had been able to get the tag off of the vehicle, which showed a Tennessee license plate, that apparently returned to an individual with an address in Memphis, so it was believed that the vehicle was attempting to go there. Once the vehicle reached the approximate city limits of Jonesboro, I was advised that Arkansas State Police took over the pursuit and there was a subsequent wreck. I was informed that the State Trooper may have performed a "P.I.T." maneuver during the pursuit. Lastly, I was told that the vehicle crash resulted in the death of the believed driver, and serious injury of the other occupants (which was said to be three others, including one juvenile of 17 years old).

With the information known, I decided to go to St. Bernard's and try to speak to the other occupants of the vehicle. I spoke further to my supervisors, and was explained that due to the crash and "P.I.T." maneuver occurring while ASP Trooper was primary unit, that ASP would be conducting their own investigation on the pursuit portion of the incident. I would be responsible for the alleged robbery portion of the incident.

Upon arrival at the hospital, I spoke to Suspect #3 (Golden, Tacorrion) and Witness #3 who were brought there and admitted due to injuries sustained. As many facts remained unknown at this time (specifically their roles in this incident) neither was under arrest or otherwise in custody or detained, not being charged with any crime or interrogated, so both were interviewed and asked questions to gather information on the incident (as well as to gather personal information) without being read Miranda Rights.

I spoke to Suspect #3 (Golden, Tacorrion) first, who at first claimed he was asleep the whole time the incident occurred. He claims that he woke up when the police began "chasing" them, in which someone were yelling "he turning around, he turning around" and that he then saw blue lights. He stated that the "police hit us" and that they "went off the road". I then went over who was in the vehicle and where everyone was positioned. He indicated that he was sitting directly behind the driver seat, that Suspect #4 was beside him (behind the passenger seat), that Suspect #1 (Davis, Lakita A) was the driver and that Witness #2 (Jackson, Octavia) was the front passenger. He also gave me his relationship to each person (and the relationships amongst them as well). When asked about their day, he first stated that they had come to Jonesboro this afternoon and that they were all her to go shopping, however he claims that he was asleep while they were driving and seems to indicate that they had just got to Jonesboro when this incident occurred. As we spoke further, I asked different questions, such as why the driver wouldn't have stopped when the police attempted to contact them, in which he stated he did not know. He also described the events directly after the wreck and stated that he knew Suspect #1 (Davis, Lakita A) was deceased.

We spoke further, in which I did ask him if everything he was telling me was true and accurate, to which he replied yes to both. I then asked about him exiting the vehicle (at Dollar General), which would have been him based on the video and his statement of where he was sitting in the vehicle. He then lied to me and stated that he woke up, got out of the vehicle to close the trunk, completely dismissing the fact that he covered the license plate. I confronted him about not being truthful, and then he stated that he covered up the tag using a shirt he got from the trunk. A side note to this is that there had to be direct communication from within the vehicle as this was happening, in that he could not have popped the trunk, the driver must have done this and done so with the specific purpose to get something to cover the tag with. Which is exactly what is seen in the video, him getting into the trunk for a matter of

*Copyright Relativity Inc.©- RPS(Relativity Public Safety)*

Incident # 20-09897 **Jonesboro Police Dept** Report Date 10/03/20

Page 11 of 15 Incident Report Report Time 7:15 PM

Narrative & Statements

**Narrative - Mccanless, Michael - 10/3/2020 (Investigative)**

seconds, closing it and then getting back in the car before striking the employee with the door. He still maintained that he was sleeping and woke up when they were at Dollar General and at first claimed ignorance of the theft that was taking place by Suspect #1 (Davis, Lakita A). I again confronted him about not knowing, because why else would he have covered the tag, in which he then admitted that this is the reason and that he did it to because "that's how they catch people" (meaning by getting the vehicle tag number). He then stated that he saw the employee outside trying to get the tag number.

I then asked him what happened after the covered the tag and got back in the vehicle, just prior to them leaving the parking lot. He hesitated for a bit, and stated that he opened the door again because his phone charger was stuck in the door and that he accidentally hit the employee with the door (as well as apologizing for doing so). He would not state that he opened the door purposefully and I did not use any advanced methods of confrontation, in that this was an interview and not an interrogation. I did get the notion that he was not truthful in this statement however.

Next, we talked about the property recovered and where it might belong, in which he was not much help in this area due to him either not knowing Jonesboro, asleep, etc. He later did give some information that gave me some directions to go. We also spoke about the pursuit, in which he could not give specific directions or routes, again because he is not from here. He stated they "was going fast because we was trying to get away". He was very ambiguous and generic with most of his answers, only ever telling the truth once I confronted him which makes it hard to determine if any of his answers or statements are accurate.

I then went to speak with Witness #3 who is a juvenile of whom I was interviewing as a witness. He was not under arrest or detained, not going to be arrested or charged, not thought to be a suspect for any crime at this point and was thought to be a witness rather than a suspect at this point (and I did explain that to him). I gathered his information as well as the others in the vehicle and their relationship to each other as he knew them. He was visibly upset and I asked him what he knew about the injuries with everyone, and he did already know of Suspect #1 (Davis, Lakita A) death. He was able to confirm the locations of everyone in the vehicle (matching what Suspect #3 (Golden, Tacorrion) stated previously. He states that they are all from Memphis and that he "don't remember everything" but that he woke up from sleeping and saw three police cars chasing them. He then says that he told Suspect #1 (Davis, Lakita A) not to wreck and that the "police hit us". We also spoke about when he believed they got to Jonesboro, but he claims that he was asleep most of the car ride and that when he woke up "we were already being chased and everyone was panicking".

When asked if he wanted to talk about why they were her (in Jonesboro), he stated that he did know, but did not specifically know what happened at Dollar General. The only thing he states that he knows is "when we left the parking lot, the police turned around on them". I began confronting him about knowing specifics, because this is the same thing Suspect #3 (Golden, Tacorrion) was stating, who then gave different information as we spoke further. He then claims that the group left Memphis before noon (approximately) and that he did sleep in the car, but also does remember "a few stops". He continued by stating he remembers a Hobby Lobby, the Dollar General and some other store. He also states that he and Suspect #3 (Golden, Tacorrion) never got out of the vehicle today.

He would admit that thefts were occurring and that is why Suspect #1 (Davis, Lakita A) ran from the police. He believes she did so the keep any of them from being caught or getting in trouble. He then said that he does remember pulling into the Dollar General and that Suspect #1 (Davis, Lakita A) went inside and came back out with toilet paper or paper towels, as well as having a backpack on her. This is when he describes "the lady came out and tried to take a picture of the tags" and that SUSPECT3] got out "to cover them". When they left the parking lot, he says that a police car was coming towards them, passed by and then made a "U-turn". He reiterates that Suspect #1 (Davis, Lakita A) did not stop. He did agree that this was to keep from getting caught. He then states that the police car "tapped us", at which time they left the roadway. He then describes the aftermath of the wreck and states that he heard that Suspect #1 (Davis, Lakita A) was deceased.

I then asked about the firearm inside the vehicle (asking him "who shot the gun" to see his reaction), in which he looked genuinely confused by. I had forgotten to ask Suspect #3 (Golden, Tacorrion) the same question previously. Witness #3 claimed that he did not know there was a gun in the car and that he did not know who it could have belonged to or been in the possession of. I did not press this line of questioning on the gun because he did not show any deceptive traits.

I then went over the Dollar General portion of the incident, asking if he remembered "T" (Suspect #3 (Golden, Tacorrion)) opening the door and hitting the lady with the door, in which he replied "I think, yeah". I also asked if he knew how fast they were going while running from the police, in which he stated he thinks it was over 100mph. I laid out the scenario that he and the others had spent all day shop lifting, got caught at Dollar General and then fled because they didn't want to get caught/arrested/etc., in which he continuously said "yeah" and nodding his head occasionally in agreement.

*Copyright Relativity Inc.© - RPS(Relativity Public Safety)*

**Narrative - Mccanless, Michael - 10/3/2020 (Investigative)**

We spoke further about where the stolen property came from and he described several places that did not seem to match Jonesboro (different stores around them, not remembering stores here that were besides the one he stated, etc.). He again stated that he had no idea a gun was in the car. As we then spoke about how they knew where to go and what stores to hit, he claims that the two girls used their GPS on their phones. I then concluded the interview with answering questions and telling him to contact me if he needed anything.

Next, I traveled to the police department and interviewed Victim #2 (Franke, Rachel), who is the employee at Dollar General who called the police and was also the one who confronted the group outside and took cell video of the interaction. During this interview, she stated that she witnessed Suspect #1 (Davis, Lakita A) come into the store and described her as seen in the video (both her cell and what I had viewed at Dollar General briefly). She states that she saw the female doing different things that led her to suspect her of stealing. She describes the female taking boxes of the 5-hour energy drinks from the shelves near the cash register and taking them to an adjacent isle, where she squatted down and looked as if she was putting items into her backpack. She also described the female taking lighters. When asked if she actually saw the female taking or concealing items, she stated no.

We also spoke about her going outside and confronting them. She states that there was no interaction from the suspect and that she went outside to get the female to come back into the store. She recording and stated that it appeared that 3-4 people were all inside the car, which she described what she could about them. She did identify the vehicle with the same color a description and stated that the back driver side male exited the car, went to the trunk (that had then been popped open) and did something at the rear of the vehicle. She believed he covered up the vehicle license and described what she saw. She also stated that at that point, as he got back into the back seat and the vehicle began moving forward, she was positioned beside the driver side door and back drivers side door, at which time the back driver side passenger opened the door and hit her with it as they drove off. She claimed that he just did a "door check" type move and that she was sore from it but sustained no real injury. She felt that the move was deliberate in an attempt to get her away from the car.

We also went over her calling 911 (or dispatch) and what she reported the crime as, in which she stated she used the term "robbery". When we spoke further, she did indicate that she knew the difference between a theft and robbery, in which she claims that "robbery" is what came to her mind when she called.

***Please refer to all body cam and formal interview video recordings for exact statements, as this narrative and quotes are paraphrased or dictated to the best of my ability and accuracy***

**Narrative - Wright, Bruce - 10/4/2020 12:25:00 AM (Investigative)**

On 10/3/20 at approximately 6:51 pm, a call went out about a robbery in progress at 5431 Southwest DRJonesboro, AR 72401. I had just left a call around the area of Airport and Johnson and headed towards the area of 5431 Southwest DRJonesboro, AR 72401. Ptl. Shull called out over the radio that he was behind the suspect vehicle and was on Parker Rd. heading towards Harrisburg. I was currently on Redwolf at Johnson and continued on south on Redwolf. Ptl. Shull called out that he thought the suspect vehicle was trying to get on I-555 south. I got on the on ramp to I-555 at Redwolf and Ptl. Shull radioed that the vehicle turned right on Phillips and they were in front of Cracker Barrel. I made a U-turn on and got back on Redwolf heading north. At the top over the overpass on Redwolf at I-555 the suspect vehicle and Ptl. Shull passed me and made a U-turn and joined the pursuit. We made a left onto I-555 heading south. Due to road construction I-555 was operating with only one lane. The suspect vehicle was pushing several vehicle onto the shoulder. I noticed that ASP was behind me and pulled onto the shoulder to let him take the lead. Ptl. Shull did the same and ASP was now the lead vehicle. We cleared the construction area and the traffic was light. I noticed that we passed two vehicle and was now clear of traffic in front of us. I noticed the ASP trooper conduct a pit maneuver and the suspect vehicle left the roadway to the right and became airborne and entered the wooded area the right of I-555. I pulled to the right came to a stop and began searching for the suspect vehicle.

Once the suspect vehicle was located, we learned that the vehicle had turn upside down and struck a tree

*Copyright Relativity Inc.© - RPS(Relativity Public Safety)*

**Narrative - Wright, Bruce - 10/4/2020 12:25:00 AM (Investigative)**

causing extensive damage. All air bags have fired including the side curtains causing visibility into the vehicle not exist. Verbal commands were being given, but could not get any response to come from inside the vehicle. After the side windows were busted out, we were finally able to make contact with the suspects. Two male suspects were pulled out and appeared to have minor injury. One female was pulled out and she appeared to be in critical condition. She was placed on a spine board and pulled her away of the crash scene.

I was helping JFD with getting their equipment to the crash scene to assist with the extraction of the forth occupant who was the driver. We was advised that we could slow down due to the confirmation that the driver had no signs of life. I this moment, I shifted my efforts to getting the female on the spine board loaded on a gurney to be transported to the hospital.

I was instructed to follow EMS to St. Bernards to sit with the occupants of the vehicle. I was later called by a supervisor that I could release the suspects and they were left in the care of St. Bernards.

See other officer's narratives for more information.

**Narrative - Oldham, Kenny - 10/5/2020 (Investigative)**

On this date, I submitted an E-Trace request on E1 (Glock 30). The E-Trace number is T20200389098.

On this date, I ran the serial number of E1 through NCIC with NEGATIVE results.

On this date, Det Wiiest and I test fired E1 for functionality. Four rounds were fired through the firearm and it fired and cycled the rounds as designed. Two of the test fired casings were collected for NIBIN entry.

**Narrative - Mccanless, Michael - 10/5/2020 (Investigative)**

I was able to obtain a search warrant for the suspect vehicle today, by Judge Boling, and went to Terry's Towing on Parker Rd. Upon arrival there, I met with the manager/owner Terry, who stated that the tow driver had picked up a lot of property from the scene on 10/03/20 due to the vehicle being upside down and severely damaged. The items collected were put into a black and white backpack that was located in the vehicle. Upon executing the warrant, he provided me this backpack and I documented the contents, which included several bottles of perfume (some in the packaging and some out of the packaging), a large number of mascara boxes containing "MAC mascara" and misc. items. I was able to locate an amount of cash and debit/credit cards belonging to Suspect #1 (Davis, Lakita A), as well as a large amount of lighters, multiple energy drinks (the small 5-hour ones described as stolen from Dollar General), 2 Iphones, keys, ladies wallet, prescription pills (Cyproheptadine, 60), lotion, gloves and some misc. items.

Once these items were documented and bagged for evidence, I went to the listed vehicle. I was able to photograph various items inside the vehicle that were believed to be stolen merchandise from various stores, which were unknown at this time. I located a large amount of merchandise in the trunk of the vehicle. I did not however, find any receipts with this merchandise. Most notably, there were two sacks from Hobby Lobby that contained numerous foam lily pads of different sizes and colors, along with two rolls of fur fabric (one pink, one white). There was a second backpack inside the vehicle that contained two new pairs of Crocs brand shoes, both with a distinct white/yellow sale tag that appeared it may have come from a store like TJ Maxx, Burlington or something similar, again with no receipt. There were other items which appeared to be merchandise that were also collected, in order to investigate their origins further.

I was also advised by Det. Varner, that four cell phones were recovered from Arkansas State Police, who advised the phones were recovered on scene of the wreck and were and also placed into ICAC, where Det. Varner was made aware of and will work on search warrants for the contents. The phones may show communications of the parties involved as they were actively stealing items (as is common with groups or multiple persons involved in coordinated thefts), as well as search histories or location services that may show other location they were at on that day.

*Copyright Relativity Inc.© - RPS(Relativity Public Safety)*

**Jonesboro Police Dept**
Incident Report



**Narrative & Statements**

**Narrative - Mccanless, Michael - 10/5/2020 (Investigative)**

Later this afternoon, I was contacted by Det. Varner who stated that a search warrant had been signed for the phones, however only two could be entered and data extractions completed. In those extractions, searches of various stores in Little Rock were seen. Further evaluation of the phones is occurring.

With looking at the property in evidence once more, I found that a few of the perfume bottles had Ulta stickers on the bottom. It was originally believed that they came from a store in Jonesboro (maybe Dillard's, TJ Maxx or etc.), however the Jonesboro Ulta was destroyed earlier this year in a tornado, and is still closed. I will be researching Ulta stores between Jonesboro and Little Rock, since this is believed to be the path the group took that day, from Memphis. There is one in North Little Rock, one in Little Rock and one in Searcy. There are no Ulta stores on I-40 between Little Rock and Memphis.

**Narrative - Mccanless, Michael - 10/7/2020 (Investigative)**

Upon investigating the property recovered from the vehicle, in better detail, I contacted the Ulta in Searcy and spoke to management there. Giving them the date of event, I was advised that they did have a black female matching that description and same vehicle, who came into their store and stole what was believed to be a felony amount of perfumes. I asked if they happened to have video of that incident, in which she stated she would contact the person who could get it and let me know (they did have video but it was unavailable right now).

I then saw that Ulta had a Hobby Lobby in the same strip mall area, as well as some other shops. I began calling these stores and speaking with different managers from each one. Hobby Lobby will be reviewing their video that day of matching suspects. They did show that several of the same lily pads appeared to be missing, but they could not tell me inventory number at the moment. I also spoke to the Shoe Dept. Encore there in the same location, in which I described the Crocs located in the vehicle, as well as the specific type of sales tag on it (white and yellow). They stated that this did appear to be their merchandise and was able to confirm this by running the tag UPCs. They did not have any video in their store.

I was advised by Det. Varner that the cell phones collected from ASP and a search warrant completed, had been released to the family of Suspect #1 (Davis, Lakita A) after the extractions were completed previously.

**Narrative - Mccanless, Michael - 10/12/2020 (Investigative)**

Hobby Lobby in Searcy was able to find video of Suspect #1 (Davis, Lakita A) and Suspect #2 in the store, shoplifting several items there. They can apparently be seen leaving with two bags full of items and carrying a large roll of the white fur fabric that was located inside the vehicle. Management stated that they were unsure if the suspects were in the store before or after this particular event found, but that they did not see either of the two women leaving with the pink fur fabric. I was advised that they did not show any transactions for these items, nor do they sell the fabric in rolls like that. The video located will be burned to a disc for evidence.

I will be traveling to Searcy later this week, to transfer property to each business there that had merchandise stolen from them, as well as hopefully gathering the video from Hobby Lobby there.

**Narrative - Mccanless, Michael - 10/16/2020 (Investigative)**

Today, I went to Searcy, AR to release property to the three known stores whom stolen property was recovered from the suspect vehicle. I first went to Hobby Lobby there and released E6 and E11. Management was also able to give me a copy of the video from there store that showed Suspect #1 (Davis, Lakita A) and Witness #2 (Jackson, Octavia) taking items and leaving with them, which I reviewed later this afternoon. In that video, Suspect #1 (Davis, Lakita A) is wearing the same clothing as what she was wearing in Jonesboro and can be seen leaving with Witness #2 (Jackson, Octavia) with a cart and carrying the white fur fabric.

I then went to Shoe Depot Encore and released E9. They advised that they had no working cameras inside the store. Lastly, I went to Ulta and released E16 and E18. They had previously sent me their video footage and did not have any further information.

Incident # 20-09897 | **Jonesboro Police Dept** | Report Date 10/03/20
Page 15 of 15 | Incident Report | Report Time 7:15 PM

Narrative & Statements

**Narrative - Mccanless, Michael - 10/20/2020 (Investigative)**

Upon full review of all the evidence found in this investigation, it was found that the actions of the deceased, as well as Suspect #3 (Golden, Tacorrion), showed clear intent to commit theft at the Dollar General on Southwest Dr. With the previous and continued criminal activity in Searcy, along with entering the store without legitimate purpose other than to commit theft, as well as the force used by Suspect #3 (Golden, Tacorrion), it is believed that probable cause would exist to charge both Suspect #1 (Davis, Lakita A) and Suspect #3 (Golden, Tacorrion) with Robbery. The statutory threshold and language of 5-12-102 states "A person commits robbery if, with the purpose of committing a felony or misdemeanor theft or resisting apprehension immediately after committing a felony or misdemeanor theft, the person employs or threatens to immediately employ physical force on another person." It can be reasonably established that Suspect #3 (Golden, Tacorrion) knew what was going on with the criminal activity in Jonesboro, especially with getting out of the vehicle to cover the license plate, and that the use of force was intentional as a means by which to flee the scene.

Due to the death of Suspect #1 (Davis, Lakita A), there will be a lack of information and/or evidence that might have been available otherwise (Suspect #1 (Davis, Lakita A) statements, confession or denial, etc). There was also a denial from Suspect #3 (Golden, Tacorrion) that he purposefully struck the employee with the door, as well as that he knew exactly what was going on. With the death of the primary suspect/offender, as well as conflicting information from the suspects statements, no arrest or war will be pursued for Suspect #3 (Golden, Tacorrion). Also, with the severity and complexity of this case, the case file shall be forwarded to the Craighead County Prosecutor's Office for a final review of any formal charges for Suspect #3 (Golden, Tacorrion). The report will be listed as CLOSED with an exceptional clearance of "Death of Offender" and may be reopened depending on the review of the Prosecutor's Office.

Copyright Relativity Inc.© - RPS(Relativity Public Safety)

PS-22-004

COPY

# JONESBORO POLICE DEPARTMENT

## Performance Notice

To: Ptl. Chris Shull Badge Number 1345

You are hereby: ☐ Counseled ☐ Admonished ☒ Reprimanded

The narrative below explains the reason and/or reasons for this action.

On January 16th, 2022 at approximately 0830 Pfc. Gifford attempted to stop a vehicle and that vehicle began to flee from him. Sgt. RJ Smith radioed to officers to terminate the pursuit. Ptl. Shull contacted Pfc. Gifford via main radio channel and asked him to go to channel three. Ptl. Shull asked Pfc. Gifford to assist with a rolling road block after Sgt. RJ Smith had previously terminated the pursuit. Pfc. Gifford told Ptl. Shull that they were not doing it due to it being a traffic hazard.

The officers continued follow at a safe speed while recording the suspect vehicles actions. Pfc. Gifford advised Sgt. RJ Smith that the vehicle had slowed down and let them catch up. Sgt. Smith told officers over the radio that the suspect was trying to get them into a pursuit and to disregard and follow at a safe speed.

Ptl. Shull then proceeds to accelerate to catch up to the vehicle and pull in front of it while activating his emergency lights. Ptl. Shull Begins to slow down and swerve back and forth in an attempt to slow the vehicle down. These actions taken by Ptl. Shull were reckless and could have put citizens in danger.

Ptl. Shull has been previously reprimand twice for reckless actions while operating a Police vehicle.

For these actions Ptl. Shull is reprimanded for insubordination which is a violation of policy 304 Code of Conduct, section V, B, 1, Duty to obey Orders.

A copy of this reprimand will be forwarded to the Office of Professional Standards for further review. Further disciplinary maybe taken by the Chief of Police.

From: Lt. T. Dy[illegible] 384 Received by: Ptl. Chris Shull 1354 Date: 1-27-2022

Signature of Supervisor — Signature of receiving Officer



EXHIBIT

D

PS-22-004

# Jonesboro Police Department

COPY

## Notice of Disciplinary Action

Instructions: This notice must be served on an employee when any of the following types of disciplinary actions are taken:

(a) suspension of any number of days;
(b) suspension more than three times or for an aggregate of more than fifteen days in one calendar year;
(c) disciplinary demotion;
(d) termination;
(e) resignation not in good standing.

| | Name | Rank/Title |
|---|---|---|
| Subject Employee: | Chris Shall | PH |
| Chief of Police: (or Designee) | Rick Elliott | Chief |

On 1-16-22 you were named as the subject employee in the complaint or charge lodged on 01/16/2022 by LT. T. Duffy Which contained the following allegations:

Policy Violations

The charge made against you has been sustained. The following disciplinary action is being taken against you:

Suspension, of 2 days beginning on 2-2-22 (Date) and ending 2-3-22

Termination, effective ________ (Date)

Demotion to position of ________ effective ________ (Date)

Resignation not in good standing, effective ________ (Date).

Other disciplinary action: ________

Signature: [signature] (Chief of Police or Designee) Title [signature] Date 2-1-22

Appeal Procedure to the employee: You have a right to appeal this disciplinary action. You may file a written appeal to the Human Resource Officer or to the Mayor of the City of Jonesboro within five days of receiving this notice. The Mayor will make a final Management decision and respond in writing to all concerned parties within ten working days.

Questions regarding LOFPI and/or retirement benefits must be addressed with Human Resources.

PS19-024

# JONESBORO POLICE DEPARTMENT

## Performance Notice

To: Officer Christopher Shull Badge Number 1354

You are hereby: ☐ Counseled ☐ Admonished ☒ Reprimanded

The narrative below explains the reason and/or reasons for this action.

On 05-07-2019 you were asked to assist school personnel with a disruptive student. While the student was being extremely defiant and his actions were forceful, your verbal response was outside of Jonesboro Police Department Policy for this particular incident and circumstances.

You are reprimanded for violating department policy 304.04; V. I.

This reprimand will be placed in your personnel file and future violations similar in nature could result in more serious disciplinary action being taken against you.

From: Cpt. J. Baxter 107 / 6 (Signature of Supervisor) Received by: Chris Shull / 1354 (Signature of receiving Officer) Date: 5/24/19

EXHIBIT
E

| | |
|---|---|
| Professional Standards Investigation: | PS 19-024 |
| Subject Officer: | Ptl. Christopher Shull |
| Complainant: | Brittney Walker (parent) |
| Nature of Allegation: | Conduct unbecoming |
| Date of Allegation: | 05-07-2019 |
| Investigators Assigned: | Cpt. Scott Baxter |

On 05-09-2019, Professional Standards Office received a complaint in the Administration mailbox from Brittney Walker complaining about Officer Shull "Cussing a Student Out". She detailed in her description that on 05-07-2019, she was told by the school principle that Officer Shull had told her son that he "will slap the shit outa him".

05-20-2019 Cpt Baxter contacted Todd Rhoades, Director and Natoya Buchanan, Asst Director at Success Academy by phone. Director Rhoades was familiar with the incident but Asst Director Buchanan was the one that actually witnessed what happened. (She was also the person who Mrs Walker referred to as the 'school principle' who notified her of the incident.) In summary: Mrs Buchanan advised that the student was being disruptive and had been sent to her office and Officer Shull was sitting in while she attempted to deal with the issues. He was eventually referred to 'meditation' room while awaiting his mom to pick him up. As he left her room, he flung open the door to her office, slamming it into a file cabinet. She said that Officer Shull responded by telling the student "that makes me want to slap the shit out of you". Audio of this conversation will be included in the file.

On 05-22-2019 at approximately 2:53 PM, Officer Chris Shull was interviewed by Cpt Baxter. He advised that the student had been in a verbal altercation with an older female student in the hall. Director Rhoades tried to deal with the student but the student was defiant and non-cooperative so Director Rhoades asked Officer Shull to escort him to Mrs Buchanan for suspension. He said that Mrs Buchanan tried to talk to the boy for about 45 minutes and he tried to reason with him for 10-15 minutes but all was to no avail. He said that he sometimes gets emotionally attached to some of the kids up there and really wants to help them to succeed and he felt like they were going above and beyond to try to get through to him, especially given that he had already done enough to justify an arrest. Officer Shull indicated that the student was being very defiant & said that when he slammed that door open, he did make the comment "that makes me want to smack the shit out of you" as he told him he needed to come back and apologize to Mrs Buchanan. He said that he realizes that he should not have made the comment and was just very frustrated that they could not get through to him. Audio of this interview will be included in the file.

**Findings**

Conduct unbecoming (Pol. 304.04; V. I.) Sustained.

While the student was being extremely defiant and his actions were forceful, the verbal response from Officer Shull was outside of Jonesboro Police Department Policy for this particular incident and set of circumstances.

Cpt. J. Baxter 1076

Cpt. J. Scott Baxter

05-23-2019

# Jonesboro Police Department

## Citizen Complaint Form

Date: 5-8-19 Internal Affairs Case #: PS19-024

Complainant's Name: Brittney Walker

Complainant's Address: 1606 Garland Dr

City: Jonesboro State: AR Zip: 72401

Home Ph# 870-761-4786 Work Ph# ______ Cell # ______

Type of Allegation: Police Office Cussing a Student Out!

Location of Occurrence: Success

Date of Occurrence: 5-7-19 Time: 12:00 ☐am ☒pm

Employee(s) Allegedly Involved: Christopher Shull

Witness:

| Name | Address | Phone |
|---|---|---|
| Amber Harris | N/A | 870-882-1145 |
| Dorloris Andrews | N/A | 870-931-9647 |
| Natoya Buchanan | N/A | 870-931-9647 |

**Description of Allegation/Statement of Complaint**

On May 7, 2019 I received a phone call from the School principal stating the fact that Officer Christopher Shull told my son D'Tavion Woodson that He will Slap the Shit outta him. and me being a mother dont think he Should Be Allowed to Cuss no Student out and I would like for Someone above Officer Christopher to do Something about this Because He is totally in the wrong. You dont Cuss nobody child out if He did it to him aint no telling whats next.

Turn in to Administration

Citizen Complaint Form
(Continued)

(If more space is needed, use back of form or attach a supplement)

**COMPLAINT AFFIRMATION**

I, Brittney Walker do hereby affirm that the foregoing information is true and complete to the best of my knowledge and belief. I understand that any false, misleading, or untrue statements or writing to any person(s) investigating this complaint, may subject me to civil prosecution by the accused.

I further realize that it may become necessary, during the investigation of this complaint, for me to meet with a member(s) of the Jonesboro Police Department to discuss this complaint; either in the presence or absence of the accused department member(s) at the discretion of the department.

I hereby accept the premise that if any action is initiated through a court or administrative hearing as a result of my complaint, my testimony before these hearing may be required. I hereby agree to make myself available to aforementioned court or administrative hearing when requested to do so.

Complainant's Signature: Brittney Walker

Related Incident Report Case # (attach copy) NONE

Receiving Officer's Signature: Sgt [signature] 470

Reviewed by: ____________________ Rank: ____________________

# Jonesboro Police Department

## Complaint Receipt

The members of the Jonesboro Police Department are committed to providing Law enforcement services that are fair, effective, and impartially applied. It is in the vest interests of everyone that your complaint about the performance of an individual officer is resolved fairly and promptly. The Police Department has formal procedures for investigating your complaint. These procedures are designed to ensure fairness and protect the rights of both citizens and law enforcement officers.

Your complaint will be subjected to a thorough and objective investigation.

You may be asked to assist in this investigation.

You will be advised of the outcome of the investigation.

If the investigation shows that a crime has been committed, you may have to testify in court.

If the investigation results in the officer being charged with a violation of department rules, you may have to testify in a departmental hearing. All disciplinary hearings shall be closed to the public unless the defendant officer requests an open hearing.

If the investigation shows that the complaint is unfounded or that the officer acted properly, the matter will be closed.

CAUTION: The Jonesboro Police Department takes allegations of employee misconduct seriously; consequently, if the investigation reveals the complaint was made maliciously, in bad faith, or with knowledge that the accusation was false, action shall be taken, whenever possible, to prosecute for a false report.

You may contact the department about internal affairs matters through the office of the Chief of Police at 933-4614 between the hours of 8am and 4pm with any additional information or any question about the case.

**I have read and I understand the above information.**

Brittney Wallace — 5-9-19 / 3:56

Complainant's Signature — Date/Time

[signature] — 5-9-19 / 1555

Receiving Officer 470 — Date/Time

**Turn in to Administration**

# CITY OF JONESBORO POLICE DEPARTMENT

***********************************************************************

| | | |
|---|---|---|
| *Type of Communication* | : | *General Order* |
| *Dissemination* | : | *Department* |
| *Destination* | : | *Directive Manual* |
| *Number* | : | *304.04* |
| *Topic* | : | *Code of Conduct* |
| *Effective* | : | *May 06, 2016* |
| *Status* | : | *Revised* |
| *Approved By* | : | *RE* |

***********************************************************************

*Reference:* **ALEAP: 1.08, 2.12, 2.13, 2.14, 2.15, 2.16, 2.17, 2.18, 2.19, 2.20, 2.21**

## I. Purpose and Policy

A. Law enforcement employees, representing government, bear the heavy responsibility of maintaining their own conduct, and the honor and integrity of the government entity that they represent and will conduct themselves in a manner which does not bring discredit upon them, the Department or the City or impair department or city operations. It is the purpose of this policy to provide additional guidance to the standards of conduct embodied in the law enforcement officer's code of ethics, this agency's mission statement and core values, as well as other ethical directives issued by superior governing authorities that may be applicable to this department so that employees of this department will better understand prohibitions and limitations pertaining to their conduct and activities while on and off duty.

B. It is the policy of this department to maintain the highest standard of integrity by working diligently to maintain the community's trust. All departmental employees must recognize that they are held to a higher standard than the private citizen they protect, in addition to representing the Department, they also represent the law enforcement profession. Conduct, on and off duty, must be beyond reproach and meet the highest degree of professionalism and personal accountability. Employees of the Police Department are to respect the rights of individuals and not engage in or tolerate discrimination, oppression or favoritism. Department employees must avoid any conduct that might compromise the integrity, morale, operations or efficiency of the Department. Violation of Federal, State and Local laws, as well as City or Department Policy may result in disciplinary action up to and including termination. [2.17]

## II. Scope

A. The provisions of the Code of Conduct are observed by all employees of the Department in order to maintain the confidence, respect, and support of the public.

B. Violation of Federal, State and Local laws, as well as City or Department Policy may result in disciplinary action up to and including termination, as outlined in policy 317. Additionally, attempting or conspiring to complete any such violation will also result in disciplinary action.

leave means that without proper authorization, the employee fails to report for duty at the time and place of duty or leaves a place of duty or assignment.

2. Unless otherwise directed, officers are to report to daily roll call at the time and place specified wearing the proper uniform and equipment. Careful attention is given to orders and instructions. It is the responsibility of each employee assigned to a shift, who cannot report for duty due to illness, to notify an on-duty supervisor or commanding officer at least one hour prior to his or her reporting time. Personnel working non-shift assignments (CID, DTF, etc) must notify their supervisor within 30 minutes before the workday begins.

3. Nonexempt sworn or non-sworn personnel may be required to work extra hours in addition to their regular workday or workweek when an emergency exists. Personnel shortages can be considered an emergency. All time worked in excess of the standard workday or workweek will be paid in accordance with current overtime and/or compensatory time policies.

F. Employees remain alert, observant, and occupied with Departmental business during their tour of duty. When on duty, employees devote their entire time and attention to the business of the Department. Employees are prohibited from engaging in the following activities while on duty:

1. Sleeping, loafing, or idling.

2. Recreational reading, except at meals.

3. Utilizing any article which distracts from the proper performance of their duty.

4. Drinking intoxicating beverages, except in performance of a police duty, and then only with the specific consent of a command rank officer, and never in uniform.

5. Gambling (including the purchase of lottery tickets), except in performance of a police duty, and then only with the specific consent of a command rank officer, and never in uniform.

6. Any sexual conduct.

G. Employees promptly submit all reports, records, citations, or other materials, which are required by the performance of their duties or by competent authority.

H. Officers obtain prior approval of their supervisor before initiating undercover investigations and all such approval is forwarded to the Chief of Police.

I. While the urgency of a situation might preclude ordinary social amenities, lack of professionalism will not be tolerated. Employees shall strive to: be courteous and civil to the public, as well as fellow employees; avoid harsh, violent, profane, or insolent

language or demeanor and shall maintain objective attitudes regardless of provocation. Employees do not, at any time, ridicule, mock, deride, taunt, or belittle any person. Neither do they willfully embarrass, humiliate, or shame any person nor do anything intentional that might invoke any person to violence.

J. Intoxicants [2.19]

1. Employees never bring or keep any intoxicating liquor or beverage in Departmental facilities, except that liquor or intoxicants brought to Departmental facilities in the furtherance of a police task, and these are promptly identified and stored according to policy.

2. Employees never become intoxicated while on duty nor consume intoxicants while off-duty to the extent that evidence of such consumption is apparent when reporting for duty or to the extent their job performance is impaired. Officers in uniform never purchase or consume any form of intoxicants.

3. Officers on duty or in uniform do not enter private clubs or other similar establishments except to perform a police service or need.

K. No expenditure of money is made or liability incurred in the name of the City of Jonesboro or the Department unless authorized by the Chief of Police.

L. Because law enforcement is often a physically demanding occupation, the Jonesboro Police Department places the responsibility on its employees to maintain their good health and the level of physical fitness required to perform law enforcement duties. Employees of the Department are encouraged to maintain a healthy diet and exercise regularly. Payroll incentives will be offered to officers who complete required testing.

M. Employees shall furnish the Department with his or her current telephone number and address within 24 hours if changed, in the form of a memo to their supervisor who shall forward the memo to the Administrative Secretary.

N. Use of Tobacco Products

1. Smoking is prohibited by state law in any city owned vehicle or building and the use of tobacco or tobacco related products while in any city building, city owned vehicle or at any time while in personal contact with the public is prohibited.

2. Tobacco use may occur only in areas designated as smoking areas or locations outside that are no closer than fifty (50) feet from the entrance to any public building or other enclosed area.

3. Public use of tobacco products detracts from the professional image of the individual and department and such use of any tobacco products is strongly discouraged during duty hours. Examples of tobacco related products include, but

PS19-024

**JONESBORO POLICE DEPARTMENT**

**PERSONNEL INVESTIGATION**

Date: 05-22-2019 1453

Officer's Name: Christopher SHULL Rank: PTL.

Complaint: Conduct unbecoming – cursing a student

The following statement/interview is being conducted in reference to the above complaint that has been made against you.

You will be asked questions specifically directed and narrowly related to the allegation(s) made against you.

You are entitled to all the rights and privileges guaranteed by the laws of the state of Arkansas and the Constitution of the United States, including the right not to incriminate yourself.

As this is a personnel investigation you are compelled to answer fully and truthfully all questions asked concerning the complaint or allegation(s) made against you. Refusal to answer any questions relevant to this personnel investigation will be deemed insubordination and you will be immediately placed on suspension pending a hearing before the chief of police.

If you do answer, neither your statements or any information or evidence which is gained by reason of such statements can be used against you in any subsequent criminal proceedings. However, these statements can be used against you in relation to subsequent departmental charges.

I understand that I have the right to have a witness of my choice present during this interview. This individual will be present as a witness only and will not be allowed to become actively involved in this interview process.

Officer's Name: X Chris Shull/1354 Date: 5/22/19

Investigating Officer: Cpt. [illegible] Baxter 107/6

Witness: ______

# JONESBORO POLICE DEPARTMENT

*"Striving for Excellence"*

Jonesboro Police Department
Professional Standards Investigation Findings

Brittney Walker
1606 Garland Dr
Jonesboro, AR. 72401

Mrs. Walker,

The complaint you filed against Officer Christopher Shull on 05-09-2019 has been investigated by Captain Scott Baxter.

Officer Shull was asked to assist school personnel due to your son's disruptive behavior. While your son was being extremely defiant and his actions were very forceful, Cpt Baxter did conclude that Officer Shull's verbal response was outside of Jonesboro Police Department policy.

The Jonesboro Police Department strives to maintain high levels of professionalism and we take complaints very seriously. Officer Shull has and will continue to receive training concerning the issues covered in your complaint. We thank you for bringing this matter to our attention.

Cpt. J. Baxter 107 6

Captain J. Scott Baxter

05-23-2019

1001 S. Caraway Road • Jonesboro, Arkansas • Ph (870)935-5562 • Fax (870)932-3892

PS19-048c

EXHIBIT F

# JONESBORO POLICE DEPARTMENT

## Performance Notice

To: Ptl. Christopher Shull Badge Number 1354

You are hereby: ☐ Counseled ☐ Admonished ☒ Reprimanded

The narrative below explains the reason and/or reasons for this action.

On or about July 13th, 2019, you (Ptl Shull) were advised that you had an excessive amount of untagged videos (331 videos) in Evidence.com. At that time you were advised to correct this problem, and were given a week to fix this issue. On July 21st, 2019, Sgt Morris checked Evidence.com to confirm that this issue had been resolved. He checked to see that all videos had been tagged and noticed that it showed to be at zero when the category of "None" was selected. He then scrolled down the list and observed that there were still numerous videos that were not labeled. He unselected the category of "None" and typed "None" in the ID field and it showed that there were 277 videos still untagged.

After further investigation it appeared that you mass categorized the videos by selecting a page (100 videos) and categorizing all of them as "Citizen Complaint/No Arrest." Sgt. Morris then checked two other officers (Branstetter and McQuay) who were given the same task of tagging videos. It showed that both these officers had done the same thing, and mass categorized videos.

After completing a routine audit search of the system it appeared that you three officers conspired to improperly categorize videos so that Sgt. Morris wouldn't notice they were completed, and would assume that you had completed the task given. During the investigation of this incident it was determined that you and the other officer categorized the videos within minutes of each other. After you were questioned about this incident it was determined that Ptl McQuay was the one who brought this idea to your attention, which you willfully followed along with.

By conspiring with other officers in an attempt to deceive your supervisors, you have violated Dept. Policy 304.05 Code of Conduct for disobeying a direct order and insubordination and Dept. Policy 510.00 Body Worn Camera for not properly labeling and categorizing videos in a timely manner.

You are receiving a Letter of Reprimand for this incident which will be forwarded to the Department's Office of Professional Standards for review. In addition, you will complete a course on police ethics and will lose your take-home vehicle privledges for a period of two weeks.

Any further incidents of this nature will not be tolerated and will result in more severe disiplinary action, up to and including termination.

From: Lt. S. McDaniel
Signature of Supervisor

Received by: [signature] 1354
Signature of receiving Officer

Date: 8/12/19

20-066
20-065
SAN

# JONESBORO POLICE DEPARTMENT

## Performance Notice

To: Christopher Shull Badge Number 1354

You are hereby: ☐ Counseled ☐ Admonished ☒ Reprimanded

The narrative below explains the reason and/or reasons for this action.

On January 15, 2020 you were operating your patrol unit while on duty and were enroute to a Domestic Disturbance (Already Occurred) call when you were involved in a motor vehicle accident. According to the accident report, you were westbound on Arrowhead Farm Road and struck a low retaining wall on the north side of the roadway. The retaining wall was part of a rock mailbox structure. As a result of the accident, your police unit sustained significant damage to both wheels on the passenger side, as well as damage to the undercarriage and frame. When asked about the accident, you said you were reaching for food when you veered off the roadway and struck the retaining wall.

Jonesboro Police Department Policy 502.01 states that "careless, abusive, negligent or reckless handling of any vehicle by any employee shall result in disciplinary action.".

This reprimand is to encourage you drive more safely in the future and be a more attentive driver.

From: ______________________ Received by: ______________________ Date: 01/17/2020
Signature of Supervisor Signature of receiving Officer



EXHIBIT
G

PS-20-034

JONESBORO POLICE DEPARTMENT

COPY

**Performance Notice**

To: PTL CHRIS SHULL Badge Number 1354

You are hereby: ☐ Counseled ☐ Admonished ☒ Reprimanded

The narrative below explains the reason and/or reasons for this action.

ON 07/14/20 AT APPR. 2100 HRS PTL CHRISTOPHER SHULL WAS AT THE POLICE DEPT. PARKING LOT WHEN HE RECEIVED A CALL FOR SERVICE IN REFERENCE TO A BURGLARY IN PROGRESS. PTL SHULL WAS TYPING IN THE ADDRESS TO THE RESIDENCE IN HIS COMPUTER AND BACKING AWAY FROM THE GATE AT THE SAME TIME WHEN HE BACKED INTO THE KEY PAD FOR THE GATE. HE DAMAGED THE KEY PAD BY KNOCKING IT LOSE FROM THE POLE AND PUT A DENT IN THE TRUNK LID OF HIS VEHICLE.

THIS IS THE SECOND INCIDENT IN REFERENCE TO PTL SHULL NOT PAYING ATTENTION AND CAUSING DAMAGE TO HIS VEHICLE. PTL SHULL PREVIOUSLY WAS REPRIMANDED FOR AN INCIDENT ON JANUARY 15, 2020, IN WHICH HE HIT A CONCRETE FOUNDATION FOR A MAILBOX ON ARROWHEAD FARM RD. CAUSE MAJOR DAMAGE TO HIS VEHICLE.

DUE TO THE REPEATED INCIDENTS INVOLVING DAMAGE TO HIS VEHICLE OR PROPERTY PTL SHULL IS BEING REPRIMANDED. THIS IS A VIOLATION OF DEPT. POLICY 322.04 VEHICLE USE SEC. II PARAGRAPH J. THE EMPLOYEE SHALL NOT DRIVE OR OPERATE A DEPT. OWNED VEHICLE IN A MANNER AS TO REFLECT DICREDIT ON THE DEPT. AND DEPT. POLICY 323.02 SEC III PARAGRAPH F. IMPROPER OR NEGLIGENT HANDLING OF OR WILLFUL DAMAGE TO CITY PROPERTY IS A VIOLATION OF THIS POLICY.

THIS REPRIMAND WILL BE FOWARDED TO THE OFFICE OF PROFESSIONAL STANDARDS FOR FURTHER REVIEW.

From: ______ 386 Received by: ______ Date: 7/21/20

Signature of Supervisor — Signature of receiving Officer

LT. T. 394



EXHIBIT

H

# Jonesboro Police Department

## Notice of Disciplinary Action

Instructions: This notice must be served on an employee when any of the following types of disciplinary actions are taken:
- (a) suspension of any number of days;
- (b) suspension more than three times or for an aggregate of more than fifteen days in one calendar year;
- (c) disciplinary demotion;
- (d) termination;
- (e) resignation not in good standing.

| | Name | Rank/Title |
|---|---|---|
| Subject Employee: | Christopher Shall | Ptl |
| Chief of Police: (or Designee) | Rick Elliott | Chief |

On 5-18-22 you were named as the subject employee in the complaint or charge lodged on 5-18-22 by Supervisors Which contained the following allegations: 304 Code of Conduct Violating Dept. Policies : 328 Social Media

✗ The charge made against you has been sustained. The following disciplinary action is being taken against you:

Suspension, of ________ days beginning on ________ (Date) and ending ________

Termination, effective 5-20-22 (Date)

Demotion to position of ________ effective ________ (Date)

Resignation not in good standing, effective ________ (Date)

Other disciplinary action : ________

Signature: Rick Elliott (Chief of Police or Designee) Title Chief Date 5-20-22

Appeal Procedure to the employee: You have a right to appeal this disciplinary action. You may file a written appeal to the Human Resource Officer or to the Mayor of the City of Jonesboro within five days of receiving this notice. The Mayor will make a final Management decision and respond in writing to all concerned parties within ten working days.

Questions regarding LOFPI and/or retirement benefits must be addressed with Human Resources.



EXHIBIT 1

IA PS 22-023

Officer: Christopher Shull

Violation of Social Media Policy 328.02, Code of Conduct (untruthfulness) 304.06

05/18/2022

**Complaint Summary**

On 05/18/2022 I received a complaint from Chief Rick Elliott concerning the conduct of Officer Christopher Shull. According to the complaint, Officer Shull posted controversial content on his social media account and then lied to his supervisors, Lt. Trey Dupuy and Sgt. David Stout, about doing so when he was asked by them.

**Inquiry**

Lt. Dupuy and Sgt. Stout provided written statements concerning the allegations and a screenshot of the social media posting, which was a video of Shull Tasing a suspect during an arrest. (JPD Incident 22-04817) The video had been recorded by another party and shared on a Facebook account by a private citizen. Officer Shull was believed to have edited that video by adding a song called "Ride the Lightning" and adding a caption saying "can't stop the flop." Shull's version of the video came to light as officers discussed the incident during shift briefing on 05/18/2022 at about 0730 hours.

According to the statements of Lt. Dupuy and Sgt. Stout, Shull played his version of the video for the entertainment of the officers present. Shortly after, Lt. Dupuy asked Shull if he had posted his video to social media and Shull told him he did not. Sgt. Stout then followed up and asked Shull again if he had posted it to social media and again he stated he did not. At approximately 0900 hours 05/18/2022, Lt. Dupuy learned the video had indeed been posted to social media.

In his statement, Sgt. Stout said he felt the way Officer Shull answered Lt. Dupuy's question showed signs of deception and that was why he followed up by asking the question again. He said Shull told him he did not post the video, it was only on his phone. He said several hours later he learned the video had been posted but it had been taken down by the time he was able to check.

On 05/19/2022 at about 0900 I met in my office with Officer Shull and his witness, Sgt. Mike McCanless. I notified him of the investigation and read his Garrity rights. I then asked him to recount the tasing incident and the events which followed. Shull told me he learned of the third party video when it was sent to him by Sgt. Stout and then he searched for the video posting on Facebook. He said he found the video, took a screen recording, added the song "Ride the Lightning," and the caption "can't stop the flop." He said he uploaded it to his Instagram account around Midnight the same night.

The next morning, there was a discussion of the incident and third party video posting by Sgt. Stout to inform the officers there may be some backlash over the use of the Taser. As this discussion happened, Officer Shull said he showed his edited video to several officers including the supervisors. He said Lt. Dupuy said he hoped he didn't upload that to social media and Sgt. Stout asked him the same. He told me he said "Nooo, I made it on my phone," as he was deleting it from his account at that moment. He told me he believed the supervisors were hinting to him that if he had posted it, he should delete it immediately. He said he did not believe their questions to be part of a "formal inquiry" and would have answered "yes" had he believed it was. He never did tell Dupuy or Stout he deleted the post.

I read Sgt. Stout's statement to him and asked him if it was accurate and he told me it was. When I asked if he felt he was being untruthful when he answered the supervisors, he said "looking back, yes sir."

I then interviewed Lt. Dupuy on 05/19/2022 in my office. Lt. Dupuy said he asked Shull "You did not post that on social media, did you?" and Shull said "no, I just made that on my phone." He said Sgt. Stout then immediately asked Shull again and Shull replied he did not. Dupuy said it was very clear he was asking Shull if he had posted the video and that he expected Shull to answer truthfully. He said the question was direct and his tone likely indicated he was displeased if Shull had indeed posted the video on social media. He said Shull clearly answered "No, I didn't." He said Stout asked him the same question and Shull again answered "No." After, they moved on to other business.

When I asked Lt. Dupuy if he believed Officer Shull was being deliberately dishonest, Dupuy said yes. He said he also believed Sgt. Stout was sincere about his question to Shull and that Shull lied to Stout. I asked Lt. Dupuy if, considering Shull's behavior, he could be trusted to tell the truth in the future. Dupuy said "No."

I then interviewed Sgt. David Stout on 05/19/2022 about the complaint. He confirmed his written statement to me was accurate and I asked him to sign it. After, I asked him to recount the events during the shift briefing a day earlier. He told me he learned of a third party Tasing video involving Officer Shull on 05/17/2022 and he sent it to Lt. Dupuy, Shull, and some other supervisors for awareness. He said when he got to the shift briefing on 05/18/2022 he discussed the incident and video with the officers present. He said at that time Shull had produced his own edited video and showed it to the officers in the briefing. He said Lt. Dupuy asked Shull if the he posted his version of the video on social media and he told him no. Stout said he could tell something was a "little off" about the way he answered so he himself asked him about posting it. Shull told him "No, it's just on my phone." He said Lt. Dupuy's questing was understandable and Shull was being deceptive to Dupuy. He said his own question to Shull was clear and he lied to keep from getting in trouble. He said he would have trouble trusting Shull in the future.

Sgt. Stout added that he had a conversation with Officer Shull two or three weeks ago about social media posting. He said he cautioned Shull on what he had been posting at that time.

**Findings**

After reviewing this complaint, I am reporting the following findings:

The complaints against Officer Shull are Sustained. It is my conclusion Officer Shull posted the video on social media in violation of JPD policy 328.02 and was untruthful to his supervisors, which is a violation of JPD policy 304.06.

Capt-S. McDaniel

Captain Stephen McDaniel
May 19, 2022

# Jonesboro Police Department

## Immediate Relief of Duty Notice

TO: Ptl. Christopher Shull
(Name and Rank of Officer)

Date and Time: 5/18/2022 17:19

NOTICE – You are hereby relieved from duty:

- [■] Administrative Leave
  - [■] with pay [ ] without pay
- [ ] Other ______

NOTE: Employees who are placed on administrative leave shall make themselves available during normal working hours (allowing for a normal lunch hour) in case their presence is required by the Chief of Police, Office of Professional Standards / Internal Affairs, or other department administrator.

Employees on administrative leave, pursuant to the completion of an internal affairs investigation, shall not:

Contact any of the parties involved in the investigation, or have someone else contact any of the parties on their behalf.

Engage in retaliation against any involved party. Any employee who engages in such retaliation will be *discharged immediately*.

The facts in support of the above reason(s) are: Violation of Policy 304.06, Violation of Policy 328.02

Capt. [signature] 6/346
Supervisor's Signature

I hereby acknowledge receipt of this notice.

Signature: Ptl. [signature] /1354 Date: 05/18/22

IA Immediate Relief of Duty Form_JPD212 F:\Police\Police Microsoft Doc Templates\Administration Forms

5/18/22

During the 0730 shift briefing today, we were talking about an incident where Officer Chris Shull had tased a subject the day before. I had been sent a video last night from a former confidential informant of the incident that was filmed by a bystander and placed on Facebook. I forwarded the video to Officer Shull and the other Supervisors on the shift so they would not be surprised if the video went viral.

While discussing the video with the shift, Officer Shull pulled out his phone and was showing the video to the officers present but his had a song over the top of it. When it got to the point where the singer says something about "ride the lightning" you can see on the video that he activated his Taser, incapacitating the arrestee.

Lt. Dupuy asked him if had put that video on social media and he stated "no." I felt that the way he answered the question that he was not being truthful so I asked him again, "Did you put it on social media?" To which he replied that he did not, he only had it on his phone.

Several hours later I learned that he had, in fact, uploaded the video to his Instagram page. When I went to check to see if it was there, he had taken it down.

I was then instructed by my Supervisors to write out a statement about him lying about the incident and then attempting to cover it up.

Nothing Further.

Sgt. David Stout
Patrol Sgt. Charlie Squad


7:03
5G E
Posts
christopher.shull
Warren Zeiders · Ride the Lightning
Can't stop the flop! Ride the lightning!

On 5.18.2022 while in the 0730 Shift briefing we were discussing the Shooting incident that took place at 111 Day Break. Sgt. Stout had a video from social media that a bystander videoed of Ptl. Shull tasing a suspect.

Ptl. Shull then proceeded to show officers the video except he had dubbed music over the video. After playing the video for the shift I asked Ptl. Shull if he posted the video to social media and he replied he had not. Sgt. Stout then followed up and asked Ptl. Shull again if he had posted the video to social media which he again stated he did not.

Approximately 0900 I received information that Ptl. Shull had posted the video to his Instagram account under the name "Christopher.shull". I was able to confirm this information and was able to gain a screen shot of the video.

Lt. Dupuy

Lt D Dupuy 384

## JONESBORO POLICE DEPARTMENT

## PERSONNEL INVESTIGATION

Date: 05/19/2022

Officer's Name: Christopher Shull Rank: PTL

Complaint: PS-22-023

---

The following statement/interview is being conducted in reference to the above complaint that has been made against you.

You will be asked questions specifically directed and narrowly related to the allegation(s) made against you.

You are entitled to all the rights and privileges guaranteed by the laws of the state of Arkansas and the Constitution of the United States, including the right not to incriminate yourself.

As this is a personnel investigation you are compelled to answer fully and truthfully all questions asked concerning the complaint or allegation(s) made against you. Refusal to answer any questions relevant to this personnel investigation will be deemed insubordination and you will be immediately placed on suspension pending a hearing before the chief of police.

If you do answer, neither your statements or any information or evidence which is gained by reason of such statements can be used against you in any subsequent criminal proceedings. However, these statements can be used against you in relation to subsequent departmental charges.

I understand that I have the right to have a witness of my choice present during this interview. This individual will be present as a witness only and will not be allowed to become actively involved in this interview process.

Officer's Name: Ptl. Chr Shull/1357 Date: 05/19/2022

Investigating Officer: Capt. S. McDaniel Capt. S. McDaniel

Witness: [signature] 799

# Jonesboro Police Department

## Internal Affairs Complaint Notification

To: Christopher Shull

You are hereby notified that an internal affairs complaint has been made against you. This complaint involves an allegation of a violation of the Social Media Policy and Untruthfulness.

which is reported to have occurred on or about: Date: 05/18/2022 Time: 0730 ☒am ☐pm

You will be contacted by the investigator and advised as to when you will be needed for an interview.

Employees who are the subject of an investigation shall NOT:

Contact any of the parties involved in the investigation, or have someone else contact any of The parties on their behalf.

Engage in retaliation against any involved party. Any employee who engages in such Retaliation will be discharged immediately.

Ptl. Chris Shull/1354
Signature

05/19/22
Date

Capt. S McDaniel

Incident # 22-04817

Page 1 of 8

# Jonesboro Police Dept

Incident Report

Report Date 05/17/22

Report Time 8:42 AM

| Status | Exception Clearance Date | Reporting Officer | ORI/Agency |
|---|---|---|---|
| Closed | Not Applicable | 1354 Shull, Christopher | AR0160100 |
| | Assigned Officer: Butler, Logan | Entered By: HKeating | Approving Officer: Stout, David |
| | Assisting Officers | | |

## Complainant

| SSN/DTIN | Title | Name | DOB | Age | Sex | Resident Status |
|---|---|---|---|---|---|---|
| [redacted] | | Cook, Brittney | [redacted] | 34 | F | Resident |

| Race | Ethnicity | Home Phone | Work Phone | Other Phone | DL (#, ST) |
|---|---|---|---|---|---|
| Black / African American | Not Hispanic/Latino | [redacted] | | | [redacted] |

| US Citizen | Legal Alien | Doc Type | Immig Doc # | Nationality |
|---|---|---|---|---|
| Yes | | | | |

| Home Address | Employer |
|---|---|
| 111 Daybreak DR E4,Jonesboro, AR 72401 | |
| **Work Address** | **Occupation** |
| | |

## Offenses

| Incident Location | Zone |
|---|---|
| 111 Daybreak DR E4 Jonesboro, AR 72401 | 6 |

| Earliest Possible Date | Time | Latest Possible Date | Time |
|---|---|---|---|
| 05/17/2022 | 07:42 | 05/17/2022 | 08:01 |

| # | Statute/Code | Description | Fel/Misd | Att/Comp | Loc | Bias | Wpn | CATypes |
|---|---|---|---|---|---|---|---|---|
| 1 | 5-54-104A | INTERFERENCE WITH A LAW ENFORCEMENT OFFICER / THREATENS PHYSICAL FORCE | Misd | Completed | 20 | 88 | 40 | 0 |
| 2 | 5-71-207A(2) | DISORDERLY CONDUCT / UNREASONABLE OR EXCESSIVE BEHAVIOR | Misd | Completed | 20 | 88 | 99 | 0 |
| 3 | 5-54-102A(1) | OBSTRUCTING GOVERNMENTAL OPERATIONS / OBSTRUCTS, IMPAIRS, HINDERS, THE PER | Misd | Completed | 20 | 88 | 99 | 0 |
| 4 | 5-54-103B(1) | RESISTING ARREST - REFUSAL TO SUBMIT TO ARREST / ACTIVE OR PASSIVE REFUSAL | Misd | Completed | 20 | 88 | 40 | 0 |
| 5 | 46-48 | DISCHARGING FIREARMS WITHIN CITY LIMITS | | Completed | 20 | 88 | 12 | 0 |
| 6 | 5-38-204A(1) | CRIMINAL MISCHIEF - 2ND DEGREE / RECKLESSLY DESTROYS | Misd | Completed | 20 | 88 | 12 | 0 |

| MO | Method Of Entry | # Prems |
|---|---|---|
| Arrestees were disorderly in a public place and threatened law enforcement officers. | n/a | 1 |

**Location Types**

01 Air/Bus/Train Terminal
02 Bank/S&L
03 Bar/Night Club
04 Church/Synag/Temple
05 Commercial/Off Bldg
06 Construction Site
07 Convenience Store
08 Dept/Discount Store
09 Drug St/Dr Off/Hosp
10 Field/Woods
11 Gov/Public Bldg
12 Grocery/Supermarket
13 Hway/Road/Alley
14 Hotel/Motel
15 Jail/Prison
16 Lake/Waterway
17 Liquor Store
18 Parking Lot/Garage
19 Rental Storage Facility
20 Residence/Home
21 Restaurant
23 Service/Gas Station
24 Specialty Store
25 Unknown/Other
37 Abandoned/Condemned Structure
38 Amusement Park
39 Arena/Stadium/Fairgrounds/Coliseum
40 ATM Separate from Bank
41 Auto Dealership New/Used
42 Camp/Campground
44 Daycare Facility
45 Dock/Wharf/Freight/Modal Terminal
46 Farm Facility
47 Gambling Facility/Casino/Race Track
48 Industrial Site
49 Military Installation
50 Park/Playground
51 Rest Area
52 School - College/University
53 School - Elementary/Secondary
54 Shelter - Mission/Homeless
55 Shopping Mall
56 Tribal Lands
57 Community Center
58 Cyberspace

**Bias Motivation Codes**

ANTI-

11 White
12 Black or African American
13 American Indian or Alaska Native
14 Asian
15 Multi-races, Group
16 Native Hawaiian or Other Pacific Islander
21 Jewish
22 Catholic
23 Protestant
24 Islamic (Muslim)
25 Other Religion
26 Multi-religious group
27 Atheist/Agnostic
31 Arab
32 Hispanic or Latino
33 Not Hispanic or Latino
41 Gay (male)
42 Lesbian
43 Lesbian, Gay, Bisexual, or Transgender, Mixed Group (LGBT)
44 Heterosexual
45 Bisexual
51 Phys Disability
52 Mental Disability
61 Male
62 Female
71 Transgender
72 Gender Non-Conforming
88 None
99 Unknown

| Suspected Of Using | Criminal Activity Types | Weapon Type(s) |
|---|---|---|
| None | B Buying/Receiving<br>P Possessing/Concealing<br>D Distributing/Selling<br>E Exploiting Children<br>C Cultivating/Manuf/Publishing<br>O Operating/Promoting/Assisting<br>T Transport/Import/Transmit<br>U Using/Consuming<br>A Simple/Gross Neglect<br>F Organized Abuse<br>I Intentional Abuse & Torment<br>S Sexual Animal Abuse | 11 Firearm (Auto)<br>12 Handgun (Auto)<br>13 Rifle (Auto)<br>14 Shotgun (Auto)<br>15 Other Firearm<br>20 Knife/Cutting Instr<br>30 Blunt Object<br>35 Motor Vehicle<br>40 Personal Weapons<br>50 Poison<br>60 Explosives<br>65 Fire/Incendiary Device<br>70 Drugs/Narc/Sleeping Pills<br>85 Asphyxiation<br>90 Other<br>95 Unknown<br>99 None |

Copyright Relativity Inc.© - RPS(Relativity Public Safety)

Printed : 5/18/2022 3:28:36 PM

Incident # 22-04817 | Page 2 of 8

# Jonesboro Police Dept
Incident Report

Report Date 05/17/22 | Report Time 8:42 AM

## Victim #1 [✓] Is Complainant — Event #s Related 1,2,3,4,5

| | | | | | | |
|---|---|---|---|---|---|---|
| SSN/ID/TIN [redacted] | Title | Name Cook, Brittney | DOB [redacted] | Age 34 | Sex F | Resident Status Resident |
| Race Black / African American | Ethnicity Not Hispanic/Latino | Home Phone [redacted] | Work Phone | Other Phone | DL (#, ST) [redacted] | |
| US Citizen Yes | Legal Alien | Doc Type | Immig Doc # | Nationality | | |
| Home Address 111 Daybreak DR E4,Jonesboro, AR 72401 | | | | Employer | | |
| Work Address | | | | Occupation | | |
| Victim Type Individual | Injury Type None, | Aggravated Assault/Homicide Circumstances None | Relationship To Suspect #1 N/A | | | |
| Justifiable Homicide Circumstances None | | | Taken to: (Hospital Name) | | | |
| Injury Description | | | | | | |

## Victim #2 — Event #s Related 1,2,3,4,5

| | | | | | | |
|---|---|---|---|---|---|---|
| SSN/ID/TIN [redacted] | Title | Name Fox, Aretha | DOB [redacted] | Age 55 | Sex F | Resident Status Unknown |
| Race Black / African American | Ethnicity Not Hispanic/Latino | Home Phone | Work Phone (870)530-7724 | Other Phone | DL (#, ST) [redacted] | |
| US Citizen Yes | Legal Alien | Doc Type | Immig Doc # | Nationality | | |
| Home Address 512 Richsmith LN,Jonesboro, AR 72405 | | | | Employer | | |
| Work Address | | | | Occupation | | |
| Victim Type Individual | Injury Type None, | Aggravated Assault/Homicide Circumstances None | Relationship To Suspect #1 N/A | | | |
| Justifiable Homicide Circumstances None | | | Taken to: (Hospital Name) | | | |
| Injury Description | | | | | | |

## Suspect #1

| | | | | | | |
|---|---|---|---|---|---|---|
| SSN/ID/TIN [redacted] | Title | Name Ruffin, Keith | DOB [redacted] | Age 55 | Sex M | Resident Status Unknown |
| Race Black / African American | Ethnicity Not Hispanic/Latino | Home Phone [redacted] | Work Phone | Other Phone | DL (#, ST) | |
| US Citizen Yes | Legal Alien | Doc Type | Immig Doc # | Nationality | | |
| Home Address 111 Daybreak DR C4,Jonesboro, AR 72401 | | | | Employer | | |
| Work Address | | | | Occupation | | |
| Height - | Weight - | Eyes | Build | AKA | | |

Incident # 22-04817 | **Jonesboro Police Dept** | Report Date 05/17/22
Page 3 of 8 | Incident Report | Report Time 8:42 AM

**Arrestee #22-A02759**

| SSN/ID/TIN | Title | Name | DOB | Age | Sex | Resident Status |
|---|---|---|---|---|---|---|
| [redacted] | | Lambert, Tory Daniell | [redacted] | 30 | M | Unknown |

| Race | Ethnicity | Home Phone | Work Phone | Other Phone | DL (#, ST) |
|---|---|---|---|---|---|
| Black / African American | Not Hispanic/Latino | | | | [redacted] |

| US Citizen | Legal Alien | Doc Type | Immig Doc # | Nationality |
|---|---|---|---|---|
| Yes | | | | |

| Home Address | Employer |
|---|---|
| 111 Daybreak DR E4,Jonesboro, AR 72401 | N/A |

| Work Address | Occupation |
|---|---|
| N/A ,, | |

| Height | Weight | Eyes | Build | AKA |
|---|---|---|---|---|
| 5' 7" | 165 | Brown | Slender | |

| Appearance | HairColor | Hair Style | Teeth | Beard/Facial Hair | Demeanor | Speech | Voice |
|---|---|---|---|---|---|---|---|
| Unkempt | Black | Straight | | | Calm | Talkative | Medium |
| | Dexterity: | Hair Length: Short | Complexion: Dark | | | | |

| Arresting Officer | Arrest Date | Time | Arrest Type | Warrant Number | Juv Disp | Disposition Date |
|---|---|---|---|---|---|---|
| 1161 - Gifford, Daniel | 5/17/2022 | 09:35 | Warrant | JO-21-875 | | |

| Multiple Clearance Indicator | BAC | BAC Operator | Arrest Location | Zone |
|---|---|---|---|---|
| Arrest Cleared Incident | | | Parking/Drop Lot/Garage | 6 |

| Weapons At Arrest | Court Date | Court Name | Time |
|---|---|---|---|
| 01 - Unarmed | 6/1/2022 | | 09:00 |

**Arrestee #22-A02760**

| SSN/ID/TIN | Title | Name | DOB | Age | Sex | Resident Status |
|---|---|---|---|---|---|---|
| [redacted] | | Mead, Whitney | [redacted] | 30 | F | Resident |

| Race | Ethnicity | Home Phone | Work Phone | Other Phone | DL (#, ST) |
|---|---|---|---|---|---|
| Black / African American | Not Hispanic/Latino | (870)738-1490 | | | [redacted] |

| US Citizen | Legal Alien | Doc Type | Immig Doc# | Nationality |
|---|---|---|---|---|
| Yes | | | | |

| Home Address | Employer |
|---|---|
| 111 Daybreak DR E5,Jonesboro, AR 72401 | Unknown |

| Work Address | Occupation |
|---|---|
| | |

| Height | Weight | Eyes | Build | AKA |
|---|---|---|---|---|
| | | | | |

| Arresting Officer | Arrest Date | Time | Arrest Type | Warrant Number | Juv Disp | Disposition Date |
|---|---|---|---|---|---|---|
| 1354 - Shull, Christopher | 5/17/2022 | 08:05 | On-View Arrest | | | |

| Multiple Clearance Indicator | BAC | BAC Operator | Arrest Location | Zone |
|---|---|---|---|---|
| Arrest Cleared Incident | | | Other/Unknown | |

| Weapons At Arrest | Court Date | Court Name | Time |
|---|---|---|---|
| | | | |

*Copyright Relativity Inc.© - RPS(Relativity Public Safety)*

Printed : 5/18/2022 3:28:36 PM

Incident # 22-04817

Page 4 of 8

# Jonesboro Police Dept

## Incident Report

Report Date 05/17/22

Report Time 8:42 AM

**Witness #1**

| | | | | | | |
|---|---|---|---|---|---|---|
| SSN/ID/TIN [redacted] | Title | Name Provow, Sierra | DOB [redacted] | Age 25 | Sex F | Resident Status Resident |
| Race White | Ethnicity Not Hispanic/Latino | Home Phone [redacted] | Work Phone | Other Phone | DL (#, ST) 938806840, AR | |
| US Citizen Yes | Legal Alien | Doc Type | Immig Doc # | Nationality | | |
| Home Address 111 Daybreak DR D10,Jonesboro, AR 72401 | | | | Employer | | |
| Work Address | | | | Occupation | | |

**Witness #2**

| | | | | | | |
|---|---|---|---|---|---|---|
| SSN/ID/TIN [redacted] | Title | Name Mead, Melissa | DOB [redacted] | Age 52 | Sex F | Resident Status Unknown |
| Race Black / African American | Ethnicity Not Hispanic/Latino | Home Phone (870)206-5264 | Work Phone (870)974-7500 | Other Phone | DL (#, ST) [redacted] | |
| US Citizen Yes | Legal Alien | Doc Type | Immig Doc # | Nationality | | |
| Home Address 111 Daybreak DR C4,Jonesboro, AR 72401 | | | | Employer 111 Daybreak Dr. | | |
| Work Address 111 Daybreak DR,Jonesboro, AR 72401 | | | | Occupation Manager | | |

**Witness #3**

| | | | | | | |
|---|---|---|---|---|---|---|
| SSN/ID/TIN [redacted] | Title | Name Robertson, Kennette | DOB [redacted] | Age 56 | Sex F | Resident Status Unknown |
| Race Black / African American | Ethnicity Not Hispanic/Latino | Home Phone (870)340-9940 | Work Phone | Other Phone | DL (#, ST) [redacted] | |
| US Citizen Yes | Legal Alien | Doc Type | Immig Doc # | Nationality | | |
| Home Address 111 Daybreak DR E6,Jonesboro, AR 72401 | | | | Employer Unknown | | |
| Work Address | | | | Occupation | | |

**Property**

Involvement: 1 None, 2 Burned, 3 Counterfeit/Forge, 4 Destroyed/Damaged, 5 Recovered, 6 Seized, 7 Stolen, 8 Unknown

Category: 02 Alcohol, 4 Bicycles, 06 Clothes/Fur, 07 Computer Hdwr/Sftwr, 08 Consumable Goods, 09 Credit/Debit Cards, 10 Drugs/Narcotics, 11 Drug/Narc Equipment, 12 Farm Equipment, 13 Firearms, 14 Gambling Equipment, 15 Hvy Construct/Industrial, 15 Household Goods, 17 Jewelry/Precious Metals, 18 Livestock, 19 Merchandise, 20 Money, 21 Negotiable Instruments, 22 Non-neg. Instrument, 23 Office-Type Equip, 25 Purses/Handbags/Wallets, 26 Radio/TV/VCR, 27 Recording-Audio/Visual, 29 Structure-Single Occ, 30 Structure-Othr Dwelling, 31 Structure-Commercial, 32 Structure-Industrial, 33 Structure-Public, 34 Structure-Storage, 35 Structure-Other, 36 Tools-Power/Hand, 38 Vehicle Parts, 39 Watercraft, 41 Aircraft Parts/Access, 42 Artistic Supplies, 43 Building Materials, 44 Camping/Hunting/Fishing, 45 Chemicals, 46 Collections/Collectibles, 47 Crops, 48 Documents / Pers or Bus., 49 Explosives, 50 Firearm Accessories, 54 Fuel, 55 Identity Documents, 56 Identity - Intangible, 57 Law Enforcement Equip., 58 Lawn/Yard/Garden Equip, 59 Logging Equipment, 67 Crops, 68 Documents / Pers or Bus., 69 Explosives, 59 Firearm Accessories, 64 Fuel, 65 Identity Documents, 66 Identity - Intangible, 57 Law Enforcement Equip., 58 Lawn/Yard/Garden Equip, 59 Logging Equip, 70 Medical / Lab Equipment, 71 Metals, Non-Precious, 72 Musical Instruments, 73 Pets, 74 Photographic/Optical, 75 Portable Electronic Comm, 76 Recreational/Sports Equip, 77 Other, 78 Trailers, 79 Watercraft Parts/Access, 80 Weapons - Other, 88 Pending Inventory

| Involvement | Category | Qty/Wt | Brand/Make | Model | Style | CAL/GA |
|---|---|---|---|---|---|---|
| 4 | 30 | 1 | | | | |

Description

APARTMENT COMPLEX BUILDING, WINDOW, VINYL SIDING, AND GUTTER.

| Owner | Serial# / Owner Applied# | NCIC Ref # | Evidence # | Value |
|---|---|---|---|---|
| Cedar Park Apartments | N/A | | | $1,500.00 |

| Involvement | Category | Qty/Wt | Brand/Make | Model | Style | CAL/GA |
|---|---|---|---|---|---|---|
| 9 | 67 | 1 | Taser | X7 | 12° | |

Description

Taser X7 12 degree cartridge (spent)

| Owner | Serial# / Owner Applied# | NCIC Ref # | Evidence # | Value |
|---|---|---|---|---|
| Jonesboro Police Department | X49233DM3 | | | $50.00 |

**Narrative & Statements**

Narrative - Butler, Logan - 5/17/2022 9:23:39 AM (Investigative)

Copyright Relativity Inc.© - RPS(Relativity Public Safety)

**Narrative & Statements**

**Narrative - Butler, Logan - 5/17/2022 9:23:39 AM (Investigative)**

On May 17, 2022 I was advised of this situation and responded to 111 Daybreak DR E4Jonesboro, AR 72401. Upon arrival I saw several people standing outside near an apartment building. Upon looking at the building I could see multiple channels through the siding where it had been struck by gunfire. There were also bullet holes in the soffit and one in a gutter. Several spent casings were also on the ground nearby. After seeing all of this, it is clear that the suspects responsible for the shooting was standing near the corner of the building and was shooing alongside the building, not directly toward it. I was advised by officers on scene that the suspect had been shooting at a raccoon who was out on a window ledge on the third floor.

I then spoke with the apartment manager Witness #2 (Mead, Melissa) who told me that she had been woken up by Witness #3 (Robertson, Kennette) who told her that there were raccoons in her apartment. Witness #2 (Mead, Melissa) went there and later called Animal Control. Witness #2 (Mead, Melissa) said that someone was out there with a pellet gun shooting at the raccoon and she left. She was later woken up after the shooting happened. She told me that she was not there when the apartment was actually shot.

I later talked to Witness #3 (Robertson, Kennette) who stated that her apartment was the one with the raccoons inside of it. She told me that she knew who shot the gun but asked if she had to tell me. I told her that she didn't have to tell me anything she didn't want to, but she later told me that Suspect #1 (Ruffin, Keith) was the one shooting. Witness #3 (Robertson, Kennette) said that she didn't want him to get into trouble because he was only trying to help and was only shooting at the raccoons.

Due to Suspect #1 (Ruffin, Keith) not shooting directly into the building or toward any person, there will be no felony charges pursued in this case. All victims will be made aware of the affidavit process. This case will be listed as closed.

CLOSED

**Narrative - Gifford, Daniel - 5/17/2022 2:39:52 PM (Investigative)**

On 5/17/22 at 8:05am I was dispatched to 111 Daybreak DR E4Jonesboro, AR 72401 to assist Ofc Shull. Upon arriving at the location I assisted Ofc Shull with handcuffing Suspect #1 (Ruffin, Keith) and then began to move all subjects in the area away from his crime scene. Once subjects were moved I put crime scene tape up and helped mark casings.

Arrestee #1 (Lambert, Tory Daniell) was placed under arrest, handcuffed, searched, placed in the rear of my patrol car and transported to Craighead County Detention Center. While at CCDC he was issued warrant citation # JO-21-875 for Failure To Appear and given a court date of 6/1/22 at 9:00am. He was given no bond due to a judge having to set one.

Ofc Shull issued Arrestee #1 (Lambert, Tory Daniell) a citation for Interference With a Law Enforcement Officer, Disorderly Conduct and Obstructing Governmental Operations.

SEE OTHER OFFICERS NARRATIVES FOR FURTHER

**Narrative - Shull, Christopher - 5/17/2022 2:56:00 PM (Initial)**

On 05/17/22 at approximately 0748 hours, I was dispatched to 111 Daybreak DR E4Jonesboro, AR 72401 in reference to shots heard in the area and Victim #1 (Cook, Brittney)'s window being shot out of her apartment.

**Narrative - Shull, Christopher - 5/17/2022 2:56:00 PM (Investigative)**

Copyright Relativity Inc.© - RPS(Relativity Public Safety)

Incident # 22-04817
Page 6 of 8

## Jonesboro Police Dept
Incident Report

Report Date 05/17/22
Report Time 8:42 AM

**Narrative & Statements**

Narrative - Shull, Christopher - 5/17/2022 2:56:00 PM (Investigative)

On 05/17/22 at approximately 0748 hours, I was dispatched to 111 Daybreak DR E4Jonesboro, AR 72401 in reference to shots heard in the area and Victim #1 (Cook, Brittney)'s window being shot out of her apartment. Upon arriving on scene, Arrestee #2 (Mead, Whitney) was sitting on the hood of a red Chevrolet truck in the parking lot with a large congregation of other people. Arrestee #2 (Mead, Whitney) asked me, "Can we help you?". I asked her if she is the one that called for the Police and she replied, no. I simply replied "ok then" and walked away in an attempt to locate Victim #1 (Cook, Brittney) who had called us. As I rounded the front of my patrol vehicle where I had parked I observed three deformities on the front face of 111 Daybreak DR E4Jonesboro, AR 72401 which is the east side of the building. I observed the window to be shattered and have a hole in it and the vinyl siding to be damaged in two other places. Through my experience and training I know these deformities to be consistent with bullet strikes. I then looked down and immediately located two spent shell casing from a pistol caliber weapon lying on the pavement a few feet in front of me.

I then contacted Lt. Dupuy via radio and advised him of what I had and that I had a residence that appeared to have been struck by gunfire and spent shell casings located on scene. During the course of this, Victim #1 (Cook, Brittney) and Victim #2 (Fox, Aretha) had walked up and contacted me and began attempting to tell me what had happened. At this point, Arrestee #2 (Mead, Whitney) interjected herself into the conversation stating that "he was only trying to shoot the raccoons" in reference to a previous call regarding raccoons in a residence that the occupants had been advised the proper course of action on by another Officer prior to me being dispatched for shots heard. Victim #1 (Cook, Brittney) and Victim #2 (Fox, Aretha) then became engaged in a back and forth verbal altercation between Arrestee #2 (Mead, Whitney), Arrestee #1 (Lambert, Tory Daniell), and several others that were amongst the congregation of people gather on and around the red Chevrolet truck. I gave all parties on scene both that of Arrestee #1 (Lambert, Tory Daniell) and Arrestee #2 (Mead, Whitney) and their associated individuals in their group and Victim #1 (Cook, Brittney) and Victim #2 (Fox, Aretha) orders to stop arguing back and forth and yelling at each other multiple times yet they continued and the altercation continued to escalate in nature as well. Arrestee #2 (Mead, Whitney) being the primary aggressor continued trying to engage with Victim #1 (Cook, Brittney) and Victim #2 (Fox, Aretha) even after I had calmed Victim #1 (Cook, Brittney) and Victim #2 (Fox, Aretha) down and focused their attention back on me so that I could ascertain what had transpired. I then requested an additional unit due to the two parties on scene being verbally hostile with each other and the fear that the incident would escalate into a physical altercation. Meanwhile, this entire time, I had been unable to secure the crime scene to protect evidence due to having to try and de-escalate the verbal confrontation between Victim #1 (Cook, Brittney), Victim #2 (Fox, Aretha), Arrestee #1 (Lambert, Tory Daniell), and Arrestee #2 (Mead, Whitney).

I had told numerous people to step out of my crime scene and had to inform them of the shell casings presence and to watch where they step all while trying to intermediary between the verbally involved parties previously mentioned. While I was trying to inform other Officers via radio of what was going on and speak with the victims, Arrestee #2 (Mead, Whitney) decided she was finally done yelling and screaming in the parking lot at Victim #1 (Cook, Brittney) and Victim #2 (Fox, Aretha) and was going into her apartment. Arrestee #2 (Mead, Whitney) walked right up to where she had seen me trying to divert other individuals out of and around due to it being a crime scene and evidence lying on the ground. I stepped in front of Arrestee #2 (Mead, Whitney) and ordered her to stop and get back out of my crime scene and she continued walking towards me. I then placed my hand on her chest and began to attempt to physically stop Arrestee #2 (Mead, Whitney) from further entering the crime scene and was pushing against her trying to push her back. Due to Arrestee #2 (Mead, Whitney)'s large stature and heavy weight she was able to continue pshing past me and it was at this time that Arrestee #1 (Lambert, Tory Daniell) came around the front of my patrol car and attempted to come up from behind me yelling and screaming about me putting my hands on Arrestee #2 (Mead, Whitney) and that I was not allowed to do that. Arrestee #1 (Lambert, Tory Daniell) was very confrontational and agitated. I then began using Arrestee #2 (Mead, Whitney)'s weight to my advantage and allowed her to push through the edge of the crime scene by pushing her against my car with one hand and pushing Arrestee #1 (Lambert, Tory Daniell) with the other hand in the same direction. Once clear of the crime scene, I told Arrestee #2 (Mead, Whitney) to turn around and place her hands behind her back that she was now under arrest. Arrestea #2 (Mead, Whitney) refused and continued to try and walk away from me. When I again placed hands on Arrestee #2 (Mead, Whitney) and grabbed her wrist to try and place her in custody she snatched her arm away from me. I then drew my department issued CEW Taser X7 less lethal weapon and held it in front of me at the low ready position and informed Arrestee #2 (Mead, Whitney) to turn around and place her hands behind her back that she was under arrest and that if she did not I would Tase her. After a brief back and forth, Arrestee #2 (Mead, Whitney) appeared to comply. I then reholstered my Taser and retrieved my handcuffs and upon attempting to place Arrestee #2 (Mead, Whitney) into handcuffs, she again snatched away and stated that she was not under arrest and that she had done nothing wrong and was not going anywhere but home.

*Copyright Relativity Inc.© - RPS(Relativity Public Safety)*

Printed : 5/18/2022 3:28:36 PM

Narrative - Shull, Christopher - 5/17/2022 2:56:00 PM (Investigative)

I then drew my Taser again and again informed her that if she did not comply and turn around and place her hands behind her back I would Tase her while holding my Taser at the low ready. Arrestee #2 (Mead, Whitney) again appeared to comply after another brief back and forth exchange of words. Upon attempting to place Arrestee #2 (Mead, Whitney) into handcuffs the second time she again pulled away and resisted my efforts to place her in custody. I then drew my Taser a third and final time and stepped backwards about two or three feet and deployed my Taser striking Arrestee #2 (Mead, Whitney) in the right side of her upper torso and lower abdomen. The Taser had the desired effect and Arrestee #2 (Mead, Whitney) fell to the ground and then complied with my orders to roll over on her stomach and place her hands behind her back so that I could handcuff her. Upon Tasing Arrestee #2 (Mead, Whitney) however, this fact made Arrestee #1 (Lambert, Tory Daniell) extremely upset and he became even more hostile towards me and began waling up towards me postured up in an aggressive manner and fighting stance waving his arms at me and pointing while yelling threats about how he was in his words going to beat my ass that I tased Arrestee #2 (Mead, Whitney) for no reason and started calling me several obscenities. I then requested more additional units ASAP due to the incident escalating and having multiple hostile parties on scene and having an unsecured crime scene with more individuals coming out of the adjacent buildings to see what all the commotion was about and walking towards 111 Daybreak DR E4Jonesboro, AR 72401 from across the parking lot. I also at this point advised over the radio Taser deployed. Due to Arrestee #1 (Lambert, Tory Daniell)'s aggressive actions I could not safely handcuff Arrestee #2 (Mead, Whitney) until other Officer's arrival and ordered her to remain on the ground face down with her arms behind her back until told otherwise. I then placed my left knee against the outside edge of Arrestee #2 (Mead, Whitney)'s left upper arm/elbow to hold it behind her while watching Arrestee #1 (Lambert, Tory Daniell) in case he again advanced on me in an aggressive manner.

Officer D. Gifford then arrived and assisted me in handcuffing Arrestee #2 (Mead, Whitney). Arrestee #2 (Mead, Whitney)'s mother had at this point arrived on scene and began trying to interject herself into the situation and talk to her and demand for me to tell her what had happened stating that what I had done is not "how we do things up here". Officer J. Myers had came walking up at this point and assisted me in getting Arrestee #2 (Mead, Whitney) to stand up. Arrestee #2 (Mead, Whitney) was still yelling and cursing demanding the Sheriff and calling me onscenities and slurs and stiffening her legs up and refusing to walk acting as dead weight so that Officer Myers and I had to physically carry her to get her to my car while she continued to state that she was not going anywhere. Upon arriving at my car I attempted to photograph the location of the Taser probes with Axon Capture per Jonesboro Police Department policy to document in case Arrestee #2 (Mead, Whitney) complained of injury as a result but I was unable to due to how aggressive and irate Arrestee #2 (Mead, Whitney) was being and combative with myself and other Officers. I then removed the probes so that Arrestee #2 (Mead, Whitney) could be placed into the back seat of my patrol car, secured, and transported to CCDC. Upon opening the door to the back seat of my patrol car, Arrestee #2 (Mead, Whitney) refused to get in. Officer Myers and J. Branstetter attempted to force Arrestee #2 (Mead, Whitney) into the back seat while ordering her to get in and Arrestee #2 (Mead, Whitney) continued to refuse to comply. Arrestee #2 (Mead, Whitney) then stated she could not breathe and started vomiting in my back seat. I then requested EMS and informed Sgt. R. Smith who had just arrived on scene of what was going on. Sgt. Smith then made the decision to relocate Arrestee #2 (Mead, Whitney) to Officer S. Fleeman's patrol vehicle until EMS arrived due to it being further removed from the actual scene in an attempt to further de-escalate the situation. Lt. Dupuy arrived shortly after and I informed him of what I knew so far. Upon EMS's arrival, they checked out and cleared Arrestee #2 (Mead, Whitney) and Officer Fleeman then transported her to CCDC on the charges of Disorderly Conduct, Obstructing Governmental Operations, and Resisting Arrest. Arrestee #2 (Mead, Whitney) was left in the custody of CCDC staff pending a Judge to set her bond. See Officer Fleeman's narrative regarding transport and citing her.

CID was called by a supervisor and arrived shortly thereafter and Sgt. D. Stout was able to talk Arrestee #1 (Lambert, Tory Daniell) out of his apartment and he was placed in to handcuffs by Officer Gifford and transported by Officer Gifford to CCDC for Interference with a Law Enforcement Officer, Disorderly Conduct, and Obstructing Governmental Operations where I cited him on citation number 1A09693066 with a next available court date of 06/01/22 at 09:00 AM. Officer Gifford cited Arrestee #1 (Lambert, Tory Daniell) at CCDC for his warrant through City Of Jonesboro and placed a hold for Cross County for a warrant that Arrestee #1 (Lambert, Tory Daniell) had through them. Arrestee #1 (Lambert, Tory Daniell) also had a warrant out of Poinsett County as well that they advised a court date of. Officer Gifford handled all of these details, see his narrative for further. Arrestee #1 (Lambert, Tory Daniell) was left in the custody of CCDC staff pending a Judge to set his bond.

As for the initial reason for the call it has been determined to the best of my abilities so far that due to the

Copyright Relativity Inc.© - RPS(Relativity Public Safety)

Incident # 22-04817 | **Jonesboro Police Dept** | Report Date 05/17/22
Page 8 of 8 | Incident Report | Report Time 8:42 AM

**Narrative & Statements**

**Narrative - Shull, Christopher - 5/17/2022 2:56:00 PM (Investigative)**

prior call about the raccoons I the residence, the tenant of that apartment called her landlord after learning that Animal Control could not render any assistance and informed the landlord of this. The landlord, Arrestee #2 (Mead, Whitney)'s mother, then had her husband who is also the maintenance man for the complex to go down there and take care of it. The maintenance man then proceeds to go down to 111 Daybreak DR E4Jonesboro, AR 72401 and upon seeing one of the raccoons stick it's head out of the third floor apartment window the tenant had left open in hopes it would climb or crawl out of the window on it's own, starts shooting at the raccoon with a handgun which according to the casings recovered on scene is a .40 caliber S&W according to all witness accounts gathered on scene. Arrestee #2 (Mead, Whitney) had stated that Suspect #1 (Ruffin, Keith) who is her mother's husband had been shooting at the raccoons but that it had been with a BB gun. I then informed her that the impacts on 111 Daybreak DR E4Jonesboro, AR 72401 and the shell casings lying on the ground were not from a BB gun but that of a real firearm. Witness #1 (Provow, Sierra) then contacted another Officer and informed them that she had briefly witnessed Suspect #1 (Ruffin, Keith) standing on the corner of 111 Daybreak DR E4Jonesboro, AR 72401 on the edge of the sidewalk firing a handgun in the air towards 111 Daybreak DR E4Jonesboro, AR 72401. Other Officers and Detectives gathered the information for Suspect #1 (Ruffin, Keith) and Det. L. Butler advised he would enter Suspect #1 (Ruffin, Keith)'s information into this report upon my completion of the remainder. The discharged Taser 7 cartridge was collected and packed per policy and transported and logged into evidence at the Jonesboro Police Department headquarters.

CID processed the scene and collected the spent shell casings and logged them into evidence. This concludes my involvement in this incident so far. See other Officer's narratives for further.

*Copyright Relativity Inc.© - RPS(Relativity Public Safety)*

The City of
JONESBORO POLICE DEPARTMENT

## 328.02 Social Media and Internet Postings

Effective: 10/02/2018 | Reviewed: 09/10/2020 | Authority: RE
ALEAP: None

I. Policy

It is essential for every employee of this department to recognize that the proper functioning of any law enforcement department relies upon the public's confidence and trust in the individual officers and this department to carry out the law enforcement function. Therefore, any matter that brings individual employees or the department into disrepute has the corresponding effect of reducing public confidence and trust in our department, thus, impeding our ability to work with and serve the public. It is the policy of this department to maintain a level of professionalism in both on-duty and off-duty conduct that fulfills the mission of our department. Any publication, through any medium which is potentially adverse to the mission, operation, morale, or efficiency of this department will be deemed a violation of this policy. As such, reasonable limitations are placed upon the personal use of social media by departmental employees. The internet, blogs, the worldwide web, social networking or social media sites and apps and any other medium of electronic communication shall not be used in a manner which is detrimental to the mission and function of this department. The Department understands that its employees may use internet accounts and sites for reasonable personal, family, recreational and community purposes and, in no manner, is attempting to limit this use.

II. Procedure

A. Employees of this department are prohibited from using department computers or other departmental electronic devices for any unauthorized purpose.

B. Employees of this department are prohibited from posting, or in any other way broadcasting, without prior department approval, information on the internet, or other medium of communication, the business of this department to include but not limited to:
   1. Photographs/images, video or audio relating to any investigation of this department, criminal or internal.
   2. Photographs/images, video or audio of any member of this department that are obtained in violation of Policy 318, Clandestine Recording of Employees.

C. Employees of this department who utilize social networking accounts and sites, blogs, or other mediums of electronic communication, whether on or off-duty, shall maintain an appropriate level of professionalism and appropriate conduct so as not to broadcast in a manner which is detrimental to the mission and function of this department.
   1. Employees shall not use references, photos, images, video or audio in these social networking accounts or sites that in any way represent themselves as an employee of this department when such postings are in violation of any Department policy or directive.
   2. Employees shall not use a social networking account or site or other medium of internet communication to post any materials of a sexually graphic nature.
   3. Employees shall not use a social networking site or other medium of internet communication to post any materials which promote violence of a criminal nature.

D. Employees of this department are prohibited from using their title as well as any reference to this

department in any correspondence to include emails, postings, blogs, , social media or networking accounts and sites (such as Facebook, Snap Chat, etc.) unless the communication is of an official nature, is serving the mission of this department, and/or is not detrimental to the department. This prohibition also includes signature lines in personal email accounts. An employee may seek department approval for such use.

E. No member of this agency shall require or cause a current or prospective employee to:
   1. Disclose his or her username and password to the current or prospective employee's social media account;
   2. Add an employee, supervisor, or administrator to the list of contacts associated with his or her social media account against their wishes; or
   3. Change the privacy settings associated with his or her social media account.

F. If an employer / member of this agency inadvertently receives an employee's username, password, or other login information to the employee's social media account through the use of an electronic device provided to the employee by this agency or a program that monitors this agency's network, the employer/this agency is not liable for the information but may not use the information to gain access to the employee's social media account.

G. Nothing in this policy prohibits the agency from viewing information about a current or prospective employee that is publicly available on the Internet.

H. Administrative Investigations: Employees who are subject to administrative investigations may be ordered to provide the department with access to their social networking account and site when the subject of the investigation is directly, narrowly, and specifically related to the employee's performance or ability to perform his or her function within the department or when the subject of the investigation is potentially adverse to the operation, morale, or efficiency of the department.

I. Nothing in this policy shall prevent an employee from communicating with an elected official about their employment unless the matter is exempt from disclosure under the Arkansas Freedom of Information Act.

J. A public employer shall not be prohibited from disciplining a public employee who has intentionally made an untrue allegation to an elected public official concerning a matter related to the public employee's job.

K. City of Jonesboro Employee Handbook, Section I-Employment Policies, Social Media 1-22;
*14. City Employees are to refrain from posting on social personal networking sites or media, photographs of City personnel wearing City distinguishable uniforms, logos, shields, badges, weapons, or writings that readily identify one as an employee of the City. City personnel are permitted to "share" or link to postings by the City on their personal networking sites or media. Otherwise when representing the City in an official capacity, City personnel may request that the Communications department post on the official City website and/or social media, photographs of the City personnel wearing City distinguished uniforms, logos, shields, badges, weapons, or writings that readily identify one as an employee of the City.*
Employees of this department will adhere to the City of Jonesboro Social Media Policy. Refer to the City of Jonesboro Employee Handbook referencing the Social Media Policy in its entirety.

The City of JONESBORO POLICE DEPARTMENT

**304.06 Code of Conduct**

Effective: 9/1/2020 | Reviewed: 8/18/2020 | Authority: RE
ALEAP: 1.08, 2.12, 2.13, 2.14, 2.15, 2.16, 2.17, 2.18, 2.19, 2.20, 2.21

I. Purpose and Policy

A. It is the policy of this Department to maintain the highest standard of integrity by working diligently to maintain the community's trust. All Departmental employees must recognize that they are held to a higher standard than the private citizen they protect, in addition to representing the Department, they also represent the law enforcement profession. Conduct, on and off duty, must be beyond reproach and meet the highest degree of professionalism and personal accountability. Employees of the Police Department are to respect the rights of individuals and not engage in or tolerate discrimination, oppression or favoritism. Department employees must avoid any conduct that might compromise the integrity, morale, operations or efficiency of the Department. Violation of Federal, State and Local laws, as well as City or Department Policy may result in disciplinary action up to and including termination. [2.17]

II. Scope

A. The provisions of the Code of Conduct are to be observed by all employees of the Department in order to maintain the confidence, respect, and support of the public.
B. It is the duty of all employees to provide the Department with specific notice whenever they are involved in or aware of any acts of misconduct. In the event of intimidation, or fear of intimidation, the reporting employee may report directly to the Chief of Police, to any supervisor, to the City Attorney or to the City Human Resource Department.
C. The Chief of Police without cause may terminate employees of the Police Department who are in provisionary status from employment. All employees should execute their duties in a professional and competent manner and should meet and maintain reasonable measures of job performance. Repeated incidents of carelessness or a pattern of errors, neglect, and/or inattentiveness to job performance is considered incompetence. Employees will be subject to disciplinary action if they fail to meet the minimum standards of performance or when they violate a law or regulatory decree announced in this Code.
D. All employees should understand that the policies of this Department are not intended to create any contractual or other legal rights. It does not alter the Department or City's at-will employment policy nor does it create an employment contract for any period.
E. It shall be the responsibility of every employee to know and adhere to federal, state and local law and the policies and directives of this Department. Violation of Federal, State and Local laws, as well as City or Department Policy may result in disciplinary action up to and including termination, as outlined in policy 317. Additionally, attempting or conspiring to complete any such violation will also result in disciplinary action. Training on all policies will be mandatory. Employees will receive training at the time of their initial employment, as well as notice and or training, as appropriate, when policies are changed or updated. [2.12]

III. Responsibilities

A. For protecting life and property, officers are always considered on duty while in the City of Jonesboro and are prepared to act anytime circumstances indicate their services are required.
B. Officers respond immediately to all calls for police service from citizens or other members. Emergency calls take precedence; however, all calls are answered as soon as possible consistent with established policies and traffic laws. Except under the most extraordinary circumstances or when otherwise directed by competent authority, no officer fails to answer any call for service. Within the City of Jonesboro officers take appropriate action to:
   1. Protect life and property.
   2. Preserve the peace.
   3. Prevent crime.
   4. Detect and arrest violators of the law.
   5. Enforce all federal, state, and local laws and ordinances coming within Departmental jurisdiction, although this is not to be construed to include enforcement of laws of a Class C misdemeanor nature or traffic enforcement when out of uniform and not on duty.
C. Authority and Accountability
   1. The ranking on-duty supervisor at the scene of any police incident is in charge and responsible for the proper conclusion of that incident. In the absence of a supervisor, the senior officer on scene will assume that responsibility until the incident is under control and/or sufficient instructions have been issued to result in the proper conclusion of that incident.
   2. The administrative delegation of the enforcement of certain laws and ordinances to particular units of the Department does not relieve officers of other units from the responsibility of taking prompt, effective police action either within or without the scope of their normally assigned duties when the occasion so requires.
D. Officers are required to take appropriate action to aid a fellow peace officer exposed to danger or in a situation where danger might be impending.
E. Employees remain alert, observant, and occupied with Departmental business during their tour of duty. When on duty, employees devote their entire time and attention to the business of the Department. An employee should notify a supervisor when taking any medication, which they believe, would impair their performance. Employees are prohibited from engaging in the following activities while on duty: ]
   1. Sleeping, loafing, or idling.
   2. Recreational reading, except at meals.
   3. Utilizing any article, which distracts from the proper performance of their duty.
   4. Any sexual conduct.
   5. Gambling (including the purchase of lottery tickets), except in performance of a police duty, and then only with the specific consent of a command rank officer, and never in uniform.
   6. Any conduct that is considered a violation of other sections of this policy or other city or Departmental policies.
F. Employees promptly submit all reports and evidence
   1. All reports, records, citations, or other materials, which are required by the performance of duties must be submitted by the end of the shift. If such cannot be submitted, notice must be made to a supervisor giving the reason.
   2. All records are to be kept within normal working areas. Taking, withholding or hiding records or paperwork in a manner that makes it unavailable for inspection is a violation of this policy.

3. All property found, confiscated by, or relinquished to members of the Jonesboro Police Department must be delivered to the official Departmental custodian without undue delay and, in any event, before their tour of duty ended.
4. Evidence must be secure in its officially designated place for preservation and storage.

IV. Appearance, Uniform and Equipment [2.13]

A. Societal interest demands highly trained personnel who demonstrate disciplined conduct and strict adherence to regulation and authorized detail. In order to best present a somewhat neutral image and effectively relate to all segments of the population they serve, employees shall comply with the uniform and appearance standards prescribed by the Chief of Police.

B. Uniforms Styles
1. Formal Class A- Navy blue department issued uniform worn with neck tie, long sleeves and/or dress jacket
2. Class A- Navy blue department issued, daily uniform. May be short or long sleeved.
3. Class B- BDU style uniform
4. Head Gear- A black baseball cap, black toboggan, or black headband (fleece or knit) worn plain only or with "POLICE," JPD authorized patch or lettering.

C. Uniform Presentation
1. Uniforms, boots, shoes, external vest carriers, and gear worn are to be kept neat, clean, in good repair, and well pressed at all times. While wearing the uniform, all employees will maintain a professional bearing.
2. When an employee is in uniform, the complete uniform, including ballistic vest, must be worn at all times in the prescribed manner. The cap is optional for all employees during inclement weather. The ballistic vests are optional for command staff. Uniform items are those furnished by or authorized by the Department. No part of the uniform is worn with civilian clothing or vice-versa.

D. Civilian Clothing
1. The police officer normally wears a uniform on a tour of duty. However, commanding officers may prescribe other clothing to be worn as required by the nature of duty to which the particular officer is assigned.
2. Normally, officers and employees who are required to wear civilian clothing do so in a manner that is complimentary to the individual and generally acceptable in the business community. Commanding officers may require other clothing or uniform depending upon the employee's job assignment.

E. Badges
1. The Department will issue badges worn in the performance of official duties. Personally owned badges of the same size and type may also be worn. Other badges may only be utilized with specific permission of the Chief of Police.
2. Suspended employees must immediately surrender their badges and identification card to the commanding officer notifying the offender of suspension.

F. Maintaining a 'neutral image' may encompass any number of general appearance issues as determined by the Chief of Police. Certain visible tattoos, unusual visible piercings and hairstyles or hair colors that would be considered 'shocking' to the general public will not be permitted.
1. Tattoos on the arms and legs will be permitted to be visible as long as they are not inappropriate or offensive in any manner. All unauthorized tattoos will be required to be covered by a uniform long sleeve shirt or a Department approved tattoo cover sleeve. Visible

neck, head, and face tattoos, body art, and branding are prohibited. Tattoos on the hands and fingers are also prohibited with the exception of a tattoo (ring design and size) on the left ring finger intended to symbolically replace the wedding band.

2. Facial hair: Mustaches must be neatly trimmed and will not extend any further than one half of an inch below or beyond the corners of the mouth. "Handle bar" mustaches are not permitted. Beards and goatees may be worn under the following guidelines:
   The length will not exceed one-half inch. All facial hair will be kept neatly trimmed with a shaved, defined neckline which is at least one inch above the collar. (Reporting for duty with neck stubble will be considered a violation of this policy.) Side burns that are neatly trimmed and extend no further than the bottom of the ear opening and are no more than 1 inch wide are permitted. Beards considered patchy or sparse will not be permitted. Any special design cuts beyond traditional beard styles must be approved by the Chief of Police.
3. The Chief of Police reserves the right to order the removal of facial hair if it does not conform to a neutral image.
4. Officers serving with a Department tactical or SWAT unit should limit facial hair in a manner that does not interfere with the proper seal of a gas mask or any similar equipment.
5. Hair length for females in uniform must not interfere with assigned duties. Hair for males in uniform must be above the collar, trimmed around the ears and extend no more than two inches outward from the head when styled. Hair coloring is permitted as long as it falls in the natural reoccurring hair color spectrum. Dyed haired out of the natural hair colors will not be permitted. Some examples of not permitted colors are blues, purples, green, orange, and bright red colors.
6. The Chief or Assistant Chief may grant exceptions to this policy.

V. Professional Conduct and Personal Bearing

A. Dereliction of duty

Dereliction of duty on the part of any employee detrimental to the proper performance of the functions of the Department is cause for disciplinary action. The offender will be punished according to the degree of severity of the violation, the results brought about by the dereliction, and the effect it has upon the discipline, good order, and best interest of the Department. The following subsections constitute dereliction of duty:

1. Failure of a supervisor to immediately take action when a violation of the policies, rules, or regulations comes to their attention, regardless of the supervisor's or violator's assignment or rank within the Department.
2. Failure of an employee to obey lawful orders.
3. Failure to observe and give effect to the rules, regulations, policies, or other directives issued by proper authority of the City or the Department.
4. Failure to deliver secure and submit all property and reports.
5. Failure to give name and badge number to any person upon request as required in the Ark Rules of Criminal Procedure 3.1.
6. To be under the influence of alcohol or drugs while on duty.
7. Sworn members who show cowardice or failure to perform police duties because of danger.
8. To malinger or feign incapacitation to avoid duty or work.
9. To engage in any strike, work stoppage, slow down, or in any way refuse to fulfill their responsibilities.

B. Duty to Obey Orders [1.08]
1. Failure to obey any lawful order addressed to them by a supervisor, including any order relayed from a superior by an employee of the same or lesser rank. Failure or deliberate refusal to obey a lawful order shall be considered insubordination.
2. Lying to a supervisor including willful omissions or misstatements.
3. Members, who are given an order that they feel to be unjust or contrary to Department or City policy, must first obey the order to the best of their ability. Then, at their first opportunity, they shall report the facts of the incident and the action taken through their chain of command. Obedience to an unlawful order is never a defense for an unlawful action; therefore, no member of the Department is required to obey any order that is contrary to federal or state law or local ordinance. Responsibility for refusal to obey rests with the member, who shall be required to justify his refusal.
4. In the event that an employee receives an order conflicting with previous commands, rules, policies or directives, the employee shall respectfully call the conflicting order to the attention of the superior officer giving the order. Should the superior officer not change the order, it shall be obeyed. The employee, in this circumstance, shall not be held responsible for disobedience of the first order.

C. Duty to Respect Others and the Agency
1. Employees treat superiors, subordinates, and associates with respect. When on duty in the presence of other members or the public, supervisors are referred to by rank.
2. Respect for other employees should also include respect for their property, both personal property or assigned equipment. Employees are not to take possession of or utilize another employee's property (clothing, equipment, food, etc.) without that employee's consent.
3. Employees will not display unnecessary violence toward any person.
4. Employees will not disrespect a civilian supervisor, supervisory officer, commanding officer or subordinate.
5. Employees should respect others by avoiding the use of indecent, profane, or harsh language in the performance of official duties.
6. Employees do not publicly criticize or ridicule the Department, its policies, or other employees by talking, writing or expressing in a manner, which is defamatory, obscene and unlawful or tends to impair the operation of the Department by interfering with its efficiency, by interfering with the ability of supervisors to maintain discipline, or by a reckless disregard for the truth.
7. Unbecoming conduct - Employees must avoid conduct in the offices or buildings of the Department or in any public place or public forum, which might discredit themselves, the Department or the city or in any way hamper the morale, activities and goals of the Department.
8. While the urgency of a situation might preclude ordinary social amenities, lack of professionalism will not be tolerated. Employees shall strive to be courteous and civil to the public, as well as fellow employees; avoid harsh, violent, profane, or insolent language or demeanor and shall maintain objective attitudes regardless of provocation. Employees do not, at any time, ridicule, mock, deride, taunt, or belittle any person, nor do they willfully embarrass, humiliate, or shame any person nor do anything intentional that might invoke any person to violence.

D. Duty Concerning Gratuities, Gifts, Bribes, etc.
1. The soliciting of any fund, money, loan, fee, reward or gratuity from other than the legal institutions established for that purpose must receive prior approval from the Chief of Police.
2. Employees do not accept, either directly or indirectly, any reward, gift, gratuity, reward, fee, loan, discount rate, rebate or special consideration arising from or offered because of police

employment or any activity connected with such employment from the public or other employees that might reasonably tend to influence their discharge of official duties. Any such monies received without solicitation must be reported to the Department. [2.21]

3. To accept, agree to accept, or solicit a bribe, which may be defined as a gift, emolument, money, thing of value, testimonial, appointment, personal advantage, or the promise of solicitation of it for obtaining special privileges or personal gain.

E. No employee shall establish an inappropriate relationship with any complainant, suspect, witness, defendant, prisoner or other person involved in any police related activity while such a case is being investigated or prosecuted. [2.18]

F. Employees report any circumstances or event, which may affect the efficient operation of the Department or its members through their chain of command so long as it is reasonable.

VI. General Conduct

A. Time Allotted For Meals

1. Sworn personnel who work an eight (8) hour shift (i.e. 0700-1500) shall be allotted a maximum of two thirty (30) minute meal breaks, when time permits, per duty shift. Officers working a ten-hour shift (i.e. 1500-0100) shall be allotted a maximum of two forty (40) minute breaks, when times permits. If possible, breaks during the last hour of the shift should be avoided.
2. Officers may be recalled to duty from a break at any time a supervisory officer deems it necessary and will check out at a specific location for meals.
3. Civilian employees will be allotted time for breaks and meals in accordance with current employment law, currently, one fifteen minute break for every four hours worked and one hour for lunch.

B. Duty Hours and Reporting for Duty [2.16]

1. The Chief has the authority to regulate the working hours of all employees and may call the employee to duty regardless of the regular working hours assigned to that employee. No employee may be absent without leave. Absence without leave means that without proper authorization, the employee fails to report for duty at the time and place of duty or leaves a place of duty or assignment.
2. Unless otherwise directed, officers are to report to daily roll call at the time and place specified wearing the proper uniform and equipment. Careful attention is given to orders and instructions. It is the responsibility of each employee assigned to a shift, who cannot report for duty due to illness, to notify an on-duty supervisor or commanding officer at least one hour prior to his or her reporting time. Personnel working non-shift assignments (CID, DTF, etc.) must notify their supervisor within 30 minutes before the workday begins.
3. Nonexempt sworn or non-sworn personnel may be required to work extra hours in addition to their regular workday or workweek when an emergency exists. Personnel shortages can be considered an emergency. All time worked in excess of the standard workday or workweek will be paid in accordance with current overtime and/or compensatory time policies.

C. Officers obtain prior approval of their supervisor before initiating undercover investigations and all such approval is forwarded to the Chief of Police.

D. Intoxicants [2.19, 2.20]

1. Employees will not be under the influence of alcohol or drugs or to be a user of drugs when a physician or dentist does not prescribe such drugs or take drugs in a manner not prescribed by a physician or dentist

2. Employees will not bring or keep any intoxicating liquor or beverage into Department facilities, except in the furtherance of a job-related task. Such items must be promptly identified and stored according to policy.
3. Employees must not become intoxicated while on duty nor consume intoxicants while off-duty to the extent that evidence of such consumption is apparent when reporting for duty or to the extent their job performance is impaired. Officers in uniform, or operating Department vehicles, will not purchase or consume any form of intoxicants.
4. Officers on duty or in uniform do not enter private clubs or other similar establishments except to perform a police service or need.

E. No expenditure of money is made or liability incurred in the name of the City of Jonesboro or the Department unless authorized by the Chief of Police.

F. Because law enforcement is often a physically demanding occupation, the Jonesboro Police Department places the responsibility on its employees to maintain their good health and the level of physical fitness required to perform law enforcement duties. Employees of the Department are encouraged to maintain a healthy diet and exercise regularly.

G. Employees shall furnish the Department with his or her current telephone number and address within 24 hours if changed, in the form of a memo to their supervisor who shall forward the memo to the Administrative Secretary.

H. Use of Tobacco Products
1. Smoking is prohibited by state law in any city owned vehicle or building and the use of tobacco or tobacco related products while in any city building, city owned vehicle or at any time while in personal contact with the public is prohibited.
2. Tobacco use may occur only in areas designated as smoking areas or locations outside that are no closer than fifty (50) feet from the entrance to any public building or other enclosed area.
3. Public use of tobacco products detracts from the professional image of the individual and Department and such use of any tobacco products is strongly discouraged during duty hours. Examples of tobacco related products include, but are not limited to cigars, cigarettes, pipes, electronic smoking devices and all forms of chewing or smokeless tobacco and snuff.

VII. Public Activities

A. Employees in the Police Department shall not be permitted to take an active part in any political campaign for an elective position of the city if they are on active duty or while in uniform. The term 'active part' includes, but may not be limited to: making political speeches, passing out cards, or other political literature, writing letters, signing petitions, displaying campaign buttons or materials on their uniform, unit or office, having their photograph made with a candidate or campaign material while in uniform, actively and openly soliciting votes and making public remarks about candidates for such elective positions. [2.15]

B. Employees are not required to contribute to any political fund or render any political service to any persons or party whatsoever and no person shall be removed, reduced in classification or salary, or otherwise prejudiced by refusing to do so.

C. Employees do not become members of any organization, association, movement or group which advocates or approves of the commission of acts of force or violence to deny others their rights under the Constitution of the United States or which seeks to alter the form of the government of the United States by unconstitutional means.

D. Employees do not participate in any type of disruptive protest demonstration nor may they act as a spokesperson, representative, or agent for any group engaged in or planning to engage in any type of disruptive protest demonstration.

E. Except for official police duties, no employee of this Department associates with persons of immoral character, convicted felons, gamblers, or other persons who habitually commit violations of the law. This does not exclude an employee of this Department from associating with immediate members of their family if they fall within the aforementioned categories.

F. Employees do not permit their name or photograph to be used to endorse any product or service, which is in any way connected with or alludes to their employment as a law enforcement officer without the permission of the Chief of Police.

VIII. Civil, Criminal, Judicial, and Investigative Actions

A. The Department has jurisdiction in criminal cases only. Employees do not render aid or assistance in civil cases except to prevent an immediate breach of the peace or to quell a disturbance actually existing. This is not intended to prevent employees from assisting any citizen with available information concerning certain civil actions as related to law enforcement.

B. Officers do not investigate criminal cases or personally file criminal charges in a court of law against any person for a criminal offense committed against him or her or any member of his or her family except misdemeanors and then will do so according to the procedures set forth by the City Attorney. Other personnel will be assigned to investigate and file such charges as may be proper.

C. Truthfulness [2.14]

1. Employees are to remain truthful in all verbal and written communications and reports and do not willfully misrepresent any matter, sign any false statement or report, commit perjury, or give false testimony before any court, grand jury, board, commission, official hearing, or Departmental hearing.
2. Employees answer questions or render material and relevant statements to a competent authority in a Departmental personnel investigation when so directed.
3. Employees do not knowingly falsify any report, document, or record, or enter or cause to be entered any inaccurate, false, or improper information on records, documents, or reports of the Department or of any court or alter any record, document, or report. Employees do not remove, destroy, or cause the removal or destruction of any report, document, or record without authorization.

D. Court Matters

1. Employees are present and available to testify in any court or before any grand jury when officially notified to appear. In criminal cases outside Craighead County and in all civil cases, employees respond to legal subpoenas only.
2. Employees who, for a valid reason, are unable to answer an official summons or written notice to appear in court must be excused by that court or prosecutor prior to the time they are scheduled to appear. The employee shall notify their immediate supervisor of the reason for any absence from court as soon as the employee returns to work.
3. Any employee who is subpoenaed or volunteers to testify for the defense in any criminal or civil trial or hearing or against the City or Department in any hearing or trial must notify his or her supervisor, who will then notify Department administration, upon receipt of the subpoena. This does not apply to the employee that has been subpoenaed as a hostile witness nor when the employee has been subpoenaed in a motion to suppress by the defense. An employee, who becomes a plaintiff, defendant, or party to a civil action not addressed elsewhere in this code of conduct, must make notification to a supervisor of his or her involvement. The purpose of this notification is not to interfere, but to inform. In civil cases arising from duty related events, coordination of case prosecution or defense may be necessary.

4. Employees do not accept fees as a witness in criminal cases prosecuted in the state or municipal courts of Craighead County. Employees may accept witness fees in criminal cases prosecuted outside of Craighead County, civil cases or in federal court as prescribed by law.

E. Employees do not engage in any of the following conduct:

1. Interfering with the service of lawful process.
2. Interfering with the attendance or testimony of witnesses through coercion, bribery, or other means.
3. Attempting to have any District Court Notice to Appear, traffic citation or other process reduced, voided, or stricken from the calendar without the approval of their division supervisor.
4. Recommending a dismissal, reduction of charges or other disposition of a pending criminal case, which has been previously filed in any criminal court or before any grand jury except by approval of their division supervisor.
5. Taking any other action, which interferes with the efficiency or integrity of the administration of criminal justice.
6. Having knowledge of such interference and failing to inform a superior officer in writing.

F. Recommendation of Services

1. Employees do not suggest, recommend or advise of any person or company offering related services, such as an attorney, wrecker service or bail bond broker, to any person coming to their attention because of police business. This does not apply when a relative or personal acquaintance of the employee seeks such service.
2. Employees do not furnish bail or act as a principal or surety of any bail bond or bail bond application for any person charged with any type of criminal offense except members of their immediate family.

G. Confidential Information

1. No employee reveals any confidential information to anyone unless authorized to do so and then only to a person or persons authorized to receive such confidential information.
2. No employee makes known any information concerning the progress of an investigation, a known or reported law violation, a condition against which action is to be taken at a future time, or any proposed police operation to any person not authorized to receive it.
3. Employees do not communicate in any manner, either directly or indirectly, any information which may assist persons guilty of or accused of criminal or quasi-criminal act(s) to escape arrest or punishment or which may enable them to dispose of secret evidence or unlawful activity, money, merchandise, or other property unlawfully obtained.
4. While most police reports are subject to FOI, employees shall not release any official information, police report, police record, arrest report, prosecution report, criminal history file, mug shot picture, or other record or report to any person or agency which does not have a criminal justice function unless ordered by a lawful subpoena or approved by a supervisor.
5. No employee gives any lawyer, bondsman, or the agent of either, or any other unauthorized person information regarding prisoners in confinement, property in custody or records of the Department, except that which is public information.

A

I understand that this application is not intended to create my contractual or other legal rights. It does not alter the at-will employment status nor does it create any employment contract for any specific period of time.

I certify that I have not made any willful misrepresentations in this application, nor have I withheld information in my statements and answers. I am aware that this information given by me in my application will be investigated, with my full permission, and that any misrepresentations may cause my application to be rejected or my employment terminated.

I authorize any former employer to release, to the City of Bay, or its authorized representative, any and all employment records and other information it may have about my employment. I understand that the information will be used for the purpose of evaluating my application for employment with the City of Bay. A photocopy of this authorization shall be as valid as the original.

I understand that this application will be at the discretion of the department head concerned, subject to the approval of the (Chief Administrative Officer) and that this application is the property of the City of Bay and will become part of my file if I am accepted for employment.

I understand that all successful applicants will be required to meet Minimum Standards, and certified applicants will be required to work a six (6) month probation period, and non-certified applicants will be required to work a one (1) year probation period.

If selected for this position, I agree to work whatever shift assigned to me by the supervision.

I HAVE READ AND AGREE TO ANY AND ALL STATEMENTS ABOVE.

[signature]

SIGNATURE OF APPLICANT

PLEASE PRINT NAME Christopher Adam Shull

DATE OF BIRTH 01/28/1988

SOCIAL SECURITY # [redacted]

DRIVERS LICENSE # [redacted]

EXHIBIT

J

B

BAY POLICE DEPARTMENT
220 ELDER
BAY, AR 72411

**Waiver and release of all claims and of right to inspect employment background investigation**

NAME: Christopher-Adam Shull DOB 01/28/1988

SSN# [redacted] DL# [redacted]TE AR

I, Christopher Shull am applying for the position of police officer with the City of Bay. I understand that in order to gauge my fitness for this position, The Bay Police Department will conduct a thorough and complete background investigation. I therefore for and in consideration of my application for the position of police officer hereby specifically authorize the Bay Police Department to conduct a thorough and complete background investigation on me for the purpose of gauging my fitness for this position. I further do hereby waive, release and forever relinquish any and all claims and causes of action against the Bay Police Department, the City of Bay, and any and all of its officials and employees that might otherwise accrue to me as a result of any conduct relating to my background investigation. I further understand that in the event I suffer any injury of any kind as a result of this background investigation, I am herein forfeiting any and all right to bring legal action against or seek redress in the courts from the City of Bay, the Bay Police Department, or any of its officials or employees, even if such injury or harm occurs as a direct result of their negligence or any other failure on their part to satisfy any duty owed me.

Also for and in consideration of the Bay Police Department's consideration of my application for the position of police officer, I do hereby and specifically authorize, request, and direct any individual, including but not limited to my family, friends, neighbors (past or present), and acquaintances (past or present) my employers (past or present), my references, educational institutions of any kind, credit bureaus or consumer reporting agencies, doctors, medical institutions (medical records will not be checked unless an offer of employment is tendered), or any other person, institution, organization or governmental agency or instrumentality (local, state, federal, military, or foreign), wherever situated, to completely and thoroughly answer any and all questions concerning me posed by any official or employees of the City of Bay and to provide to the Bay Police Department or any of its officials or employees, any requested document, information, record or file concerning me. I do hereby waive, release, and forever relinquish any and all claims and cause of action against any such individual that may accrue to me as a result of the individual's cooperation with the conduct of the background investigation or release of information to the Bay Police Department or any of its officials or employees. I understand that in the event I suffer any injury6 of any kind as a result of the individual's cooperation with the conduct of the background investigation or release of information to the Bay Police Department, I am herein forfeiting any and all right to bring legal action against or seek redress in the courts from individual even if such injury or harm occurs as a direct result of the individual's negligence or actual malic or any other failure on the individual's part to satisfy any duty owed me.

Understanding that complete candor on the part of those from whom information is sought is ensured only by maintaining the confidentially of a complete background investigation, I do hereby waive, release and forever relinquish any right I might otherwise have pursuant to the Arkansas Freedom of Information Act, the Federal Freedom of Information Act, or any other present or future laws granting me a right to inspect the information and records collected as a part of this background investigation. If any portion of this release and\waiver is held to be invalid, the balance shall, notwithstanding, continue in full legal force and effect. My spouse, (if any), heirs, and legal representative, and any and all successors and assigns, are bound by the terms of this Waiver and Release of All Claims. Further, in consideration of my application for employment, I hereby waiveany and all statutory written notice for the release of disciplinary reports, letters of reprimand, or other disciplinary actions.

I further understand that the information gathered by the Bay Police Department will be kept confidential, will become the sole property of the Bay Police Department, and may not be released to anyone including myself, the applicant.

(See Reverse)

FORM F-3

# STATE OF ARKANSAS

# COMMISSION

# ON

# LAW ENFORCEMENT STANDARDS

# AND TRAINING

# PERSONAL HISTORY STATEMENT

# PERSONAL HISTORY STATEMENT

Law Enforcement Agency

Month Day Year

INSTRUCTIONS: Fill out this questionnaire completely and accurately. All statements in your questionnaire are Subject to verification. Incorrect statements may bar or remove you from employment. If space provided is Inadequate, add additional pages and identify information by item number. If a question does not apply to you, Indicate by writing N/A in the answer blank. Type or print legibly in ink all responses.

## PERSONAL

1. NAME Christopher Adam Shull [redacted]
   First Middle Last Social Security Number

   Nicknames or Aliases

2. Height 70 inches Weight 185 lbs.
3. Present Mailing Address: 5008 Brac Pl. Jonesboro AR 72401
   Street and Number City State Zip Code

   Permanent Mailing Address: 5008 Brac Pl. Jonesboro AR 72404
   Street and Number City State Zip Code

   Telephone Number: Home: 870-520-9543 Business:
4. Date of Birth: 01/28/1988 Place of Birth: Martin, TN
5. Citizenship: ☒ U.S. Born ☐ U.S. Naturalized ☐ Other-Specify
6. List organizations, clubs and associations of which you are or have been a member, or with which you are or have been associated.

   SSPBA, FOP, NRA

7. List hobbies and/or special skills. working on vehicles, welding, competition shooting matches, running heavy equipment.

## MARITAL

8. Marital Status (check one) ☐ Single ☐ Married ☐ Divorced ☒ Engaged ☐ Separated ☐ Widowed
9. Names of Spouse or Fiancée Kim Murdie

10. If married, are you living with your spouse? [ ] Yes [ ] No

If not, state reasons:

11. Have your ever been separated or divorced? [ ] Yes [X] No. If Yes, give date and location of court or jurisdiction.

12. Give the following information concerning your spouse's parents:

| | NAME | ADDRESS |
|---|---|---|
| Father | N/A | |
| Mother | N/A | |

13. List below every child born to you.

| NAME | BIRTHDATE | PLACE OF BIRTH | WITH WHOM RESIDES |
|---|---|---|---|
| N/A | | | |
| | | | |
| | | | |

14. Are you now supporting all children born to you, adopted by you and stepchildren? [ ] Yes [ ] No

15. Have you ever been involved as defendant in a paternity proceeding? [ ] Yes [X] No
If yes, give date and court or jurisdiction:

**REFERENCES:**

16. Give the names of five responsible persons, other than relatives or past employers, who could provide information about your character, ability, experience, personality and other qualities:

| NAME | ADDRESS | TELEPHONE |
|---|---|---|
| Tommy Fitzgerald | 111 Summer Leigh Co. 72411 | 870-578-8786 |
| Maurice Kinnard | 320 Pintail Dr. Bay 72411 | 870-219-7983 |
| Douglas Robertson | 1590 Red Bell Rd. Newbern, TN 38059 | 731-589-5806 |
| Dakota Miller | 10683 Wilson Cemetary Rd. Melba, ID 83641 | 208-908-1360 |
| Jon Stover | 5399 Minnick Elbridge Rd. Obion, TN 38240 | 731-442-0364 |

**FAMILY HISTORY:**

17. List your parents, brothers and sisters:

| | NAME | ADDRESS | TELE-PHONE |
|---|---|---|---|
| Father | Dwight E. Shull | 2364 S. Bluff Rd. Obion, TN 38240 | 731-442-3708 |
| Mother | Phoebe M. Shull | 2364 S. Bluff Rd. Obion, TN 38240 | 731-442-1340 |
| Bro./Sis. | | | |
| Bro./Sis. | | | |
| Bro./Sis. | | | |

18. Has any member of your immediate family ever been arrested for or convicted of a felony offense?
[ ] Yes [X] No. If yes, complete the following:

| DATE | LOCATION | CHARGE | DISPOSITION |
|---|---|---|---|
| | | | |

**FINANCIAL:**

19. Do you have life insurance and/or hospitalization insurance? [X] Yes [ ] No

20. Have you a savings account? [X] Yes [ ] No

Bank: Region's City and State: Jonesboro, AR 72401

Bank: City and State:

21. Have you a checking account? [X] Yes [ ] No

Bank: Region's City and State: Jonesboro, AR 72401

Bank: City and State:

22. Do you own or have an interest in any type of business dealing in alcohol?

[ ] Yes [X] No. If yes, give name, location and type of business.

23. Do you own or are you buying your own home? [ ] Yes [X] No
Is there a mortgage on the property? [ ] Yes [X] No

Bank or Company: City and State:

24. Do you own or are you buying other real estate? [ ] Yes [X] No
If yes, give name of agency holding mortgage:

Bank or Company: City and State:

25. List motor vehicles that you own or are buying or leasing:

| MAKE | MODEL | YEAR | AMOUNT OWED |
|---|---|---|---|
| Chevrolet | Silverado | 2014 | 8,943.08 |
| | | | |
| | | | |

26. What income other than salary do you have at present? Include spouse's salary.

None/N/A

27. List Credit References:

| | | | |
|---|---|---|---|
| Name of Firm | Capital One | Amount Owed | $5,964.30 |
| Street Address | 1680 Capital One Dr. | City and State | McLean, VA 22102-3491 |
| Name of Firm | Synchrony Bank | Amount Owed | $3,228.84 |
| Street Address | 777 Long Ridge Rd. | City and State | Stamford, CT 06902 |
| Name of Firm | Region's Bank | Amount Owed | $9,557.69 |
| Street Address | 1900 Fifth Avenue N. | City and State | Birmingham, AL 35203 |
| Name of Firm | Citi Bank/Home Depot | Amount Owed | $4,510.42 |
| Street Address | 388 Greenwich St. | City and State | New York, NY 10013 |
| Name of Firm | | Amount Owed | |
| Street Address | | City and State | |
| Name of Firm | | Amount Owed | |
| Street Address | | City and State | |
| Name of Firm | | Amount Owed | |
| Street Address | | City and State | |
| Name of Firm | | Amount Owed | |
| Street Address | | City and State | |
| Name of Firm | | Amount Owed | |
| Street Address | | City and State | |

28. What is your total indebtedness at present? $32,204.33

29. Have your creditors treated you fairly? Yes . If not, explain:

30. Have you ever been sued? [ ] Yes [X] No. If yes, give details:

**RESIDENCES:**

31. List Addresses for past 10 years starting with present address at top:

| FROM MO. YR. | TO MO. YR. | ADDRESS/RESIDENCE | CITY & STATE | LANDLORD |
|---|---|---|---|---|
| 12/2017 | PRESENT | 5008 Brac Pl. | Jonesboro, AR | Fiance' |
| 07/2016 | 12/2017 | 200 W. Poplar St. | Tiptonville, TN 38079 | Parents |
| 08/2012 | 07/2016 | 5700 Hwy. 22 | Samburg, TN | Lucas Hamilton |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**WORK HISTORY:**

32. Are you now or have you ever been engaged in any business as an owner, partner, or corporate board member?

[X] Yes [ ] No. If yes, give details below:

Shull Security Services, LLC

33. If you have ever been discharged or forced to resign because of misconduct or unsatisfactory service, give details:

Terminated from JPD for social media policy violation, and code of conduct policy violation.

34. Have your employers always treated you fairly? [X] Yes [ ] No. If no, explain:

35. Do you object to wearing a uniform? ☐ Yes ☒ No

36. Do you object to working nights? ☐ Yes ☒ No

37. Do you object to working shifts? ☐ Yes ☒ No

38. List all jobs you have held in the last ten years. Put your present or most recent job first. If you need more space, you may attach additional sheets. Include military service in proper time sequence and temporary part-time jobs.

A. Title of present or last position: Patrolman  Starting Salary: $34,500  Last Salary: $39,500

| | | | |
|---|---|---|---|
| Date Employed: | 01/01/18 | | |
| Date Separated: | 05/20/22 | | |
| Full-time | Yrs. 4 | Mos. 5 | |
| Part-time | Yrs. | Mos. | |
| If Part-time, # of hours worked per week: | | | |

Name and title of supervisor: Josh Beasley
No. employees supervised by you: N/A
Employer Address: 100 S. Caraway Rd. Jonesboro, AR 72401
Duties: Patrol Assigned area and enforce state and local laws and ordinances. Arrest/cite violators.
Reason for leaving: Terminated for policy violations.

B. Title of next to last position: Jailer/Corrections Officer  Starting Salary: $15.00/hr.  Last Salary: $17.00/hr.

| | | | |
|---|---|---|---|
| Date Employed: | 06/16 | | |
| Date Separated: | 12/24/17 | | |
| Full-time | Yrs. 1 | Mos. 6 | |
| Part-time | Yrs. | Mos. | |
| If Part-time, # of hours worked Per week: | | | |

Name and title of supervisor: Alan Bargery
No. employees supervised by you: N/A
Employer Address: 401 E. Cedar St. Dyersburg, TN 38024
Duties: Supervise inmates and maintain facility security.
Reason for leaving: Resigned for job at JPD.

C. Title of next position: Welder/Assembler  Starting Salary: 10.00/hr.  Last Salary: $21.00/hr.

| | | | |
|---|---|---|---|
| Date Employed: | 02/2012 | | |
| Date Separated: | 12/2015 | | |
| Full-time | Yrs. 3 | Mos. 10 | |
| Part-time | Yrs. | Mos. | |
| If Part-time, # of hours worked Per week: | | | |

Name and title of supervisor: Shane Stover/Roger Cravens
No. employees supervised by you: N/A
Employer Address: 1625 Sylvan Rd. Dyersburg, TN 38024
Duties: Weld and assemble 3phase distribution transformer
Reason for leaving: Terminated with no reason given.

D. Title of next position | Starting Salary | Last Salary

| Date Employed: | | Name and title of supervisor | |
|---|---|---|---|
| Date Separated: | | No. employees supervised by you: | |
| Full-time Yrs. | Mos | Employer Address Duties | |
| Part-time Yrs. | Mos | | |
| If Part-time, # of hours worked Per week: | | Reason for leaving: | |

39. Have you previously submitted an application for employment with this agency? ☐ Yes ☒ No
Approximate date:

## MILITARY SERVICE

40. Were you ever in the U.S. Military Service or any other military organization? ☐ Yes ☒ No

Branch of Service | Unit | Date of Enlistment

Date of Discharge | Service Number | Highest Rank

41. List medals and decorations:

42. Type of Discharge:

43. If you are presently a member of the National Guard or any military reserve, give the unit, location, and describe your obligation:

44. List all schools attended:

| Name of School | Location (City and State | From Mo. & Yr. | To Mo. & Yr. | Year Completed |
|---|---|---|---|---|
| Grade | | | | |
| Margaret Newton | Tiptonville, TN | 08/1993 | 05/2001 | 2001 |
| High School | | | | |
| Lake County High | Tiptonville, TN | ~~200~~ 08/2002 | 05/2006 | 2006 |
| College or University | | | | |
| Nashville Auto/Diesel | Nashville, TN | 08/2006 | 10/2007 | 1 year 2 mos. |

45. Did you either graduate from high school or pass the high school equivalency test? ☒ Yes ☐ No

46. List college degrees received and major field of each. Include incomplete courses: N/A

47. Were you ever expelled from any school or were you ever disciplined by any school official?
[X] Yes [ ] No. If yes, explain: In junior high for fighting with another student that was bullying me. ~~In high school~~ Was not expelled but received two days suspension. In high school saturday school for incomplete assignments.

## ARREST AND MILITARY DISCIPLINARY

Answer all of the following questions completely and accurately. Any falsifications or misstatements of fact may be Sufficient to disqualify you. (Exclude minor traffic violations.)

48. Have you ever been arrested or detained by police? [ ] Yes [X] No. If yes, give details below:
Crime Charged [ ] Police Agency [ ]
Date [ ] Disposition of Case [ ]

Crime Charged [ ] Police Agency [ ]
Date [ ] Disposition of Case [ ]

49. Have you ever been placed on probation? [ ] Yes [X] No. If yes, give details below: [ ]

50. Have you ever been required to pay a fine in excess of $25.00? [X] Yes [ ] No. If yes, give details below:
Defective tail lights. Approx. November 2007.
Fall/Winter of 2011 for failure to tag game animal (deer) properly.

51. Have you ever been reported as a missing person or as a runaway? [ ] Yes [X] No. If yes, give complete details, including jurisdiction, dates, and outcome: [ ]

52. Were you ever court-martialed, tried on charges, or were you the subject of a summary court, deck court, captain's Mast or company punishment, or any other disciplinary action while a member of the armed forces?
[ ] Yes [X] No. If yes, explain below: [ ]

53. List any disciplinary action taken against you in the National Guard or other reserve unit: N/A

54. If you have ever been fingerprinted by a police agency other than for an arrest, give details below. Your answers will be checked with the FBI and other agencies.

Agency JPD Date 01/01/18 Purpose Employment

Agency ATF Date Can't remember Purpose NFA item purchase (Supp

Agency ATF Date can't remember Purpose SBR purchase

55. Can you operate a motor vehicle? [X] Yes [ ] No

56. Do you possess a valid operator's license from the State of Arkansas? [X] Yes [ ] No
Operator's License Number 940709266 Date Issued 01/03/18

57. Do you possess an operator's license issued by any state other than Arkansas? [ ] Yes [X] No
If yes, give state and number.

58. Was your license ever suspended or revoked? [ ] Yes [X] No. If yes, state which and give reasons:

59. Was your license ever restored. [ ] Yes [X] No. When?

60. Have you ever been refused an operator's license by any state? [ ] Yes [X] No.

61. Have your driving privileges ever been restricted? [ ] Yes [X] No. If yes, give details:

62. Has a motor vehicle being driven by you ever been involved in an accident? [X] Yes [ ] No.
If yes, give complete details for each accident whether collision or non-collision:

Date: 01/2018 Police Investigation? [X] Yes [ ] No
Location: S. Caraway Rd. Jonesboro Cause of Accident Rear ended a slowing vehicle when approaching an intersection when trying to change lanes.

Date: 01/15/20 Police Investigation? [X] Yes [ ] No
Location: Arrowhead Farm Rd. Jonesboro Cause of Accident Ran off shoulder of road and struck concrete and rock mailbox wall structure.

63. List any convictions for minor traffic violations:

| LOCATION | APPROX. DATE | NATURE OF VIOLATION | PENALTY OR DISPOSITION |
|---|---|---|---|
| Trenton, TN | 11/2007 | Defective tail lights | paid fine and fixed tail lights |
| | | | |
| | | | |
| | | | |
| | | | |

## ATTITUDES

64. What do you consider to be the current social problems of greatest concern?

Political and false racial divide in the country. The news media only providing small bits and pieces of an incident further push an agenda.

65. What are your experiences and beliefs concerning the use of alcoholic beverages?

I do not have an issue with consumption in moderation so long as the person does not drink to excess or drive after consuming alcohol.

66. What are your experiences and beliefs concerning the use of marijuana and/or other mind-altering drugs?

I do not believe marijuana or other mind altering drugs should be legalized for recreational use.

67. What are your feelings about the use of deadly force if it became necessary in the performance of official duties?

I hope to never have to use deadly force but if the need arises to protect my life or the lives of other officers or citizens I will not hesitate to do so.

## CAREER OBJECTIVES

68. Explain briefly your reasons for applying for this position: To further continue my career as a law enforcement officer and assist victims of crime in obtaining justice.

I hereby certify that all statements made in this questionnaire are true and complete and understand that any misstatements of material facts will subject me to disqualification or dismissal.

[signature]
Signature in Full

SWORN AND SUBSCRIBED BEFORE ME

[signature]
NOTARY PUBLIC, THIS 19 DAY

OF December, 20 22

MY COMMISSION EXPIRES 8-10-2032

NOTICE – False swearing is a Class A misdemeanor. Punishable under Arkansas Code 5-53-103.

MORSHAYDRICK RACY
NOTARY PUBLIC - STATE OF ARKANSAS
CRAIGHEAD COUNTY
MY COMMISSION EXPIRES 08-10-2032
COMMISSION # 12720349

FORM F-1

# COMMISSION ON LAW ENFORCEMENT STANDARDS AND TRAINING
## INITIAL EMPLOYMENT REPORT

1. Check One:
Full Time Officer ☐
Part Time Officer ☐
Auxiliary Officer ☐
Specialized Officer ☐
Type:

(To be completed and submitted to the Commission within ten (10) days after officer is employed.)

| | | | | |
|---|---|---|---|---|
| 2. Social Security No. [redacted] | 3. Last Name Shull | 4. First Name Christopher | 5. Middle Name Adam | Email cshull@cityofbay.org |
| 6. Date of Birth 01/28/1988 | 7. Place of Birth – City Martin; County Weakley; State Tennessee | | 8. Drivers License Number: [redacted] | 9. Title of Position Patrolman |
| 10. Type of Agency: State ☐ County ☐ Municipal ☑ | 11. Name of Agency Bay Police Department | | 12. Agency Address 220 Elders St. | |
| | 13. Agency City & ZIP Code Bay 72411 | | 14. County of: Craighead | 15. Contact Phone Number (870) 781-3221 |
| 16. Date of Hire 01/11/2023 | 17. Ethnic Group (Check appropriate box): Black ☐ Asian ☐ American Indian ☐ Caucasian ☑ Spanish Surnamed ☐ Other ☐ | | | |
| 18. Sex (Check One): Male ☑ Female ☐ | 19. General Education (Check One): High School ☑ GED ☐ Less than High School ☐ | | 20. College Hours (Attach original transcript or notarized copy of original transcript) 65.50 | |
| 21. College Major Automotive and Diesel Tech | 22. College Degree (Check degree held and attach notarized copy of degree): Associate ☐ Baccalaureate ☐ Masters ☐ Doctorate ☐ | | | |
| 23. Name of College from which Degree received or last attended (if no Degree) Nashville Lincoln College of Technology | | | | |
| 24. Date Degree received or last attended 11/13/2007 | | 25. Total years of prior Law Enforcement Experience 4.0 (List prior Law Enforcement Experience below) | | |
| 26. Department Name Jonesboro Police Department | 27. From (Date) 01/01/2018 | 28. To (Date) 05/20/2022 | | |
| 29. Department Name | 30. From (Date) | 31. To (Date) | | |
| 32. Has the officer attended a Basic Police Training Course? Yes ☑ No ☐ If yes: Date Completed: 04/13/2018 Location of Training: | | | | |
| 33. Highest Law Enforcement Certification held by Officer (Specify Type): Basic ☑ General ☐ Intermediate ☐ Advanced ☐ Senior ☐ PT I ☐ PT II ☐ Aux ☐ Spec. ☐ | | | | |

Revised 12-16

EXHIBIT
K

FORM F-1

34. Has the Officer:
(This section must be completed on all law enforcement officers before employment date.)

| | Yes | No |
|---|---|---|
| a. Verified being a citizen of the United States? | ☑ | ☐ |
| b. Verified of being at least twenty-one (21) years of age? | ☑ | ☐ |
| c. Been fingerprinted and prints submitted to the ASP and FBI for Criminal Records check? | ☑ | ☐ |
| d. Been checked and found not to have entered a plea of guilty or been convicted of a felony at anytime. (Pardoned or otherwise) | ☑ | ☐ |
| e. Been investigated as to background? | ☑ | ☐ |
| f. Examined by a physician and psychiatrist or licensed psychologist under Regulation 1002 (2)(g) and (i)? | ☑ | ☐ |
| g. High School graduate or GED? | ☑ | ☐ |
| h. Been interviewed by personnel of this department and found to be suitable for appointment as a law enforcement officer? | ☑ | ☐ |
| i. A valid driver's license? | ☑ | ☐ |

**DEPARTMENT INTERVIEW**

35. Did the Interview Board recommend employment or appointment? (Yes ☑ ) (No ☐ )

Date Conducted 01/03/2023

Board made up of Chief Keith Milam
(Department Head)

Others Asst. Chief TJ Burns, Sgt. Eddie Weems

36. Will applicant begin basic training prior to being armed? (Yes ☐ ) (No ☑ )

If Yes, date and location of training:: ______

If No, answer the following:
37. Has the applicant reviewed department policies? (Yes ☑ ) (No ☐ )

38. Has the applicant completed the CLEST Firearms Qualification prior to being armed? (Yes ☑ ) (No ☐ )

**I hereby attest that to the best of my knowledge the information on this form is true and correct.**

| [signature] | Patrolman | 01/19/2023 |
|---|---|---|
| Signature of Employee | Rank | Date |
| [signature] | Chief | 01/19/2023 |
| Signature of Department Administrator or Designate (NO STAMP) | Rank | Date |

**SWORN AND SUBSCRIBED BEFORE ME**

[signature]

NOTARY PUBLIC, this 19th day

Of January, 2023

My Commission expires 7-3-23.

Revised 12-16

**NOTICE** – False swearing is a Class A misdemeanor.

**Agency Heads should be aware of 12-9-602 of the Arkansas Code which, in part states: Before employing or appointing a law enforcement officer, a subsequent employing agency must contact the commission to inquire as to the facts and reasons a law enforcement officer became separated from any previous employing agency.**

HOLLY COLBERT
Notary Public-Arkansas
Craighead County
My Commission Expires 07-03-2023
Commission # 12394444

# Bay Police Department

220 Elder Street Bay, AR 72411

Phone: (870)781-3221 Fax: (870)781-3553

Chief Keith Milam

January 5, 2023

Re: Christopher A. Shull

Christopher Shull has applied for a full-time position as Patrolman with the Bay Police Department. I completed a background check and found nothing in Christopher's personal history, family life, and previous employers that would reflect any negativity toward him being hired as a full-time patrolman with this department. Christopher has previously worked for the Jonesboro Police Department, to which his supervisors spoke highly of Christophers knowledge and abilities in law enforcement. Christopher Currently holds a basic certificate in law enforcement, and the drive to obtain higher certifications. He will be a great asset to this department.

Chief Keith Milam

Bay Police Department

EXHIBIT

L